1

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**PADUCAH DIVISION**
**CASE NO. 5:22-CV-00154-BJB**

Daquavian McKnight                                        Plaintiff

v.

Officer Alexander Cortez, individually;
Officer Zachary Lamblin, individually;
Chief Clayton Sumner, individually; and
The City Of Hopkinsville, Kentucky            Defendants

_____

Deponent:  **Daquavian McKnight**

Date:  August 14, 2023

_____

   The following noticed deposition was taken at 100 South Fourth Street pursuant to the applicable Rules of Civil Procedure for all purposes allowed.

_____

***BLUEGRASS REPORTING***
Agency, LLC
providing services throughout western Kentucky

* * * * * * * * * * * * * * * * * * * *

120 Spring Valley Drive, Paducah, Kentucky 42003
phone number:  270-925-1989
e-mail address:  bluegrassreporting@gmail.com

2

1                    A P P E A R A N C E S

2

3        For Plaintiff:

4        D. Wes Sullenger, Esq.
         Sullenger Law Office, PLLC
5        2508 Jackson Street
         Paducah, Kentucky 42003
6

7
         For Defendants:
8
         James A. Sigler, Esq.
9        Keuler, Kelly, Hutchins, Blankenship & Sigler, LLP
         100 South Fourth Street, Suite 400
10       Paducah, Kentucky 42001

11

12

13

14

15

16                        I N D E X

17

18       Daquavian McKnight                    Examination

19       By Mr. Sigler:                        4

20
         CERTIFICATE OF REPORTER:   115
21

22

23

24

25

3

1                    E X H I B I T S

2

   Number              Description            Marked

3

4    Ex. 1              statement             p. 114

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DAQUAVIAN MCKNIGHT

4

1       The witness, **DAQUAVIAN MCKNIGHT**, after first having

2   been duly sworn, testified as follows:

3                           EXAMINATION

4   BY MR. SIGLER:

5       Q.   Sir, state your name, please.

6       A.   Daquavian McKnight.

7       Q.   Mr. McKnight, what is your current address?

8       A.   ████████████████████

9       Q.   Is that in Hopkinsville, Kentucky?

10      A.   Yes, sir.

11      Q.   All right.  Mr. McKnight, my name is Jim Sigler.

12           I represent Officer Cortez, Officer Lamblin,

13           former Chief Sumner and the City of Hopkinsville

14           in the lawsuit that you have filed that's pending

15           here in federal court in Paducah.

16               Have you ever given a deposition before?

17      A.   No, sir.

18      Q.   I'm sure counsel has given you guidance on this

19           but for the record today, let me outline a couple

20           of ground rules that will help me to accomplish

21           what I need to accomplish today and help you to

22           give the best answers you can give.

23               If you don't hear me, tell me that and I

24           will repeat the question for you.  Is that

25           acceptable?

5

1    A.    Yes, sir.

2    Q.    If you don't understand one of my questions, make

3          that clear to me.  And I will rephrase it or do

4          my best to make it understandable to you.  Is

5          that agreeable to you?

6    A.    Yes, sir.

7    Q.    If you don't hear me or understand me but you

8          don't say anything to that effect, then I'm going

9          to assume that you did hear me, that you

10         understood me and that you gave truthful

11         responses to the question.  Is that acceptable to

12         you?

13   A.    Yes, sir.

14   Q.    All right.  Are you feeling okay today physically

15         and mentally that you can give truthful and

16         accurate answers to the questions?

17   A.    Yes, sir.

18   Q.    Are you taking any prescribed medication that

19         would influence your ability to hear me and

20         understand me?

21   A.    No, sir.

22   Q.    Taking any substance of any type that would

23         impair your ability to hear me, understand me and

24         give truthful responses?

25   A.    No, sir.

**DAQUAVIAN MCKNIGHT**

6

1    Q.    Let me get a little bit of background information

2          on you.  First of all, were you born and raised

3          in Hopkinsville, Christian County?

4    A.    Yes, sir.

5    Q.    Ever lived outside of Christian County?

6    A.    No, sir.

7    Q.    And how old are you today?

8    A.    27 years old.

9    Q.    How tall are you?

10   A.    Five-seven.

11   Q.    And how much do you weigh?

12   A.    130.

13   Q.    And would your weight have been about the same on

14         the date of the incident of your arrest in August

15         of 2022?

16   A.    Yes, sir.

17   Q.    When I say arrest, obviously you were pulled over

18         and cited; you weren't arrested.  But you are

19         talking about the same day that you received a

20         citation for not wearing a seat belt and your

21         weight was the same at that time?

22   A.    Yes, sir.

23   Q.    All right.  Do you wear any type of corrective

24         lens like contacts; anything like that?

25   A.    No, sir.

**DAQUAVIAN MCKNIGHT**

7

1    Q.    Do you have any impairment to your ability to

2          hear or see?

3    A.    No, sir.

4    Q.    What is the highest grade that you completed in

5          school?

6    A.    Twelfth.

7    Q.    And where did you graduate high school?

8    A.    Christian County High School.

9    Q.    And what year was that?

10   A.    2014.

11   Q.    Any education beyond high school?

12   A.    I went to community for a semester.

13   Q.    Okay.  Hopkinsville Community College?

14   A.    Yes, sir.

15   Q.    Any certifications, diplomas, licenses, anything

16         like that, related to work or education?

17   A.    From high school or college?

18   Q.    Anywhere.  Did you get any certifications?

19   A.    In high school, I had my welding certification.

20   Q.    Okay.  Any others?

21   A.    No, sir.

22   Q.    And today, do you have a valid Kentucky driver's

23         license?

24   A.    Yes, sir.

25   Q.    And on the date of this incident, August 3, 2022,

8

1          did you have a valid Kentucky driver's license?

2    A.   Yes, sir.

3    Q.   To your knowledge, are there any restrictions on

4          your license; meaning that you cannot drive at a

5          certain time or you have to wear eye correct

6          lenses, things like that?

7    A.   No, sir.

8    Q.   So it is a totally unrestricted driver's license

9          as of August of 2022, as far as you recall?  Is

10          that correct?

11   A.   Yes.

12   Q.   All right.  Did you look at any documentation,

13          video, pleadings, anything like that, to prepare

14          for your deposition today?

15   A.   No, sir.

16   Q.   Have you looked at any of the either body cam

17          video of Officer Cortez, Officer Lamblin or the

18          dash cam of Officer Lamblin?

19   A.   Yes, sir.

20   Q.   Have you just reviewed that on one occasion?

21   A.   Yes, sir.

22   Q.   Do recall how long ago that was?

23   A.   No, sir.

24   Q.   Was it at or about the time the lawsuit was

25          filed?

9

1   A.   Right before.

2   Q.   Right before.  All right.  And it looks like the

3        lawsuit was filed in November of 2022.

4             So sometime toward the early part of 2022

5        is when you last looked at all of the video; is

6        that correct?

7   A.   Yes, sir.

8   Q.   Did you also look at Ms. Osborne's video that she

9        made?

10  A.   Yes, sir.

11  Q.   And would that have been at the same time,

12       roughly early November 2022?

13  A.   Before.

14  Q.   Before.  Was there just one video of this

15       interaction with the Hopkinsville Police

16       Department personnel related to this incident

17       that she had made?

18  A.   Yes, sir.

19  Q.   And we have been produced a copy of that.  Do you

20       know if that's the entirety of the video?

21  A.   Yes, sir.

22  Q.   All right.  It is as far as you know?

23  A.   Yes, sir.

24  Q.   All right.  And other than the police video and

25       Ms. Osborne's video, are you aware of any other

10

1          video of the events and circumstances of August

2          3, 2022?

3   A.   No, sir.

4   Q.   I'm going to go over a couple of things with you

5          that have been filed.

6               First of all, there is a pleading called

7          Plaintiff's Initial Disclosures.  It would have

8          been prepared by your attorney and filed with the

9          court and served upon me.  And it is one of the

10         things the federal rules require us to do as

11         parties to a lawsuit.

12            And among other things, it asks for you to

13         identify folks that would have relevant

14         information about your lawsuit.  And, of course,

15         you listed yourself.  And we will go over what

16         you know today.  And you listed Zakia, ZAKIA,

17         Osborne.

18           She was identified as your girlfriend at

19         the time.  Is she still your girlfriend today?

20   A.   No, sir.

21   Q.   I saw a reference in the conversations with the

22         police to the effect that you all have a child

23         together.  And that morning, I think you had

24         dropped the child off at day care somewhere in

25         Hopkinsville.  Is that right?

DAQUAVIAN MCKNIGHT

11

1    A.    Yes, sir.

2    Q.    At the time of the incident with the police,

3          August 3, 2022, she was your girlfriend.  She is

4          no longer your girlfriend, it sounds like.

5                Was there a particular reason you all

6          stopped dating or stopped your relationship?

7    A.    No, sir.

8    Q.    Just elected to mutually do that?

9    A.    Yes, sir.

10   Q.    All right.  And obviously she was with you the

11         morning of this incident, August 3, 2022.  And so

12         you listed her as having been present.

13               Has Ms. Osborne told you anything that she

14         observed or that she heard at the incident that

15         you were not aware had happened?

16   A.    No, sir.

17   Q.    Is she still living in Hopkinsville at this time?

18   A.    Yes, sir.

19   Q.    Do you know her address by any chance?

20   A.    Yes, sir.

21   Q.    What is her address?

22   A.    ██████████████████

23   Q.    If we need to obtain her deposition, do you have

24         the type of relationship with her that if you

25         connect her to your lawyer and he clears dates

12

1          with me and you and her, we can schedule her

2          deposition in Hopkinsville if we need to do that?

3     A.   Yes, sir.

4     Q.   And, otherwise, if we need to subpoena her, she

5          lives at the address you just gave us, right?

6     A.   Yes, sir.

7     Q.   And you mentioned in this pleading that I

8          referred to -- your lawyer identified two

9          different recordings of the incident.

10              Were those both just video that she filmed

11         at the scene of the encounter with the police

12         from what you recall?

13    A.   Can you repeat that question?

14    Q.   Yeah.  So this pleading says there were two

15         recordings.  And it may just be two different

16         video clips of the same incident.

17              What do you recall, were there two

18         recordings that she made at the scene or more

19         than two or just one?

20    A.   Just one.

21    Q.   Just one that you recall?

22    A.   Uh-huh.

23    Q.   Yeah.  Okay.  And we can talk to her about that.

24         But your recollection of those two videos or one

25         video, whichever one it is, is that it was the

13

1          same type of recording that you could -- that you

2          observed when you looked at the Hopkinsville

3          Police Department video cams, right?

4    A.    Uh-huh.

5    Q.    Yes?

6    A.    Yes, sir.

7    Q.    Yeah.  I didn't say this earlier, but anytime you

8          give an answer, be sure to say yes, no or I don't

9          know.  Otherwise, our reporter may want get that

10         down correctly.  Is that acceptable?

11   A.    Okay.  Yes, sir.

12   Q.    Okay.  Let's talk then about the incident of

13         August 3, 2022.

14               And I want to start 24 hours earlier.  If I

15         understand it correctly, that was a Monday.  Do

16         you recall it being a Monday, August 3, 2022?

17   A.    Yes, sir.

18   Q.    And so what had you been doing all day on Sunday,

19         August 2, 2022?

20   A.    Fishing.

21   Q.    All right.  Were you with anyone when you were

22         fishing?

23   A.    No, sir.

24   Q.    And where did you go fishing?

25   A.    Lake Barkley.

14

1    Q.   All right.  So just drove there yourself and
2         fished for the afternoon or whatever?
3    A.   Yes, sir.
4    Q.   Was that recreation or a hobby that you like to
5         do regularly?
6    A.   Yes, sir.
7    Q.   All right.  And then obviously you weren't
8         fishing Sunday night, were you?
9    A.   No, sir.
10   Q.   What were you doing Sunday night?
11   A.   At home.
12   Q.   Is that the same residence you identified for me
13        earlier when I asked you where you live?
14   A.   ███████
15   Q.   Yeah.
16   A.   No.  At that time, I was living with my
17        girlfriend.
18   Q.   Okay.  And was that the Glass Drive address you
19        gave for her?
20   A.   Yes, sir.
21   Q.   All right.  So during the day on Sunday, you went
22        to Lake Barkley and you were fishing by yourself.
23        And then you drove back to Hopkinsville; you went
24        to your girlfriend's residence.
25             And then were you living there at that

15

1        time?

2    A.    Yes, sir.

3    Q.    All right.  And then what did you do that evening

4        there if you recall?

5    A.    Nothing.  Once I got home, nothing.

6    Q.    Okay.

7    A.    Just normal.

8    Q.    If memory serves -- and we can check the video

9        here in a minute if we need to -- you had

10       mentioned, during the course of your interaction

11       with the police department on August 3, that you

12       had smoked marijuana the previous night.  Did I

13       understand that correctly?

14    A.    Yes, sir.

15    Q.    All right.  Would that have been with your

16       girlfriend at her residence?

17    A.    No.

18    Q.    All right.  Where were you when you did that?

19    A.    The lake.

20    Q.    At the lake.  All right.  Okay.  Had you used any

21       other drug in the 24-hour period prior to August

22       3, 2022?

23    A.    No, sir.

24    Q.    Or consumed any alcohol or any other substance in

25       the 24 hours prior to August 3, 2022?

**DAQUAVIAN MCKNIGHT**

16

1  A.  No, sir.

2  Q.  And then anything else, other than driving back

3      to Hopkinsville, being there with your girlfriend

4      -- I assume your child was there as well?

5  A.  Yes, sir.

6  Q.  Just the three of you in that residence that

7      night?

8  A.  Yes.

9  Q.  And then just to bed at regular time?

10  A.  Yes, sir.

11  Q.  And got up at what time?

12  A.  Around 7:30.

13  Q.  Okay.  Were you scheduled to work on that Monday?

14  A.  No, sir.

15  Q.  And did you have a job at that time?

16  A.  No, sir.

17  Q.  When had you last worked prior to August 3, 2022?

18  A.  June or -- May or June, somewhere around that

19      time.

20  Q.  Of 2022?

21  A.  Yes, sir.

22  Q.  And where were you employed at that time?

23  A.  The YMCA.

24  Q.  And what did you do there?

25  A.  Summer camp supervisor.

**DAQUAVIAN MCKNIGHT**

17

1   Q.   Okay.  Was that a seasonal job just for the

2        summer or would you have worked there full time

3        beyond the summer?

4   A.   It was a seasonal job.

5   Q.   And did you complete that work?

6   A.   Yes, sir.

7   Q.   So between, say, May, June of 2022 and August 3

8        of 2022, you had not worked at all?

9   A.   No, sir.

10  Q.   Was there a particular reason you had not worked

11       after the seasonal job ended with the YMCA?

12  A.   No, sir.

13  Q.   Other than taking your child to day care on the

14       morning of August 3, 2022, did you have anything

15       else you were scheduled to do that day?

16  A.   No, sir.

17  Q.   And if you had not been pulled over by the

18       Hopkinsville Police Department, was the plan to

19       drop off your child and then just go back home?

20  A.   Yes, sir.

21  Q.   What was the name of the day care?

22  A.   A Place To Grow.  Am I allowed to look it up to

23       get it 100 percent?

24            MR. SULLENGER:  No.  Just testify what you

25            recall.  If there is anything we need to

18

1    clarify afterwards, we can do that later.
2    THE WITNESS:  Okay.
3  Q.  You are pretty sure it was called A Place To
4    Grow?
5  A.  Yes, sir.
6  Q.  And it is in Hopkinsville?
7  A.  Yes, sir.
8  Q.  Does your child still go there now?
9  A.  No, sir.
10  Q.  How old was your child as of August of 2022?
11  A.  Two.
12  Q.  And a girl or boy?
13  A.  Boy.
14  Q.  And did your son go to day care every day --
15  A.  Yes, sir.
16  Q.  -- during the week?
17  A.  Yes, sir.
18  Q.  And was he there -- what times would he have been
19    there?
20  A.  Around 8:00 to 3:30.
21  Q.  Was your girlfriend working at the time?
22  A.  Yes, sir.
23  Q.  Where does she work?
24  A.  Big Lots.
25  Q.  Big Lots.  Would she have gone to work or

19

1          intended to go on to work on August 3 of 2022?

2     A.   No, sir.

3     Q.   She wasn't scheduled that day?

4     A.   No, sir.

5     Q.   So the two of you were just going to go back

6          home?

7     A.   Yes, sir.

8     Q.   Any plans for the day?

9     A.   No, sir.

10    Q.   Just be there all day until somebody needed to go

11         back and get your son at 3:30?

12    A.   Yes, sir.

13    Q.   All right.  So if I'm following you correctly,

14         basically you get up -- you and your girlfriend

15         get up, get your son ready for day care and take

16         him there to arrive around 8 o'clock or so?

17    A.   Yes, sir.

18    Q.   And everything is normal for a Monday morning as

19         you take your son to day care?

20    A.   Yes, sir.

21    Q.   And is it when you are leaving day care to go

22         back home that you were pulled over?

23    A.   Yes, sir.

24    Q.   Give us your description of when you first

25         noticed anyone from Hopkinsville Police

DAQUAVIAN MCKNIGHT

20

1          Department during the course of that morning.

2                  Did you see anybody from HPD when you went

3          to drop your son off?

4     A.   No, sir.

5     Q.   Had you had any dealings with HPD in, say, the 30

6          days prior to August 3 of 2022?

7     A.   No, sir.

8     Q.   Had you had any dealings with HPD or its

9          personnel at any point prior to August 3 of 2022?

10                 And I know that's kind of broad.  Because

11         it wouldn't necessarily mean you getting pulled

12         over or getting arrested.  I mean I'm talking

13         about would you have interacted with them in any

14         way.

15    A.   Yes, sir.

16    Q.   All right.  Where would you have last interacted

17         with them?

18    A.   The Recreational Center in Hopkinsville

19         basketball court.

20    Q.   And what time frame?

21    A.   July.

22    Q.   Of 2022?

23    A.   Yes, sir.

24    Q.   That would not have been a part of the YMCA work?

25    A.   No, sir.

21

```
 1    Q.   So it is after that had finished and this is at

 2         the Rec Center; is that what you said?

 3    A.   Yes, sir.

 4    Q.   And what was the nature of that interaction?

 5    A.   For a basketball fundraiser.

 6    Q.   What was your role in that?

 7    A.   I coach a basketball team, travel team.

 8    Q.   What is the name of that team?

 9    A.   At the time, it was Up Next Basketball.

10    Q.   Say that again.

11    A.   At the time it was Up Next.

12    Q.   Spell that for me.

13    A.   UP NEXT.

14    Q.   Up Next.  All right.  And do you still do that

15         now?

16    A.   Yes, sir.

17    Q.   What's the name of the team now?

18    A.   270 Bad Boys.

19    Q.   Okay.  So in July of 2022, there is a fundraiser

20         going on and HPD personnel are involved in that?

21    A.   Yes, sir.

22    Q.   Are they playing or are they just showing up to

23         help out?

24    A.   Playing.

25    Q.   Okay.  Did you know any of the officers?
```

22

1    A.    One.

2    Q.    Which one?

3    A.    I can't think of his name right now.

4    Q.    Okay.  Was he an officer that was kind of a point

5          of contact for HPD to do this kind of thing or

6          did you know him from school or how did you know

7          him?

8    A.    I know him from school.

9    Q.    So he went to the same high school?

10   A.    No.

11   Q.    Which school did you know him from?

12   A.    He went to Hopkinsville.  I went to Christian

13         County.

14   Q.    All right.  Okay.  So he was somebody you would

15         recognize and even though you can't recall his

16         name today, you would know his name at the time

17         and you might have been -- you would have been

18         comfortable talking to him about just whatever

19         needed to be talked about?

20   A.    Yes, sir.

21   Q.    And as of July of 2022 and that interaction with

22         HPD personnel for the fundraising effort, was

23         there anything about any of your dealings with

24         HPD that concerned you or felt like that wasn't a

25         positive interaction with HPD as of July of 2022?

1    A.    No, sir.  And to answer that other question, his

2          name was Dillon Greenwell.

3    Q.    All right.  So other than the interaction in July

4          of '22 with HPD on the basketball fundraiser, had

5          you had any interaction with anybody from HPD

6          prior to August of 2022, whether it was positive,

7          negative, official, unofficial; anything like

8          that?

9    A.    No, sir.

10   Q.    Okay.  So let's go back to August 3 of 2022.

11         When did you first see Officer Lamblin?

12   A.    After I left the day care when I got to the end

13         of the street to the stop sign.

14   Q.    All right.  And what street are you on when you

15         first see Officer Lamblin?

16   A.    Millbrooke Drive.

17   Q.    And was he already behind you at that point or

18         was he sitting somewhere?

19   A.    He was sitting across.

20   Q.    And where was the vehicle located?

21   A.    His vehicle?

22   Q.    His vehicle.

23   A.    In Indian Hills Elementary School parking lot.

24   Q.    Explain what then happened.  In other words, what

25         was the interaction between you and Officer

24

1          Lamblin beginning from the point where you first

2          see him and concluding at the point where he

3          pulls you over.

4   A.   After I make a turn, he just follows me for six

5          to seven minutes, probably four or five miles, to

6          the other side of Hopkinsville where he pulls me

7          over.

8   Q.   All right.  Were you wearing your seat belt at

9          the point you left the day care?

10   A.   No, sir.

11   Q.   And you understood that Kentucky law required you

12          to wear that seat belt at all times when you were

13          operating your vehicle?

14   A.   Yes, sir.

15   Q.   So you understood you were in violation of

16          Kentucky law operating your vehicle that morning

17          by not wearing your seat belt?

18   A.   Yes, sir.

19   Q.   And you understood that you could be pulled over

20          and cited for that, did you not?

21   A.   Yes, sir.

22   Q.   All right.  So when he followed you, did you

23          instantly believe that that's why he was

24          following you?

25   A.   No, sir.

25

1    Q.    What did you think?

2    A.    I didn't think he was following me at first.  I

3          just thought maybe he was just going the same

4          direction.

5    Q.    Okay.  Was there at some point that you realized

6          he was following you?

7    A.    Yes, sir.

8    Q.    All right.  And was that when he turned on his

9          emergency flashers?

10   A.    No, sir.

11   Q.    When did you realize it?

12   A.    When I got to downtown, I got over in the left

13         lane and he got in the left lane too behind me so

14         I figured he was following me.

15   Q.    And what street were you on at that point?

16   A.    Virginia Street.

17   Q.    And had Officer Lamblin stayed behind your

18         vehicle for the entirety of the time after you

19         left the day care and before he eventually turns

20         on his emergency lights?

21   A.    Yes, sir.

22   Q.    Did you own the vehicle you were driving at the

23         time you were pulled over?

24   A.    No, sir.

25   Q.    Who owned it?

26

1    A.    My girlfriend.

2    Q.    And what type of vehicle was it?

3    A.    Nissan Altima.

4    Q.    And Ms. Osborne obviously had given you

5          permission to drive the vehicle this morning

6          because the two of you were taking your son to

7          day care?

8    A.    Yes, sir.

9    Q.    Did you regularly use the Altima?

10   A.    Sparingly.

11   Q.    Did the seat belt on the driver's side work to

12         the best of your knowledge?

13   A.    Yes, sir.

14   Q.    So it was usable that day?

15   A.    Yes, sir.

16   Q.    If I'm following you correctly, from your

17         firsthand perspective, as soon as Officer Lamblin

18         gets behind you, shortly after you leave the day

19         care center, he pulls out from Indian Hills

20         Elementary School parking lot and he stayed

21         behind you for the entirety of that trip to the

22         point where you pull into the parking lot and he

23         interacts with you outside of the vehicles,

24         correct?

25   A.    Yes, sir.  Yes, sir.

DAQUAVIAN MCKNIGHT

27

1    Q.    All right.  So just to be clear, he didn't follow

2          you initially and then go in a different

3          direction and catch back up with you, he followed

4          you continuously?

5    A.    Yes, sir.

6    Q.    And to your knowledge, there had been no

7          interaction between you and Officer Lamblin prior

8          to you leaving the day care center, correct?

9    A.    No.

10   Q.    That's correct?

11   A.    Yes.

12   Q.    All right.  When -- I'm correct that Officer

13         Lamblin turned on his emergency lights to alert

14         you that he was now expecting you to pull over?

15   A.    Yes, sir.

16   Q.    And did you pull over as quickly and safely as

17         you could?

18   A.    Yes, sir.

19   Q.    Tell me what you initially recall from your

20         interactions with Officer Lamblin at the point

21         where he has pulled you over and you are in your

22         vehicle and he comes to your vehicle to speak to

23         you?

24   A.    Can you repeat that for me?

25   Q.    Yeah.  So picking up at the point where Officer

28

1        Lamblin has now exited his vehicle and has

2        approached your vehicle to alert you as to why he

3        just pulled you over, tell me what you recall

4        about that.

5    A.   Before he got -- well, he walked up to the car.

6        He was asking me how I was doing.  And he seen my

7        registered firearm.  And then from there, he

8        didn't even tell me at first why he pulled me

9        over, he just locked in on my firearm.  The rest

10       -- that's all I really remember.

11   Q.   Okay.  Did you consider that all of the

12       interaction you had with Officer Lamblin at the

13       point beginning where he gets out of his vehicle

14       and comes over to your vehicle and ending at the

15       point where he has given you the citation and

16       told you that you are free to leave, did you

17       consider that all of those interactions by

18       Officer Lamblin were professional?

19   A.   Somewhat.

20   Q.   Tell me what you did not find professional about

21       your dealings with Officer Lamblin that morning.

22   A.   He was under suspicion that I had illegal drugs

23       but he didn't search my person or frisk my

24       person.

25   Q.   Okay.  That's something you would have expected

**DAQUAVIAN MCKNIGHT**

29

1          him to do?

2     A.   Yes, sir.

3     Q.   Am I correct that that's not something you wanted

4          him to do?

5     A.   At the time, I wasn't doing anything so it didn't

6          matter.

7     Q.   Okay.  All right.  And when you say you would

8          have expected him to search your person because

9          of the potential for there to be illegal drugs --

10         I think those are the two words you used -- is

11         your observation based on the fact that he

12         advised you that he had smelled marijuana coming

13         from the car?

14    A.   Yes, sir.

15    Q.   And what did you advise Officer Lamblin as to

16         when or if marijuana had been used in the

17         vehicle?

18    A.   You explain that?

19    Q.   Yeah.  Did you tell Officer Lamblin when

20         marijuana or if marijuana had been used in the

21         vehicle?

22    A.   Yes, sir.

23    Q.   What did you tell him?

24    A.   He asked if I had marijuana.  I told him no.

25    Q.   And what about the smell of marijuana, did he ask

30

1           if marijuana had been used in the car?

2    A.    He asked me if I had been burning that day and I

3           was like no.

4    Q.    What did you tell him as to when you last used

5           marijuana or burned it in the car?

6    A.    The day before.

7    Q.    And is that when you were at the lake?

8    A.    Yes, sir.

9    Q.    Did you smoke marijuana coming back from the lake

10          to Hopkinsville?

11   A.    No, sir.

12   Q.    Did you smoke it at the lake?

13   A.    Yes, sir.

14   Q.    In the car?

15   A.    No.

16   Q.    All right.

17   A.    Just more of a -- I went to the car to get

18          something and I was already smoking.

19   Q.    Okay.  So you would have smoked marijuana in the

20          car the day before?

21   A.    Yes, sir.

22   Q.    And so it didn't surprise you that Officer

23          Lamblin said he would smell marijuana in the car?

24   A.    It did surprise me.

25   Q.    It did.  Is there a reason why marijuana may not

1          have been smelled in the car even though it had

2          been used in the car the day before?

3     A.   Because I wasn't just smoking in the car; just

4          briefly went to the car to grab something and

5          come back.

6     Q.   Okay.  So your thought at the time was even

7          though I was in the car, I was not smoking

8          marijuana -- for the entirety of the time that I

9          was smoking it, I wasn't in the car?

10    A.   Yes, sir.

11    Q.   Is that what you are telling me?

12    A.   Yes, sir.

13    Q.   How long were you in the car when you had

14         marijuana and was smoking it?

15    A.   I would say 30 seconds to a minute.

16    Q.   And because of it being 30 seconds to a minute

17         that you were in there, you questioned whether it

18         still could be smelled?

19    A.   The day after, yes, sir.

20    Q.   All right.  But would you agree with me that it

21         was certainly reasonable if Officer Lamblin

22         thought he smelled marijuana, that he would then

23         ask you about the use of marijuana in the car?

24    A.   Yes, sir.

25    Q.   And that if he suspected that marijuana had been

32

1           used in car, you understood that it would be

2           reasonable for him to search the vehicle?

3    A.    Yes, sir.

4    Q.    And he did that?

5    A.    Yes, sir.

6    Q.    And you consented to that?

7    A.    Yes, sir.

8    Q.    Because you knew there was no marijuana in the

9          car?

10   A.    Yes, sir.

11   Q.    And to your knowledge, the search did not reveal

12         any marijuana in the car, correct?

13   A.    Yes, sir.

14              MR. SULLENGER:  To clarify, yes, it did not

15              or, yes, it did?

16              THE WITNESS:  He said -- he said --

17              MR. SULLENGER:  I'm trying to clarify -- it

18              was a double negative, the question, so I'm

19              trying to clarify what was your answer.

20                  Was it your understanding that

21              marijuana was not found?

22              THE WITNESS:  From my understanding, no

23              marijuana was found in the car.

24   Q.    All right.  And with respect to the handgun, that

25         was a handgun that you lawfully possessed that

33

1         was in the vehicle at the time Officer Lamblin

2         approached the vehicle, correct?

3    A.   Yes, sir.

4    Q.   And it was visible?

5    A.   Yes, sir.

6    Q.   And you immediately told Officer Lamblin where it

7         was and that you owned it?

8    A.   Yes, sir.

9    Q.   As far as you were concerned, you lawfully

10        possessed it?

11   A.   Yes, sir.

12   Q.   But you understood the need for Officer Lamblin

13        to take possession of that vehicle to protect

14        himself and the public while he was searching the

15        vehicle?

16   A.   Yes, sir.

17   Q.   And that was reasonable as far as you were

18        concerned?

19   A.   Yes, sir.

20   Q.   And to your knowledge, the handgun that Officer

21        Lamblin took into his possession while he

22        searched the vehicle was properly secured and

23        returned to you without damage to the gun,

24        correct?

25   A.   Yes, sir.

34

1   Q.   And as Officer Lamblin searched the vehicle, to

2        your knowledge, there was no damage done to

3        anything within the vehicle or to the vehicle

4        itself as a result of that search; is that

5        correct?

6   A.   Yes, sir.

7   Q.   And the failure to pat you down, as you said, was

8        the only thing you considered that Officer

9        Lamblin did that would be unprofessional; did I

10       understand that correctly?

11  A.   Yes, sir.

12  Q.   Did Officer Lamblin treat your girlfriend at the

13       time, Ms. Osborne, with respect and

14       professionalism?

15  A.   Yes, sir.

16  Q.   Did Officer Lamblin make any requests of you that

17       you thought was unreasonable and unnecessary?

18  A.   Explain.

19  Q.   In other words, in your interactions with Officer

20       Lamblin beginning at the point he arrives at your

21       vehicle and up to the point where he tells you

22       you are free to leave the scene, did he make any

23       request of you that you thought was unreasonable?

24  A.   He made a statement.

25  Q.   Okay.  What was that statement?

35

1   A.   I'm not 100 percent.  I can't remember exactly

2        what.  I just know he was like use your -- I

3        can't remember what amendment it was.  He was

4        just like use some -- some amendment.

5   Q.   Okay.

6   A.   He told me -- he made a statement while he was

7        searching the car to tell me, use some amendment.

8   Q.   Amendment?

9   A.   Amendment, yeah.

10  Q.   Okay.

11  A.   I guess he was telling me to be quiet or...

12  Q.   Okay.  And that came from Officer Lamblin?

13  A.   Yes, sir.

14  Q.   What was it about his suggestion or the words he

15       used to exercise your amendment that you thought

16       was unreasonable or unprofessional or

17       inappropriate?

18  A.   I was talking to Officer Cortez and Lamblin, he

19       just came out with it, like -- it was like

20       aggressive like how he said it.

21  Q.   Okay.  You can't speak for Officer Lamblin of

22       course.  He will have to speak for himself.  But

23       what did you take that to mean?

24  A.   He was basically telling me shut up.

25  Q.   Okay.  So you didn't think he meant for you to

1      exercise your constitutional rights; you thought

2      he meant you needed to shut up?

3   A.  Basically.

4   Q.  Okay.  Anything else about the interaction with

5      Officer Lamblin from the point he follows you in

6      your vehicle to the point that he speaks to you

7      at the scene and interacts with you at the scene

8      where you are pulled over and concluding at the

9      point where you are released?  Anything else

10     about what he said or did that you found to be

11     inappropriate?

12  A.  No, sir.

13  Q.  Officer Cortez, did you know him prior to August

14     3, 2022?

15  A.  Yes, sir.

16  Q.  How did you know Officer Cortez prior to that

17     date?

18  A.  I have been in the car with people who have been

19     pulled over by Officer Cortez.

20  Q.  Do you recall how many times?

21  A.  Three or four times.

22  Q.  And do you recall who you were with?

23  A.  My friend, Jaylin Brown.

24  Q.  Jaylin Brown?

25  A.  Yes, sir.  He is now deceased.

37

1    Q.   So all three or four occasions where you were

2         with Mr. Brown, it happened to be that Officer

3         Cortez pulled over Mr. Brown?

4    A.   Yes, sir.

5    Q.   To your knowledge, had Officer Cortez ever acted

6         unprofessionally toward Mr. Brown?

7    A.   From my knowledge, yes, sir.

8    Q.   Okay.  I mean, did you observe that yourself or

9         are you relying upon what Mr. Brown told you?

10   A.   Both.

11   Q.   And they were incidents before August 3, 2022?

12   A.   Yes, sir.

13   Q.   Do you know whether, in fact, Officer Cortez knew

14        who you were prior to August 3, 2022?

15   A.   I assumed he did.

16   Q.   And that would be because you were present when

17        the three or four times Officer Cortez pulled

18        over Mr. Brown and you were with Mr. Brown?

19   A.   Yes, sir.

20   Q.   Would Officer Cortez have checked your

21        identification at the scene on those three or

22        four occasions?

23   A.   No, sir.

24   Q.   Would you have told him your name on any of those

25        occasions?

38

1   A.   No, sir.

2   Q.   Did anyone else tell him your name on those

3        occasions, to your knowledge?

4   A.   No, sir.

5   Q.   So how do you think he would know who you are as

6        of August 3, 2022?

7   A.   Just by face.

8   Q.   And of these three or four occasions where

9        Officer Cortez pulled over Mr. Brown prior to

10       August 3, 2022, do you know the time frame of

11       those three or four incidents?

12  A.   No, sir.  I can't recall.

13  Q.   I mean if -- can you give me some reasonable

14       estimate?

15            Are we talking about something within the

16       last year prior to August 2022, the last five

17       years?

18  A.   Yes, sir.  Probably the last three or four years;

19       2020, 2021.

20  Q.   Okay.  So beginning sometime around 2020 or 2021

21       and leading up to August of 2022, you were with

22       Mr. Brown three or four times when he got pulled

23       over by Mr. -- or Officer Cortez?

24  A.   Yes, sir.

25  Q.   Was Mr. Brown ever arrested by Officer Cortez, to

39

```
 1         your knowledge?
 2    A.   No, sir.
 3    Q.   Was there any type of history or bad blood or
 4         anything like that between Mr. Brown and Officer
 5         Cortez, to your knowledge?
 6    A.   Yes, sir.
 7    Q.   What did that involve?
 8    A.   Basically my friend felt like he was harassing
 9         him; every time he seen him, he would pull him
10         over.
11    Q.   And when you say my friend, you mean Mr. Brown?
12    A.   Yes, sir.
13    Q.   And when did Mr. Brown die?
14    A.   2000 -- 2023 -- let me see.  2021.
15    Q.   Okay.  And how or why did he die, do you know?
16    A.   We -- we actually don't know how he was killed.
17         We just know we -- we found his body in Atlanta
18         burned up.
19    Q.   All right.  Anything else about Officer Cortez,
20         his interaction with your friend, Mr. Brown,
21         between 2020 and 2021 when Mr. Brown died in
22         Atlanta that you think would be important to add
23         to what you've already said?
24    A.   No, sir.
25    Q.   To your knowledge, did Mr. Brown ever make any
```

40

1          type of complaint to HPD or the City about his

2          interactions with Officer Cortez?

3     A.   I'm not sure.

4     Q.   And, likewise, are you aware that he filed any --

5          Mr. Brown filed any kind of lawsuit or anything

6          against Officer Cortez or HPD?

7     A.   I'm not sure.

8     Q.   All right.  Anything else in terms of your

9          interaction with Officer Cortez prior to August

10         3, 2022?

11    A.   No, sir.

12    Q.   There was a printed e-mail that I think you sent

13         to your lawyer about the incident itself.  And it

14         was marked as DM01 and 02 in response to your

15         written discovery answers which is this pleading

16         that I'm showing you.

17              Have you looked at that printed e-mail

18         lately?

19    A.   Yes, sir.

20    Q.   All right.  Is it still accurate to your

21         knowledge?

22    A.   Yes, sir.

23    Q.   Would you want to clarify, correct, anything

24         that's stated there?

25    A.   Where it said I had seeked physical like therapy

41

```
 1          to go talk to somebody, I didn't seek it.  I was
 2          attempting to.
 3     Q.   Okay.  And we will talk about that in a minute.
 4               But what I understand from what you are
 5          telling me, you had the idea that you may need
 6          some therapy and you thought about trying to
 7          arrange for that but it never happened?
 8     A.   Yes, sir.
 9     Q.   All right.  We will talk about that in more
10          detail in just a second.  But let's talk about
11          your description in the incident.  And I want to
12          get -- I want to get some clarification of a
13          couple of points you make here.
14               You state on page DM 01, he -- referring to
15          Lamblin -- continued to follow me to the other
16          side of town where I was pulled over by the
17          Hopkinsville Brewing Company.  That's still a
18          correct statement, right?
19     A.   Yes, sir.
20     Q.   And you estimated that was an eight to ten minute
21          window of time where he followed you.  And you
22          also said that was about three miles.  I think
23          you testified to a slightly different number of
24          miles and time frame.
25               Are you just giving us estimates on that?
```

42

1    A.    Yes, sir.

2    Q.    And that's why there is a difference between what

3          you said today and what this says?

4    A.    Yes, sir.

5    Q.    And I think you state -- I stated, I did not have

6          any marijuana and that I hadn't even smoked

7          marijuana in the car, unquote.

8                That would have been true that you hadn't

9          smoked marijuana in the car that day, August 3.

10         But you've clarified for us there would have been

11         a 30 second to one minute window when you were

12         smoking in it at the lake the day before,

13         correct?

14   A.    Yes, sir.

15   Q.    Were you aware that Officer Lamblin had notified

16         dispatch that a supervisor was needed at the

17         scene?

18   A.    No, sir.

19   Q.    Did you know Officer Cortez was even coming to

20         the scene prior to his arrival there?

21   A.    No, sir.

22   Q.    Other than Officer Cortez and Officer Lamblin,

23         was there anybody else from HPD at the scene to

24         your knowledge?

25   A.    No, sir.

43

1   Q.   And other than your girlfriend, was there any

2        member of the public or another citizen that was

3        aware of you being pulled over at the scene that

4        morning?

5   A.   No, sir.

6   Q.   You make mention in DM O1 that it was surprising

7        to you that he didn't pat down your girlfriend.

8             Why would you have expected him to pat down

9        your girlfriend?

10  A.   Because he is suspecting drugs.

11  Q.   And then you go on to state, quote, I put my

12       phone away and I hackled the officers stating

13       they could be solving crimes or protecting

14       somebody instead they are harassing someone who

15       is active in the community in youth sports and

16       who had just had six to eight police officers

17       come to the youth basketball practice and donated

18       money to my boy's basketball team to gravel to

19       Gatlinburg and play in a tournament.

20            When you say you were hackling the officer,

21       what did you mean by that?

22  A.   Just what it says, I -- you could be solving

23       bigger crimes.  They're bigger fish out here.

24       I'm somebody -- I'm somebody that's in the

25       community; just stuff like that.

44

1    Q.    I think I asked you earlier whether you agree
2          that you complied with all of the directives that
3          would have been given to you by Officer Lamblin
4          and you said that you did, correct?
5    A.    Yes, sir.
6    Q.    Now, let's talk about Officer Cortez.  When
7          Officer Cortez arrived on the scene, did he
8          explain to you why he was there?
9    A.    No, sir.
10   Q.    Did you have any understanding of why he was
11         there?
12   A.    Yes, sir.
13   Q.    What did you understand his role to be?
14   A.    To stand and watch us while Lamblin did his
15         search.
16   Q.    Okay.  And you understood that when Officer
17         Lamblin was in the vehicle and conducting the
18         search, that he would be in a position where if
19         somebody wanted to, they could potentially harm
20         him, correct?
21   A.    Yes, sir.
22   Q.    And you understood then that it was Officer
23         Cortez's role to make sure that that didn't
24         happen, correct?
25   A.    Yes, sir.

1    Q.    And that would have included, of course, that you

2          and/or your girlfriend would be somebody who if

3          they elected to try to harm Officer Lamblin, it

4          would be Officer Cortez's job to prevent that,

5          right?

6    A.    Yes, sir.

7    Q.    And that's certainly reasonable in your mind,

8          right?

9    A.    Yes, sir.

10   Q.    It would also be reasonable in your mind if

11         another member of the public showed up at the

12         scene and tried to interfere with or harm Officer

13         Lamblin as he was searching the vehicle, that

14         Officer Cortez's role was to prevent that from

15         happening, right?

16   A.    Yes, sir.

17   Q.    You stated, quote, I told him, no, everything was

18         over and I'm not putting my phone away, unquote.

19               When you say you told him, you were

20         referring to Officer Cortez?

21   A.    Yes, sir.

22   Q.    Did you consider it your obligation to follow

23         lawful direction from the Hopkinsville police

24         officers on the scene that morning?

25   A.    Yes, sir.

46

1    Q.    You go on to state that, quote, I immediately

2          told him I was recording it on Facebook live and

3          that he'd better hope he knew what he just did

4          was illegal and wrong, unquote.

5                When you say recording it on Facebook, did

6          you mean you were taking your cell phone that you

7          owned and logging onto Facebook with the intent

8          of capturing what was happening at the scene with

9          Officer Cortez and Officer Lamblin for anybody on

10         Facebook to observe?

11   A.    No, sir.  When Officer Cortez took my phone,

12         everything was already over.

13   Q.    All right.  Let's talk about what you meant

14         though when you said, I told him I was recording

15         it on Facebook live.  What did you mean by that?

16   A.    I told him I was going live -- well, I told him

17         my phone was live on Facebook when he snatched it

18         from me.

19   Q.    Okay.  So you would agree then that you had

20         activated Facebook such that it was recording

21         live at the scene?

22   A.    Yes, sir.

23   Q.    Mr. McKnight, do you agree that there are

24         occasions when people observe Facebook live and

25         will react to that post by coming to a scene

1          potentially?

2                    MR. SULLENGER:  Object; calls for

3                    speculation.  Answer if you know.

4     A.   No, sir.

5     Q.   You don't know of that ever happening?

6     A.   No.

7     Q.   All right.  Do you agree that it could happen?

8     A.   No, sir.  I'm not -- I don't know how they -- I

9          don't know what goes on.

10    Q.   Would you agree with me that when you are

11         broadcasting on Facebook live, that it is going

12         to depict the area where you are located in

13         Hopkinsville?

14    A.   No, sir.  Because the camera on was on my face.

15    Q.   All right.  So you wouldn't be able to tell

16         anything about where you were?

17    A.   No, sir.

18    Q.   Would you be able to tell anything about the

19         police officers at the scene?

20    A.   No, sir.

21    Q.   All right.  Would you -- what was the purpose of

22         recording it on Facebook live?

23    A.   The search was already -- everything was over.

24         And I just wanted to tell people what I had just

25         went through.

48

1  Q.   And what did you mean when you said to him,

2       quote, he better hope he knows what he just did

3       was illegal and wrong, unquote?  What did you

4       mean by that?

5  A.   I wanted him to know that he just violated my

6       rights.

7  Q.   All right.  And how did he violate your rights?

8  A.   By illegal seizure of my phone after Lamblin had

9       told me everything was over and he was done, he's

10      writing my citation and we can go.

11           MR. SIGLER:  I tell you what let's do, let

12           me -- let's go off the record just a second.

13                (Off the record.)

14 Q.   Mr. McKnight, we are back on the scene.  Looking

15      at the video I have posted here, I will represent

16      to you this is Officer Cortez's body cam video.

17      It is seven minutes and 19 seconds long.  And I

18      stopped it at the four second mark.  Do you see

19      that video?

20 A.   Yes, sir.

21 Q.   And does that video, where it's stopped, depict

22      you and your girlfriend at the scene after you

23      had been pulled over by Officer Lamblin that

24      morning?

25 A.   Yes, sir.

49

1   Q.   And do you have your cell phone in your hand at

2        this point?

3   A.   Yes, sir.

4   Q.   Before this interaction with Officer Cortez at

5        the four second mark, had you placed your cell

6        phone on the hood of the police vehicle?

7   A.   Can you say that again?

8   Q.   Yeah.  Prior to this segment right here shown at

9        the four second mark, had you placed your cell

10       phone on the hood of the vehicle as directed?

11  A.   I wasn't directed to put my phone on the vehicle

12       before this.

13  Q.   Did you ever do that though?

14  A.   Yes, sir.

15  Q.   All right.  Why did you do that?

16  A.   Because he asked me to.

17  Q.   Okay.  So you're distinguishing between him

18       asking you to and directing you to?

19  A.   He directed me to.

20  Q.   Okay.  And when you say he, do you mean Officer

21       Cortez or Officer Lamblin?

22  A.   Cortez.

23  Q.   Did you have any interaction at all with Officer

24       Lamblin about the use of your cell phone, the

25       possession of your cell phone?

50

1    A.    No, sir.

2    Q.    That was all Officer Cortez?

3    A.    Yes, sir.

4    Q.    Did Ms. Osborne have any interaction with Officer

5          Lamblin about the use of her cell phone to your

6          knowledge?

7    A.    No, sir.

8    Q.    Did she have any with Officer Cortez to your

9          knowledge?

10   A.    No, sir.

11   Q.    Did she use her cell phone at any point, to your

12         knowledge, either to call or to log onto Facebook

13         or do anything like that after you all exited

14         your vehicle and before you were cleared to

15         leave?

16   A.    Are you asking did I know?

17   Q.    Do you know?

18   A.    At the time, no.

19   Q.    Do you know now?

20   A.    Yes, sir.

21   Q.    What was she doing to your knowledge?

22   A.    Recording the whole situation.

23   Q.    And do you know what tools she was using to

24         record it?

25   A.    Her phone; her camera.

51

1    Q.   Just her camera, her video?  So this is something

2         that's going to be solely on her phone and not

3         broadcast from the scene to the public, correct?

4    A.   Yes, sir.

5    Q.   Okay.  (Video playing.)  Do you know what you

6         said to him at the nine second mark when Officer

7         Cortez first arrived and confronted you about the

8         cell phone?

9    A.   No, sir.

10   Q.   (Video playing.)  So at the 22 second mark, do

11        you know what you stated to Officer Cortez in

12        this segment?

13   A.   I was recording for my safety.

14   Q.   All right.  What did you mean by that?

15   A.   I felt like -- I have never felt like that being

16        pulled over for one.  And like I just felt like I

17        needed to record.  Like he was making me feel

18        uncomfortable just the way he was looking at me

19        and -- he was just giving me a look that made me

20        feel uncomfortable to the point where I had to

21        record.

22   Q.   When you say he was giving you a look, are you

23        saying that he was using his hands in some way or

24        pointing to something or sending signals?  What

25        do you mean by that?

52

1   A.   He was just looking me in my eyes, just giving me

2        a look; just staring at me.

3   Q.   Okay.  At any point when you're interacting with

4        Officer Cortez at the scene, did you consider

5        that he used an improper tone of voice?

6   A.   No, sir.

7   Q.   Did you consider that the content of what he said

8        to you was unprofessional?

9   A.   Somewhat, yes, sir.

10  Q.   All right.  Tell me what was unprofessional about

11       what he said to you.

12  A.   He basically told me -- after he took my phone, I

13       was like you just violated my rights.  He was

14       like I don't care, I told you to stay off your

15       phone, like he was just being a bully like

16       intimidating me.  Just...

17  Q.   Okay.  Anything else that you recall Officer

18       Cortez doing by way of the content of what he

19       said that was inappropriate in your mind?

20  A.   No, sir.

21  Q.   Was it beneficial and somewhat comforting to you

22       that your girlfriend had her cell phone and was

23       recording the events at the scene?

24  A.   Can you say that again?

25  Q.   Was it comforting to you, reassuring to you, that

53

1   your girlfriend at the time, Ms. Osborne, had her

2   cell phone and was recording the interaction with

3   Officer Cortez?

4 A. I never knew she was recording.

5 Q. Did you ask her at the scene?

6 A. Did I ask her if she was recording?

7 Q. Yes.

8 A. No.  I mean I think I told her, like you should

9   have been recording this.  But I never knew she

10   was recording.

11 Q. All right.  Do you recall when you told her she

12   should be recording it?

13 A. No.  I just know it was while me and Cortez was

14   having words.

15 Q. Okay.  So from the time Cortez arrived and he is

16   looking at you in a way that's concerning to you,

17   you direct or ask Ms. Osborne to record?

18 A. No.

19 Q. You don't?

20 A. No.

21 Q. You don't know whether she was when you are at

22   the scene; is that what you're telling me?

23 A. Yes, sir.  I never knew she was recording it.

24 Q. But you learned after the fact she -- she had

25   been?

54

1   A.   Yes.

2   Q.   All right.  And at some point, you told her that

3        she should be but you can't remember when you

4        said that to her?

5   A.   No, sir.

6   Q.   Are you confident it was after the interaction

7        began with Officer Cortez?

8   A.   Yes.  I'm 100 percent sure it was while we was

9        dealing with Cortez.

10  Q.   All right.  (Video playing.)  All right.  In this

11       segment between the 29 second mark and the 39

12       second mark, you are looking at your phone.  Are

13       you speaking live on Facebook?

14  A.   At that moment?

15  Q.   Yes.

16  A.   Yes, sir.

17  Q.   All right.  And we can't hear everything you are

18       saying at that point.

19            But what are you trying to convey to

20       Officer Cortez in that 29 to 39 second window of

21       this video?

22  A.   Are you basically asking me what was my point?

23  Q.   Yeah.

24  A.   Like everything was over.  I mean it was done

25       with everything.

**DAQUAVIAN MCKNIGHT**

55

1    Q.    Okay.  So you are saying at the time depicted on

2          the video, 29 seconds to 39 seconds, that Officer

3          Lamblin has completed the search of the vehicle?

4    A.    Yes.  From my understanding, if I can recall

5          correctly.

6    Q.    Okay.  And you are basing that strictly on what

7          you remember today about whether Officer Lamblin

8          had completed the search or not?

9    A.    Yes, sir.

10   Q.    (Video playing.)  And at this point, are you

11         telling Officer Cortez that he is disrespectful

12         to you?

13   A.    Yes, sir.

14   Q.    And have you told me the reasons that you feel

15         that he was disrespectful to you?

16   A.    Because he grabbed my hand and he squeezed my

17         hand.  As he was taking my phone, he squeezed my

18         hand.

19   Q.    Let me back it up.  (Video playing.)  Okay.  So

20         right there at the 39 second mark, you are saying

21         that he grabbed your hand?

22   A.    Yes, sir.  That's when I knew to let the phone

23         go, because I felt like he was -- it could have

24         got serious.

25   Q.    Okay.  Did he injure you when he grabbed your

56

1          hand?

2     A.   This hand was already broken before so at that

3          time, it was like a sharp pain so I just let the

4          phone go.

5               But I did feel -- I did feel pain when he

6          squeezed; that's why I let the phone go.

7     Q.   Okay.  Did you tell him that he injured you when

8          you were still there at the scene?

9     A.   No, sir.

10    Q.   (Video playing.)  Okay.  And then at the 1:05 to

11         1 minute, 11 second mark of this video, you are

12         advising Officer Cortez that you know who he is.

13              Is that because of the interactions you had

14         with Mr. Brown and Officer Cortez -- I'm sorry --

15         yeah, Mr. Brown and Office Cortez on the three or

16         four occasions back in 2020 and 2021?

17    A.   No.  That is just from people speaking about

18         Officer Cortez constantly on Facebook about the

19         things that he do when he pulls people over and

20         that -- how he handles situations.

21    Q.   And can you give me any names of people that have

22         spoken to that issue?

23    A.   I'm pretty sure they have been -- I have already

24         provided all of that.

25              MR. SULLENGER:  I think we produced some

57

```
 1              that were produced to us.  We produced

 2              everything we have.

 3   Q.   Okay.  So you are saying, Mr. McKnight, that the

 4        names of people who you understood to have

 5        observations of Officer Cortez in the way he

 6        treats people in his capacity as a police officer

 7        has been provided to your lawyer and then

 8        provided to us as far as you know?

 9   A.   Yes, sir.

10   Q.   You don't know any specific names as you sit here

11        today?

12   A.   No.  These are just people I have on my Facebook

13        from Hopkinsville, Kentucky.

14   Q.   Okay.  Generally speaking, what is it that you

15        perceived about Officer Cortez that others

16        believed would be a description of the way he

17        treated people?

18   A.   Racially profiling.  Does things to trigger

19        people to -- to escalate situations.  Things of

20        that nature.

21              MR. SULLENGER:  I don't see where we have

22              produced anything.  I don't know if it was

23              your girlfriend -- I have seen -- or if it

24              was investigation I have done, I have seen

25              some Facebook postings relating to him.  But
```

58

1          I don't see anything in the record so I'm
2          not sure where I came across that but I will
3          try to find it.
4          THE WITNESS:  I think it was on my Facebook
5          stuff.  I thought I'd sent the screen shots
6          along with like my Facebook posts and all of
7          that or the comment section of the video too
8          that we sent and I posted the people who
9          were commenting of their -- their situations
10         of prior run-ins with Cortez.
11    Q.   All right.  And was this posted, Mr. McKnight, by
12         folks after this arrest or was it posted by folks
13         from your recollection prior to August 3, 2022?
14    A.   Was what posted?
15    Q.   All of those Facebook entries you just referred
16         to.
17    A.   Some after.
18    Q.   And some before?
19    A.   Yes, sir.
20    Q.   And so what you would expect is if that exists
21         and you've supplied that to your lawyer, that we
22         would be able to go to those saved Facebook posts
23         and see who said it and what was said?
24    A.   The only ones that I know that we have are the
25         ones that came after I posted the video and

59

1          people commented their past reactions.  I'm not

2          saying that I have the records or screen shots of

3          people who before this situation happened.

4     Q.   Okay.  So what I'm hearing you say is that after

5          the Facebook live post that went, you received

6          additional posts in response to that where people

7          were saying, hey, this is the way he treated me

8          or this is how I know that he treated other

9          people?

10    A.   Yes, sir.

11    Q.   And you took that to mean that he would -- his

12         conduct would involve racial profiling,

13         triggering oftentimes some type of increased

14         response from folks?

15    A.   Yes, sir.

16    Q.   Instead of, in your view, trying to calm the

17         situation down, he was, in essence, creating --

18         creating some level of excitement or inciting

19         violence, that kind of thing?

20    A.   Yes, sir.

21    Q.   That's how you took it?

22    A.   Yes, sir.

23    Q.   All right.  And I would be correct to say that

24         the only account you knew of and information that

25         you knew of related to Officer Cortez prior to

DAQUAVIAN MCKNIGHT

60

1        August 3 of 2023 (sic), was your interactions

2        when you were in the vehicle with Mr. Brown and

3        he was pulled over by Officer Cortez?

4   A.   Yes, sir.

5   Q.   (Video playing.)  So between the segment 1 minute

6        20 seconds and 1 minute 30 seconds, do you know

7        what you are saying to Officer Cortez right

8        there?

9   A.   Yes, sir.

10  Q.   What are you saying?

11  A.   I told him he is super petty; I know him.

12  Q.   And did you mean by that what you have already

13       shared with us?

14  A.   Yes, sir.

15  Q.   Anything more than that?

16  A.   No, sir.

17  Q.   (Video playing.)  And then between 1:30 and 1:37,

18       do you know what you said there?

19  A.   No, sir.

20  Q.   (Video playing.)  And between 1:37 and 1:53, do

21       you know what you said there?

22  A.   No, sir.

23  Q.   (Video playing.)  All right.  And then between

24       1:57 and 2:06, what are you referring to there?

25  A.   I felt racially profiled.

61

1    Q.    And have you already described for me why?

2    A.    Because he followed me from Indian Hills all the

3          way to -- well, I was referring to Officer

4          Lamblin at that time.

5                I felt like he followed me from Indian

6          Hills all the way over there just to pull me over

7          for a seat belt, which I felt like if you are

8          going to pull me over for a seat belt, you should

9          have pulled me over when you seen me and not

10         follow me for a long length of time just to pull

11         me over then.  Everything just -- it was just gut

12         wrenching.  Like it was just...

13   Q.    (Video playing.)  And then between the 2:20 and

14         2:27 mark, do you know what you are saying there?

15   A.    No, sir.

16   Q.    (Video playing.)  Between 2:27 and 2:37, do you

17         know what you are saying there?

18   A.    No, sir.

19   Q.    What did you mean by the statement at 2:39, 2:40,

20         you all must be going broke?

21   A.    Because they probably -- I was basically saying

22         that they -- they just needed somebody to pull

23         over, try to get an arrest, to get their -- I

24         don't know what they call it.  I forgot what they

25         call it.  Get their -- their numbers up.

62

1    Q.    Meaning Hopkinsville Police?

2    A.    Yes, sir.

3    Q.    (Video playing.)  Between 2:45 and 2:55, do you

4          know what you are saying there?

5    A.    No, sir.

6    Q.    Between 2:25 and 3:15, do you know what you are

7          saying?

8    A.    No, sir.

9    Q.    Has Ms. Osborne said anything to you up to this

10         point?

11   A.    She told -- when I asked her what time it was,

12         she told me what time it was.

13   Q.    Okay.  (Video playing.)  I'm stopping the video

14         here at the four minute mark.

15              At this point, Mr. McKnight, are you still

16         telling me that your left hand is injured?

17   A.    Yes, sir.  It was hurting at the time still.

18   Q.    And at this point, are you telling me that what

19         we are seeing on this video would reflect the

20         fact that you were scared, upset, unsure about

21         what's going on?

22   A.    Yes, sir.

23   Q.    (Video playing.)  And I'm stopping the video here

24         at 5:01.  Having watched the video for five

25         minutes or so, does that change your view as to

63

1       whether Officer Lamblin is still conducting the

2       search of your vehicle?

3   A.  From my understanding at this point in the video,

4       he was in the car doing the citation.

5   Q.  Doing the citation?

6   A.  Yeah.

7   Q.  Okay.  So there is -- at this point, he is not

8       doing any further part of the search?

9   A.  No, from my understanding if I can remember

10      correctly.

11  Q.  (Video playing.)  Between the 5 minute and 5:15

12      minute mark on the video, do you recall what you

13      were saying to Ms. Osborne?

14  A.  No, sir.

15  Q.  (Video playing.)  So between 5:15 and 5:45, what

16      are you saying there?

17  A.  The only thing I can recall right there, because

18      I just heard it, I told him you should have

19      joined the military.

20  Q.  Okay.  And did he respond to you?

21  A.  I think he grinned.

22  Q.  (Video playing.)  And why were you suggesting

23      that Officer Cortez should join the military?

24  A.  I felt like that at that time, I was just

25      talking; just frustrated.  Just...

64

1    Q.    Is your intent there just to say something that
2          will insult Officer Cortez?
3    A.    No.
4    Q.    (Video playing.)  Did you consider the comments
5          that Officer Cortez made between the second --
6          I'm sorry, the 6 minute and 6:15 minute marker on
7          the video to be inappropriate, unprofessional?
8    A.    I don't recall what he said.
9    Q.    Do you want me to back that up for you?
10   A.    I can't hear it.
11   Q.    (Video playing.)  Did you hear that --
12   A.    Yeah.
13   Q.    -- at the 5:49 mark --
14   A.    Yeah.
15   Q.    -- Officer Cortez said that he and Officer
16         Lamblin both served in the military, right?
17   A.    Yes, sir.
18   Q.    (Video playing.)  And did you hear between the
19         5:50 and 6 minute mark, that he said that he and
20         Officer Lamblin both served, that he had been
21         deployed multiple times?
22   A.    Yes, sir.
23   Q.    (Video playing.)  At the 6:03 mark, that he had
24         been in the infantry and had jumped out of
25         airplanes as part of his deployment; did you hear

65

1          him say that?

2    A.    Yes, sir.

3    Q.    (Video playing.)  And then at the 6:10 mark

4          roughly, he says been there, done that.  Did you

5          consider any of those comments to be

6          inappropriate by Officer Cortez?

7    A.    No, sir.

8    Q.    (Video playing.)  Between 6:20 and 6:30, do you

9          know what you are saying?

10   A.    No, sir.

11   Q.    (Video playing.)  So then we see between the 6:30

12         and 6:45 mark, the interaction between you and

13         Officer Lamblin.  He is presenting you with the

14         citation and giving your driver's license back.

15         All of that was reasonable and professional and

16         appropriate in your mind, wasn't it?

17   A.    To a certain extent, no, sir.

18   Q.    Okay.  Why was it not?

19   A.    Because he put my handgun in the trunk.

20   Q.    What was inappropriate about that?

21   A.    I have been pulled over plenty of times and

22         nobody has ever put my handgun in the trunk.

23         They always put it back in the front where --

24         where I was sitting at.

25   Q.    Okay.  What was it about putting it in the trunk,

66

```
 1              though, that was in any way harmful to you?
 2      A.   I'm not saying it was harmful.  It was just odd
 3           because it never happened -- never put my handgun
 4           in the trunk.  Especially that's where they
 5           didn't retrieve it from.
 6      Q.   Okay.  Anything else?
 7      A.   No, sir.
 8      Q.   And you heard Officer Lamblin advise at the 6:45
 9           mark that it was HPD protocol to place it in the
10           trunk, correct?
11      A.   I didn't hear him state that.
12      Q.   (Video playing.)  Did you hear him that time?
13      A.   Yes, sir.
14      Q.   Okay.  So he explained to you that that's part of
15           the protocol of the Hopkinsville Police
16           Department to place the handgun back in the trunk
17           of your vehicle.  You heard him say that,
18           correct?
19      A.   Yes, sir.
20      Q.   (Video playing.)  Did you hear Officer Cortez
21           thanking your girlfriend?
22      A.   I'm not sure if he was talking to her.
23      Q.   Okay.  Did you interrupt that he was talking to
24           you too?
25      A.   I didn't even hear him.
```

DAQUAVIAN MCKNIGHT

67

1    Q.    (Video playing.)  Did you hear it that time?

2    A.    Yes, sir.

3    Q.    At the 6:49 mark?

4    A.    Yes, sir.

5    Q.    Do you know if he was referring to you and Ms.

6          Osborne?

7    A.    It sounds like he said thank you, ma'am.  So...

8    Q.    You consider that to be professional and

9          reasonable, don't you?

10   A.    Yes, sir.

11   Q.    (Video playing.)  All right.  So other than what

12         we have discussed about the video up to this

13         point and watched the clip that I presented to

14         you -- that's roughly about 7 minutes and 19

15         seconds long, right --

16   A.    Uh-huh.

17   Q.    Yes?  You have got to say yes or no.

18   A.    Yes, sir.

19   Q.    All right.

20   A.    Sorry.

21   Q.    Anything else about that video that refreshes

22         your memory or that you believe should be pointed

23         out as being important to support your lawsuit

24         against Officer Cortez, Officer Lamblin, Chief

25         Sumner and the City of Hopkinsville?

68

1    A.    Can you --

2    Q.    Yeah.  Anything about that video refresh your

3          memory as to something you would want to add that

4          serves as a basis for your lawsuit against the

5          defendants?

6    A.    I just didn't understand why my handgun was

7          placed in the trunk.

8    Q.    Okay.  And what you do know is that Officer

9          Lamblin advised you that that was the protocol of

10         the police department that he was considering

11         that he was following, correct?

12   A.    Yes, sir.

13   Q.    You don't know whether it is the protocol or not,

14         right?

15   A.    No, sir.

16   Q.    And you have told us that others had not done

17         that, correct?

18   A.    Correct.

19   Q.    How many times have you been pulled over where

20         your gun was removed from your car?

21   A.    Three times.

22   Q.    And each time it was put back where it was, in

23         the front of the vehicle?

24   A.    Yes, sir.

25               MR. SIGLER:  Okay.  We have been going about

69

1          an hour and a half.  Let's take a break.

2                    (Off the record.)

3    Q.   We are back on the record.  I'm going to show you

4         a different video here.  This is the dash cam

5         video from Officer Lamblin's vehicle.  And I have

6         moved it up to the 5:50 mark on the video.

7              This is showing you and your girlfriend at

8         the time, Ms. Osborne, right?

9    A.   Yes, sir.

10   Q.   All right.  (Video playing.)  And at the 5:57

11        mark, this is the first occasion that Officer

12        Cortez arrives and interacts with you, right?

13   A.   Yes, sir.

14   Q.   (Video playing.)  And I will stop here at the

15        6:20 mark of this video.  The conversation at

16        this point is the same conversation we watched on

17        the previous video, right?

18   A.   No.

19   Q.   It is not?

20   A.   No.

21   Q.   Okay.  We can go back to that in a second.  Well,

22        let me -- before we go on, so at this point, what

23        do you recall you and Officer Cortez are talking

24        about at the 6:20 mark on the dash cam video?

25   A.   This is when he is first telling me about my

70

1          phone and we are going back and forth about my

2          phone.  And then you will see me put my phone on

3          the hood while Lamblin does his search.

4     Q.   And at this point, 6:41 of the dash cam video,

5          Officer Lamblin comes back over to join the

6          conversation.  What do you recall is happening at

7          this point?

8     A.   I honestly don't remember what Lamblin was

9          saying.  It was me and Cortez who was really

10         going back and forth.

11    Q.   All right.  (Video playing.)  Then we see at the

12         6:54 mark, you place your cell phone on the hood

13         of Officer Lamblin's police vehicle, right?

14    A.   Yes, sir.

15    Q.   And why did you do that?

16    A.   Just to get everything over with.  Because

17         Lamblin came back up like they wasn't going to go

18         on with his search until I put the phone down and

19         everything.  So I just wanted to get everything

20         done so I put the phone on the car.

21    Q.   Okay.  And at this point, 7 minutes of the dash

22         cam video, we can see that you are talking again

23         to Officer Cortez.

24              Do you remember what the conversation was

25         about at that point?

71

1    A.    I asked him why was he so big on me getting off

2          my phone or having my phone in my hand period.

3                He was just like -- I think that's when we

4          were going back and forth about it because he

5          said so basically.

6    Q.    And is that the interaction we discussed in the

7          previous video?

8    A.    No.  These are two separate videos.

9    Q.    No.  I know they are two separate videos.  But

10         they are the same encounter with Officer Cortez,

11         are they not?

12   A.    The last video we watched was after Lamblin did

13         his search.  This is before.  So the conversation

14         was still different.

15   Q.    Okay.  And in essence, what you are saying is you

16         are questioning why it is that you have to put

17         your cell phone down?

18   A.    Yeah.  Because I wasn't -- from my understanding,

19         I wasn't arrested.  I wasn't being under arrest.

20         I wasn't being detained.  So I was confused on

21         why I couldn't have my phone.

22   Q.    Okay.  But do you agree with me that, say, at the

23         7:08 mark that we are looking at here, where I

24         have stopped the video, that Officer Lamblin is

25         still engaged in the search of your vehicle?

72

1    A.   Yes, sir.

2    Q.   And you understood that the reason that Officer

3         Cortez wanted you to put your phone down was that

4         search was still ongoing at this point, right?

5    A.   I didn't understand that.  But I just -- like I

6         said, I just put the phone away just on my own

7         doings not because of what he was saying.

8    Q.   Okay.  In other words, you questioned why it was

9         necessary to do it; is that what you are saying?

10   A.   Yes, sir.

11   Q.   And we go back to the question I think we talked

12        about earlier which is that did you understand

13        that, in part, it was Officer Cortez's job to

14        make sure that Officer Lamblin, you, your

15        girlfriend, Officer Cortez himself and any

16        members of the public are to be kept safe during

17        the time when he is searching your car?  You

18        understood that, right?

19   A.   Yes, sir.  But at this time, I didn't understand

20        that.

21   Q.   Okay.  So when you say at this time, we are at

22        the 7:13 mark.  If Officer Lamblin is still -- is

23        he still in the car at that point?

24   A.   Yes, sir.

25   Q.   All right.  What is it that you didn't understand

73

1          would be just as important at the 7:13 mark as it

2          was at any other time when Officer Lamblin was

3          inside your vehicle doing his search?

4     A.   When you asked me earlier, you was talking about

5          -- from my understanding, you were talking about

6          that particular moment.  And then from this, we

7          are talking about this particular moment.  This

8          particular moment, I didn't understand.

9     Q.   Okay.  When you say this particular moment, we

10         are looking at the video from the dash cam at

11         7:13, 7 minutes 13 seconds.  We have agreed that

12         Officer Cortez is having a conversation with you

13         about the use of the cell phone, where he has

14         told you that you need to put it down.

15              He has not taken the cell phone away from

16         you at this point, right?

17    A.   Yes, sir.

18    Q.   That's correct?

19    A.   Yes, sir.

20    Q.   All right.  And the search is still ongoing, you

21         agree with me on that point, right?

22    A.   Yes, sir.

23    Q.   And you understood why -- why Officer Cortez --

24         you understood what his role was, that he was

25         there to protect the scene, protect you, protect

74

1          your girlfriend, himself and Officer Lamblin and

2          the public from any threat that might be posed to

3          any of you, correct?

4     A.   Yes, sir.

5     Q.   And certainly you understand that that's a

6          reasonable thing for an officer to do under that

7          circumstance; do you agree?

8     A.   No, sir.

9     Q.   You don't?

10    A.   At the time, I didn't know that.

11    Q.   Okay.  As you look back on it now, do you agree

12         that that was reasonable?

13    A.   Yes, sir.

14    Q.   (Video playing.)  All right.  Then at the 16

15         minute 22 second mark, you take the -- your cell

16         phone off the hood of Officer Lamblin's police

17         vehicle, correct?

18    A.   Yes, sir.

19    Q.   Had anybody from -- either Officer Cortez or

20         Officer Lamblin told you that that was

21         acceptable?

22    A.   No, sir.

23    Q.   And why did you elect to do that at that point?

24    A.   Well, I can't tell from this -- I can't tell if

25         the search was ongoing still because you skipped

**DAQUAVIAN MCKNIGHT**

75

1        up so far.  I don't know if Lamblin had went back

2        to the car.

3            But I do know when I picked my phone up,

4        Lamblin told me everything was over.  He was just

5        getting my citation and we were good to go.  So

6        that -- I took it upon myself that everything was

7        over; I was good to, you know, get back on my

8        phone.

9  Q.   All right.  I'll let you watch it in a second.

10       I'm just trying to move us along.  But I want to

11       make sure you have a fair opportunity to look at

12       this video.

13           I mean you have looked at the video before;

14       you already told me that.

15  A.   Not the dash cam.

16  Q.   Not the dash cam.  Okay.  And at the, say, 14

17       minute, 50 second mark, do you know if Officer

18       Lamblin is in your vehicle or his vehicle?

19  A.   I'm not sure.  From right now, I'm not sure.

20       Right now I'm taking it he is in the -- now I'm

21       taking that he is in the car because we are

22       looking back talking, so yeah.

23  Q.   Okay.

24  A.   He is done with his search.

25  Q.   Well, let me back up here.  Because I want to

DAQUAVIAN MCKNIGHT

76

1       find out where that is.

2   A.  I wasn't aware what time he went back on the

3       camera.

4   Q.  From your recollection of the events that day and

5       from your review of any of the video that you

6       looked at, did you pick the cell phone up off of

7       the hood of Officer Lamblin's vehicle at the

8       point Officer Lamblin went back to his vehicle?

9   A.  No.  When he went back, he was still in his

10      vehicle doing whatever.  It was like minutes

11      after I asked him was he done, what was going on;

12      and he was like, no, sir, you are good to go.

13      I'm just doing your citation.

14  Q.  Okay.  And so as we are watching this video -- we

15      are backing up now.  But as we are watching this

16      video at the 12 minute 15 second mark, you are

17      still unsure whether Officer Lamblin is in his

18      vehicle or your vehicle?

19  A.  Yes.  Because from the video, I can't see -- I

20      don't know if he is -- he hasn't walked back to

21      the car on the video so I don't know where he is

22      right now.

23  Q.  (Video playing.)  And then we look at the 15

24      minute mark right there, you were looking back.

25      Are you looking for something in particular?

1    A.   I think I -- I don't know if some -- somebody had

2         yelled out or something over at the little place

3         behind us.  And we just turned around and looked

4         -- seeing what was -- just look, that's all.

5    Q.   Okay.  Was that concerning to you in any way that

6         somebody had yelled out?

7    A.   No.  It wasn't nobody yelling out to get our

8         attention.  It was just somebody just walking and

9         it was just -- I guess it was a homeless man.  He

10        was making a noise and we turned around.

11   Q.   (Video playing.)  All right.  So I think that

12        sounded like Officer --

13   A.   Yeah.  Right here when we turned around, that's

14        when I asked him -- after we turned around the

15        first time, heard the yelling, I turned around

16        again and asked Lamblin what was going on and

17        that's when he's telling me he is doing my

18        citation.

19   Q.   So if we go all the way back to the beginning of

20        this video clip right here, we see that this

21        encompasses a time where he is behind you at what

22        looks like maybe Virginia and -- is that Main

23        Street?

24   A.   Yes, sir.

25   Q.   All right.  And that's city hall up here on the

78

```
 1              left, right here?
 2    A.    The municipal building.
 3    Q.    Yeah.
 4    A.    Yeah.
 5    Q.    Okay.  (Video playing.)  And then at this point
 6          because the video comes on and we can hear audio,
 7          you are crossing the next intersection on
 8          Virginia and are his lights illuminated at that
 9          point?
10    A.    I want to say like right after my car went up
11          under the light or whatever, that's when I got
12          pulled over.
13              Because like right there in the street, is
14          a hump.  So I -- I initially thought he was
15          pulling me over for swerving.  Because I -- you
16          have got to go around the hump so your car won't
17          just dip down.  So I went over to the left a
18          little bit.  That's what I -- I really thought I
19          was getting pulled over for that.  But...
20    Q.    But you knew Officer Lamblin was behind you this
21          whole way --
22    A.    Uh-huh.
23    Q.    -- since back when you first left the day care
24          center?
25    A.    Uh-huh.
```

79

1    Q.    Yes?

2    A.    Yes, sir.

3    Q.    All right.

4    A.    I'm sorry.

5    Q.    That's all right.  No problem.  (Video playing.)

6          And then obviously you start looking for a place

7          to pull over and ultimately you get into the

8          parking lot where he conducts the search, right?

9    A.    Yes, sir.

10   Q.    All right.  Then at the 1 minute 10 second mark

11         on the dash cam, we can see Officer Lamblin

12         departing his vehicle and coming up to yours,

13         right?

14   A.    Yes, sir.

15   Q.    And we have already discussed your interactions

16         with Officer Lamblin and to whatever degree you

17         might have had any concern about what he was

18         doing or why he did it, we have already talked

19         about that, right?

20   A.    Yes, sir.

21   Q.    If I can move this along here.  (Video playing.)

22         And I think we have established this, but you

23         understood from what you were told by Officer

24         Lamblin that the reason he was removing your

25         vehicle from the car was for your safety, your

80

1        girlfriend's safety and his safety, correct?

2   A.   Removing -- excuse me?

3   Q.   Removing the handgun from your vehicle.

4   A.   Oh, yes, sir.

5   Q.   (Video playing.)  Now using the body cam video at

6        the 3 minute mark, at this point do you consider

7        again that you have been pulled over because of

8        racial profiling or any other inappropriate

9        reason?

10   A.   Yeah, I was still feeling like that.

11   Q.   All right.  So even though you knew you didn't

12        have your seat belt on, which was a violation of

13        the Kentucky traffic code and that would justify

14        you being pulled over, when you got pulled over

15        you were already thinking I'm being pulled over

16        for racial reasons, not traffic violation

17        reasons?

18   A.   Yes.

19   Q.   (Video playing.)  And then at the 5 minute 40

20        second mark, I think we've established Officer

21        Lamblin asked you and your girlfriend to go back

22        and stand in front of his police vehicle,

23        correct?

24   A.   Yes, sir.

25   Q.   And I think at the 6 minute mark, we see Officer

**DAQUAVIAN MCKNIGHT**

81

1          Cortez arrive, correct?

2     A.   Yes, sir.

3     Q.   And we see Officer Lamblin going back to your

4          vehicle to begin the search; is that right?

5     A.   Yes, sir.

6     Q.   (Video playing.)  And I think we have already

7          established at the 6:55 mark, that's where you do

8          place the cell phone on the hood of Officer

9          Lamblin's police vehicle, correct?

10    A.   Yes, sir.

11    Q.   And then Officer Lamblin goes back to your

12         vehicle to continue the search, right?

13    A.   Yes, sir.

14    Q.   (Video playing.)  At this 8 minute mark, do you

15         know whether he is in your car or his cruiser,

16         being Officer Lamblin?

17    A.   He was in my car, I think.

18    Q.   I'm not trying to skip over anything by moving

19         the video; I'm just trying to save us some time.

20         Because I'm trying to figure out exactly where on

21         here -- at the 10 minute mark, do you think he is

22         still in your vehicle?

23    A.   Yeah, he's right there.

24    Q.   There he is.  Okay.  So -- (video playing.)

25              As far we know, at the 12 minute mark, he

82

1          is still searching the vehicle, right?

2     A.   Yes, sir.

3     Q.   And then at the 13:30 mark, do you know if he is

4          still in your vehicle?

5     A.   I'm not sure.

6     Q.   Okay.  Do you recall if Officer Lamblin walked

7          back to his vehicle outside of the video?

8     A.   I don't recall.

9     Q.   Do you even remember him going back to his

10         vehicle?

11    A.   No, sir.

12    Q.   So after the search, you would just have to rely

13         upon whatever the video shows or whatever others

14         would tell you about when he went back to his

15         vehicle to fill out the citation?

16    A.   Yes, sir.

17    Q.   But what you are telling me is that once he gets

18         back to his vehicle, you considered that the

19         search is over?

20    A.   No.  Because he was in his vehicle for, I would

21         say, a minute or two before I even said anything

22         to him, like what's going on now.

23    Q.   Okay.  And then when is it along the way that you

24         considered that Officer Lamblin has completed his

25         search of your vehicle?

83

1    A.   You are asking when did I think he was done?

2    Q.   Yeah.

3    A.   When he got to his car and he didn't go back for

4         like another minute or two, I was wondering what

5         was going on.

6    Q.   Okay.  And then if we move forward, I think what

7         we see is this interaction somewhere around the

8         13 -- no.  It is not 13.  Hang on.  Let me find

9         it.

10             All right.  So we have established at the

11        23 minute mark is when Officer Lamblin comes back

12        and presents you with a citation, right?

13   A.   Yes, sir.

14   Q.   And then it is after that point that you and your

15        girlfriend go back to the car and get in the car,

16        right?

17   A.   Yes, sir.

18   Q.   And then is it at that point that Officer Lamblin

19        places your handgun in the trunk of the car?

20   A.   Yes, sir.

21   Q.   I think it is right at the 23:30 mark that you

22        can see him close your trunk, right?

23   A.   Yes, sir.

24   Q.   And then he comes up alongside your vehicle and

25        advises you that you are free to go?

84

1    A.    Yes, sir.

2    Q.    Okay.  Let's go back then to your statement that

3          we are going to mark as Exhibit 1.  It is the

4          DM-0102 and the typed e-mail.  I want to ask you

5          a couple more questions.

6                Down toward the bottom of page 01 of

7          Exhibit 1, it says, quote, upset, shaking, scared

8          and teary eyed, I told him he would hear about

9          this and I would make sure he heard from my

10         lawyer because he just violated my rights and he

11         told me he didn't care and he told me to put my

12         phone away, unquote.

13               How would you describe being upset?  Are

14         you talking about purely emotionally or are you

15         sweating?  Are you crying?  What are you doing?

16   A.    I'm tearing up and getting a feeling in my

17         stomach.  I'm upset emotionally.  Especially like

18         after he grabbed my hand and squeezed, I felt

19         like he was just in -- inputting his dominance;

20         letting me know that he is in charge.  When he

21         squeezed my hand, it really just gave me a

22         different feeling like if I would have reacted

23         wrong, things could have went left or anything.

24   Q.    Okay.  Anytime you have watched the video, could

25         you see that you had tears in your eyes on the

DAQUAVIAN MCKNIGHT

85

1           video?

2    A.    No.  Because we were sweating.

3    Q.    I'm sorry?

4    A.    No.  Not from the videos that I have seen because

5          we were sweating.

6    Q.    Okay.  Are you saying that sweating would have

7          interfered with our ability to see you crying and

8          tearing up on the video?

9    A.    No.  You can see me several times wiping my face.

10   Q.    Okay.  Do you remember roughly how hot it is

11         August 3, 2022?

12   A.    No.  It was just by standing in the same spot;

13         standing in front of a hot car making me sweat.

14   Q.    All right.  So are you sweating solely because it

15         is hot outside and you are in front of a hot car?

16   A.    Me, no.  Probably, her, yes.  I was sweating more

17         so the situation after we were arguing, my

18         emotions going, feeling -- you know, emotions

19         going.  Just being nervous, scared, already in

20         front of a hot car; all of that coming in one

21         makes me sweat.

22   Q.    Okay.  So back to the specific question, your

23         explanation is we can't see that you have tears

24         in your eyes because you were sweating?

25   A.    I wasn't crying, I was teary eyed, but yes.

86

1    Q.   And that's the reason we can't see you teary eyed

2         is because you were sweating?

3    A.   No.  Because I wiped my face multiple times.

4    Q.   Okay.  And you would have wiped the tears from

5         your eyes multiple times?

6    A.   Yes.

7    Q.   All right.  And you are not saying that you're

8         sweating and your eyes -- and that's causing you

9         to tear up; you are saying you teared up because

10        of the circumstances?

11   A.   Yes, sir.

12   Q.   And you wiped the tears out when you wiped the

13        sweat off?

14   A.   Yes, sir.

15   Q.   And have you seen anything on the video we

16        reviewed today or the video that you reviewed

17        back at the time the lawsuit was filed to show

18        that you were shaking?

19   A.   No, sir.

20   Q.   Okay.  When you said in Exhibit 1, page 1, that

21        you were shaking, would you have an explanation

22        about why that's not shown in the video?

23   A.   The shaking started after he took my phone out of

24        my hand and when I crossed my arms because I was

25        in a wreck so I have like nerve damage already.

87

```
 1              So when he grabbed my hand, he squeezed it,
 2         like I was just -- like this was trying to --
 3         this is reframing me from my shaking.
 4              I didn't want to show my girlfriend that I
 5         was nervous.  She obviously seen I was upset.
 6         But like me trying to just hold my composure for
 7         her sake.
 8    Q.   Okay.
 9    A.   For her not to get upset and get worried.
10    Q.   And you were just describing that you put your
11         arms across your upper chest in order to sort of
12         -- you're suggesting that you were -- your
13         attempt was to hide the shaking; is that right?
14    A.   Yes, sir.
15    Q.   But you do see that on the video where you -- you
16         put your arms over your chest and embrace your
17         arms near your chest, right?
18    A.   Yes, sir.
19    Q.   And that would have been the only occasion when
20         you were shaking at the scene?
21    A.   Yes, sir.
22    Q.   You go on to state in Exhibit 1, page 1, that
23         this situation haunts me.  It's changed my
24         outlook.  Explain what you mean by that.
25    A.   Beforehand, before this situation, like I said, I
```

88

1          have coached so I'm always telling my kids, you

2          know, these people are here to protect and serve

3          us.  Like I always looked at them like the higher

4          authority.

5               So after this situation, it was more of

6          like I try to avoid any type of run-ins with the

7          police.  No matter what, I mean, if I see a

8          police officer at the gas station, I won't even

9          stop over there now.  So it's just like I

10         interact with the public, the people, but anybody

11         who has -- like I had a kid who played on my

12         basketball team and his mom was -- she worked for

13         the police department, like dispatch, like going

14         forth, the next year like I was just like I don't

15         think we should, you know, stay trying to -- you

16         know, have you a part of the team.  And I just

17         didn't feel right.

18              Like it just altered everything in my life,

19         like how I think, how I react.  Like emotionally.

20         Like I would get frustrated sometimes like just

21         thinking about the situation never -- never been

22         through nothing like that.  Made me fear like if

23         I had reacted a different way or what if when he

24         took my phone and squeezed my hand I bulked up

25         and -- I couldn't stop thinking about it.

89

1    Q.   All right.  Anything else you would add to that?

2    A.   No, sir.

3    Q.   Did you all go back to your girlfriend's house

4         after you were told you could leave?

5    A.   Yes, sir.

6    Q.   Did, at any point, you actually go and have your

7         wrist examined to see if you had suffered any new

8         damage?

9    A.   No, sir.

10   Q.   Did you even try to do that?

11   A.   No, sir.

12   Q.   Did the wrist bother you more after Officer

13        Cortez took your phone away?

14   A.   If I was picking up something, like it would --

15        it would have like a sharp pain but it wasn't

16        nothing like when -- at the time that it

17        happened.  That's why I never really just went to

18        go.

19   Q.   Have you had any symptoms in your left hand or

20        wrist area that you associate with Officer Cortez

21        taking your phone away, say, in 2023?

22   A.   Yes, sir.

23   Q.   I mean, how often do you have any of those

24        symptoms?

25   A.   If I'm at practice with my kids -- I usually get

90

1          down and try to do pushups with them.  But now

2          it's like a certain way of me turning my hand, I

3          feel that same like pain in my knuckle so I don't

4          do pushups or anything that has to with my hand

5          anymore too much.  I don't like putting pressure

6          on it or nothing.

7     Q.   All right.  So basically what it takes is that

8          you've got to use your left hand and you have got

9          to use it in a certain way that it will create

10         some type of pain; in your mind, that stems from

11         Officer Cortez taking your phone away from you?

12    A.   Yes, sir.

13    Q.   You go on on page 2 of Exhibit 1 to state that

14         this was the worst day of your life?

15    A.   Yes, sir.

16    Q.   Would you categorize this day worse than the day

17         that you heard your friend Jaylin Brown was

18         killed, and didn't you say his body was burned?

19    A.   Yes, sir.

20    Q.   So this day was worse than that?

21    A.   Yes, sir.

22    Q.   You go on to state on page 2 of Exhibit 1 that

23         this situation has changed me mentally and it's

24         hindering me from being who I am at heart.  This

25         encounter has permanently, I think that's,

1      scarred me for the rest of my life.  Is that what

2      you were saying?

3   A.  Yes, sir.

4   Q.  All right.  Have you given me all of the detail

5      about that that you think would be important for

6      you or a jury or anyone else to hear about how

7      it's changed you and scarred you?

8   A.  I have never in my life ever been put in that

9      situation where I felt like my life could be in

10     danger or one wrong move, anything could go wrong

11     and I have the mother of my child with me.  So

12     all of that factors into me being nervous and me

13     being scared and trying to control my emotions

14     and be strong in front of her.

15  Q.  Okay.

16  A.  And then me -- mentally has altered me thinking

17     like -- like I said I had a kid who his mother

18     worked in Hopkinsville police dispatch.  Me being

19     me, all of my parents tell me like I don't turn

20     my back on no kid.  I try to help anybody who

21     wants to get better with basketball.

22         But after this situation, it was just like

23     I was so nervous about the future, going forward,

24     like just having to deal with the police period.

25     Like anybody that is associated with them, I

```
 1          didn't want no dealings and that's not me.
 2    Q.    All right.  Anything else you would want to add?
 3    A.    No, sir.
 4    Q.    All right.  Did you seek any type of mental
 5          health therapy after August 3, 2022 as a result
 6          of what happened that day?
 7    A.    No, sir.
 8    Q.    Did you even attempt to do that?
 9    A.    Yes, sir.
10    Q.    How did you attempt to do that?
11    A.    I called a -- I called the -- I can't really
12          recall the name off the top of my head.  But me
13          being -- and I don't have any insurance because
14          I, of course, not having a job and all of that.
15                So when she -- when I was talking to the
16          woman, she was basically like who is your
17          insurance.  I'm like I don't have no insurance.
18          She's like, well, you're going to have to have
19          insurance or you will have to go through these
20          steps.  And it was just like -- it made me feel
21          like I wouldn't have the opportunity because I
22          didn't have insurance.
23    Q.    Okay.  So the reason you didn't follow up and get
24          any mental healthcare therapy is you didn't have
25          insurance?
```

1    A.    Yes.

2    Q.    And you are not on Medicaid, anything like that,

3          are you?

4    A.    No, sir.

5    Q.    Who do you consider to be your primary care

6          physician or provider?

7    A.    Hospital wise or doctor?  Jennie Stuart.

8    Q.    Yeah, Jennie Stuart is the hospital.  Is there a

9          particular person that you try to see when you

10         have got, you know, some kind of health need?

11   A.    No, sir.  I just go to Jennie Stuart.

12   Q.    Do you just go there.  Do you typically go to one

13         of their urgent care centers or outpatient

14         centers or what?

15   A.    Yes, sir.  The last time I was there, it was just

16         for a car wreck.

17   Q.    Okay.  Was that the one in 2018?

18   A.    Yes, sir.

19   Q.    Tell me about that wreck.  What happened?

20   A.    I was T-boned by -- it is called a Pax bus.  It's

21         like transportation for older people who have to

22         get around to doctors' appointments.

23              And I was going down a street.  And I guess

24         the person driving the bus, he didn't see me and

25         he like T-boned me.  Hit me right on my driver

94

1          door.  My shoulder was like stuck between the

2          door frame and the seat.  That's when I went to

3          the hospital.  I had back problems and all of

4          that.

5    Q.    Okay.  Did you file a lawsuit against the bus

6          driver or the bus company?

7    A.    Yes, sir.

8    Q.    And has that resolved?

9    A.    Yes, sir.

10   Q.    And I assume you were -- you settled for

11         compensation, financial compensation, with them?

12   A.    Yes, sir.

13   Q.    Do you have any physical problems that you still

14         suffer from as a result of the 2018 vehicle

15         collision?

16   A.    Yes, sir.

17   Q.    What are those?

18   A.    Back problems, sleeping.  I can't sleep a certain

19         way.  I can't lay down a certain way.  And like I

20         said before, I have like sometimes -- my left

21         shoulder was stuck between the door and like my

22         hand will get to shaking or my arm will get to

23         shaking; just nerve damage.

24   Q.    When is the last time that you sought any medical

25         care of any type for your symptoms from the car

DAQUAVIAN MCKNIGHT

95

1       wreck?

2   A.   2019.

3   Q.   Did you have to have surgery?

4   A.   No, sir.

5   Q.   Were you admitted to the hospital following that

6       wreck?

7   A.   Admitted like?

8   Q.   Overnight.

9   A.   Oh, no, sir.

10   Q.   And all of the care you got for that wreck and

11       the problems you had, though, was at Jennie

12       Stuart?

13   A.   Yes, sir.  And they referred me to their -- they

14       have physical therapy.  I had to go to physical

15       therapy for awhile.

16   Q.   Okay.  And you completed all of that?

17   A.   Yes, sir.

18   Q.   And the last time you had anything to do by way

19       of medical care or follow up, PT, any of that,

20       would have been 2019?

21   A.   No.  I was involved in another wreck.  I can't

22       recall if it was 2022 or 2021.

23   Q.   Tell me about that one.

24   A.   I was on my way to take my girlfriend to work.

25       And it was a car -- I guess I was in the car's

96

1      blind spot.  And they -- they proceeded to get

2      over and they hit us on the right side of the

3      car.  Yeah, they hit us on the right side.

4           And they were at fault for that too.  I

5      went to -- we both went to the hospital for that

6      too.

7  Q.  Did you go by ambulance?

8  A.  No, sir.

9  Q.  Did you go by ambulance in the 2018 wreck?

10  A.  Yes, sir.

11  Q.  Did you file a lawsuit from the 2021 or 2022 car

12      wreck?

13  A.  No, sir.

14  Q.  Or settle a claim?

15  A.  No, sir.

16  Q.  No settlement; no nothing?

17  A.  No, sir.

18  Q.  Even though it was the other driver's fault?

19  A.  Yes, sir.

20  Q.  And you were injured?

21  A.  Yes, sir.

22  Q.  And have you -- there may be a chance you can

23      still file that, but you are not pursuing that at

24      all?

25  A.  It was more of it -- it was a situation with the

97

1   hospital where they -- they said I didn't provide

2   them with the people's information, which I did.

3   They gave me -- the officer gave me a piece of

4   paper to give to the hospital, which I gave it to

5   them.  And they said I didn't.  But they had my

6   girlfriend's paper, which it was the same paper

7   just a different name.  Just I -- you know, I

8   gave it to them.

9       And they -- they said I never gave it to

10  them, which I know for a fact I did.  I wouldn't

11  have came to the hospital if I didn't.  And they

12  were trying to bill me with the bill from the

13  hospital from that incident.

14      So I'm just in contact with the bill people

15  or we are trying to find out how to get it

16  settled.

17 Q.  Okay.  The bottom line though on the second

18      wreck, you were not at fault.  You were injured.

19      You did have to have medical care?

20 A.  Yes, sir.

21 Q.  And did it make the injuries you suffered back in

22      2018 even worse?

23 A.  Yes, sir.  I -- I have way more back problems

24      than I did from the first wreck after that second

25      wreck.

**DAQUAVIAN MCKNIGHT**

98

1    Q.    Did you sustain any new injuries in the second

2          wreck?

3    A.    No new injuries.

4    Q.    All right.  Just an aggravation of the previous

5          wreck?

6    A.    Yes.

7    Q.    All right.  And prior to the 2018 wreck, did you

8          feel like you had anything physically wrong with

9          you?

10   A.    No, sir.

11   Q.    And you had not sought any kind of medical health

12         care of any type prior to 2018?

13   A.    No, sir.

14   Q.    And I think you answered this earlier.  You have

15         not sought any mental healthcare treatment since

16         or at any time in your life?

17   A.    At any time, no, sir.

18   Q.    All right.  Okay.  And this second wreck happened

19         before August 3, 2022; is that right?

20   A.    Yes, sir.

21   Q.    And other than the incident with the player on

22         your team, his mother who works for HPD in

23         dispatch, you have not had any interaction

24         whatsoever with the Hopkinsville Police

25         Department since August 3, 2022?

99

1   A.   No, sir, that's not -- I have had interactions

2        with them.

3   Q.   You have?

4   A.   Yes, sir.

5   Q.   We talked about the basketball thing.  But that

6        was before August 3, 2022, right?

7   A.   The basketball thing?

8   Q.   Yeah.  The fundraising event and all of that?

9   A.   Yes, it was before that.

10  Q.   You have had interaction with the HPD since

11       August 3 --

12  A.   When you say interactions, are you saying like me

13       getting pulled over or just being somewhere where

14       the police have been called to?

15  Q.   Let's start with the pull over.  Have you ever

16       been pulled over, arrested, detained, anything

17       like that, since August 3, 2022 by Hopkinsville

18       Police Department?

19  A.   Yes, sir.

20  Q.   All right.  How many times?

21  A.   Once.

22  Q.   For what?

23  A.   She said I -- what did she say?  She said I --

24       when I turned out, I went to the furthest lane

25       over instead of the lane that was closest to me.

100

1    Q.    Were you cited?

2    A.    She -- she pulled me over and she -- this was

3          actually Friday.

4                She pulled me over.  And she -- she -- when

5          she came to the car, I told her -- I let her know

6          I had my gun.  She asked for my gun.  She ran it.

7          She ran the card, the tags and everything.

8          Everything came back fine and she let me go.

9    Q.    All right.  So this is a female Hopkinsville

10         Police Department officer --

11   A.    Yes, sir.

12   Q.    -- who on August 11, this past Friday, pulled you

13         over for a lane violation.  Everything checked

14         out; she let you go?

15   A.    Yes, sir.

16   Q.    And you have no problems with the way she treated

17         you?

18   A.    No, sir.

19   Q.    Any other direct interaction like that?

20   A.    No, sir.

21   Q.    How about indirect interaction; basketball

22         events, whatever?

23   A.    Yes, sir.

24   Q.    Okay.  Tell me about those.

25   A.    My cousin was having -- she has this birthday

101

1          party every year.  And the police -- it's a

2          backyard party, which we were in the backyard.

3          Had a DJ, which the music wasn't loud.

4               The police came like seven times and kept

5          saying they had noise complaints.  But usually if

6          they have noise complaints, it is one or two

7          times and the third time they come back, they --

8          they are shutting it down.

9               But it was like they just kept coming back

10         just rallying the crowd up.  And then the last --

11         like the sixth or seventh time they came back

12         they just pulled up and grabbed my cousin, which

13         was the homeowner, put her in the car and told

14         everybody that she -- they are not letting her

15         out of the car until everybody leaves.

16    Q.   And that included you?

17    A.   No.  Well, yeah.  Everybody leave which including

18         me too, yeah, because I was there at the party.

19    Q.   Okay.  You didn't have any direct contact with

20         HPD that day, did you?

21    A.   No.

22    Q.   And you understood they were doing that because

23         of a potential noise violation?

24    A.   Yeah, that's right.

25    Q.   Okay.  Any other interaction?

102

1    A.    No, sir.

2    Q.    You have filed a lawsuit against the former chief

3          of the police, Clayton Sumner.

4                Do you have any specific information of

5          what former Chief Sumner did or failed to do that

6          would have harmed you in any way?

7    A.    No, sir.  But he made a statement which made me

8          feel like his officers was wrong.

9    Q.    Okay.  When did he make a statement and what did

10         he say?

11   A.    When I went to go grab my complaint paper from

12         the Hopkinsville Police Department, they said

13         they were expecting me because they had seen the

14         video and that Sumner said he felt like I baited

15         Cortez.

16   Q.    Okay.  He said that to you?

17   A.    Yes, sir.

18   Q.    Was there anyone else present when you and the

19         chief were talking?

20   A.    Yes, sir.

21   Q.    Who else?

22   A.    My uncle, Cary Sharber, and there was another

23         police officer in there with us.

24   Q.    Is that all the chief said that you found

25         inappropriate?

103

1    A.    Well, I didn't find it inappropriate.  It just

2          made me feel like that maybe he knows that Cortez

3          probably messed up.  And then he said --

4    Q.    Well, let me make sure I understand.  He -- you

5          understood the chief to be saying that Cortez

6          baited you?

7    A.    No.  He is saying I baited Cortez which prompted

8          Cortez to make the -- the moves he made, I guess.

9    Q.    I see.  Okay.  You didn't agree with the chief on

10         that point, or did you?

11   A.    No.  No, I didn't agree that I baited him.

12   Q.    Okay.  So anything else the chief said or did --

13   A.    He told me -- he was the one to tell me get a

14         lawyer.

15   Q.    Okay.  And you did that?

16   A.    Yes, sir.

17   Q.    Were you going to do that anyway?

18   A.    Yes, sir.

19   Q.    So that wasn't anything inappropriate that he

20         said?

21   A.    No.  He didn't do anything inappropriate.  He

22         didn't say anything inappropriate.

23   Q.    The only thing Chief Sumner said to you was that

24         you baited him, meaning Officer Cortez.  You

25         disagree with the chief about that?

104

1    A.    Yes, sir.

2    Q.    Otherwise, Chief Sumner did not do or say

3          anything that you know of that harmed you in any

4          way?

5    A.    Correct.

6    Q.    And then, of course, the City of Hopkinsville is

7          named as a party to the suit.  Do you know what

8          the City did or failed to do that harmed you in

9          any way?

10   A.    I feel like when you have several complaints on

11         an officer, you really need to take a look at

12         that officer instead of just having them out.

13             There's 30, 40 people saying things about

14         one police officer, is not a coincidence.

15   Q.    Okay.  And when you say officer, you mean Officer

16         Cortez?

17   A.    Yes, sir.

18   Q.    And when you say 30 to 40 people, are you talking

19         about people who have said that on Facebook that

20         you are aware of?

21   A.    Yes, sir.

22   Q.    All right.  Do you know how many complaints have

23         been filed against Officer Cortez?

24   A.    I don't.

25   Q.    This pleading that is styled McKnight's Responses

105

1          to the City of Hopkinsville's First Set of

2          Interrogatories and Request for Production of

3          Documents has an electronic signature back here

4          on page 15.  Is that your electronic signature?

5     A.   Yes, sir.

6     Q.   And you understood that the answers you gave in

7          this pleading and any other pleading were your

8          electronic signature exists is a verification

9          under oath that the information you have provided

10         is correct?

11    A.   Yes, sir.

12    Q.   Is there anything else you would want to add

13         about the emotional harm that you are claiming

14         occurred as a result of the actions of the

15         Hopkinsville Police Department and these two --

16         these three officers that you have sued that you

17         haven't otherwise told me about?

18    A.   No, sir.

19    Q.   I think we asked you in this pleading and you

20         told us you have never been convicted of a

21         felony, correct?

22    A.   Correct.

23    Q.   Are you under any criminal charge at this time?

24    A.   No, sir.

25    Q.   Do you have any intentions of filing bankruptcy?

106

1    A.    No, sir.

2    Q.    Have you ever filed a bankruptcy petition?

3    A.    No, sir.

4    Q.    You have made reference to producing Jennie

5          Stuart Medical Center records.  I believe there

6          are 210 pages of that.

7                There may actually be more than that, but

8          all of those Jennie Stuart medical records are

9          going to relate to the car wrecks that you were

10         involved in, right?

11   A.    Yes, sir.

12   Q.    And your contention here is that those two wrecks

13         led to injuries.  One of them being your left

14         hand, wrist, and that when Officer Cortez took

15         your phone away, he aggravated one of those

16         injuries; is that what I'm understanding you to

17         say?

18   A.    No, sir.  No wreck caused nothing with my hand.

19         My hand situation came back when I was like in

20         high school.

21   Q.    Okay.  And you --

22   A.    That wreck just messed up my -- my arm and a

23         little nerve damage.

24   Q.    Okay.  All right.  So the preexisting hand,

25         wrist, problem dates all the way back to high

107

1       school?

2   A.  Yes, sir.

3   Q.  And had it been a problem since you got out of

4       high school?

5   A.  No, sir.

6   Q.  When did it stop hurting after you initially hurt

7       it in high school?

8   A.  I would say after -- probably like a month and a

9       half after practice; like I wasn't able to

10      practice really.

11  Q.  Okay.  And that was what year?

12  A.  '20 -- I was a freshman.  2010.

13  Q.  2010.  All right.  So that would have been 13

14      years before the incident of August 3 of 2022 or

15      12 years actually?

16  A.  Yes, sir.

17  Q.  All right.  And you are saying that within a few

18      weeks, couple months, period of time, this was a

19      sports related injury, it healed up; it was all

20      good?

21  A.  Yes, sir.

22  Q.  And then when Officer Cortez grabs your wrist to

23      take the phone away as we reviewed on the video,

24      he injured your wrist?

25  A.  He didn't grab my wrist.  He grabbed my hand.

108

1      Q.   Your hand?

2      A.   Yes, sir.

3      Q.   Okay.  And he injured your hand?

4      A.   Yes, sir.

5      Q.   And you still have problems with the hand?

6      A.   Yes, sir.  Only when I apply pressure.

7      Q.   All right.  In the initial disclosure pleading

8           that was filed by your lawyer -- this is not one

9           that you verified but it was represented to the

10          court and to me and to my client that you're

11          making claim for emotional pain and suffering.

12               Have we talked about that in all of the

13          detail that you feel would be appropriate to

14          describe your emotional pain and suffering?

15     A.   Explain.

16     Q.   Yeah.  You are making a claim for emotional pain

17          and suffering against the defendants that have

18          been named in the suit, right?

19     A.   Yes, sir.

20     Q.   And you have told me a lot about your emotional

21          reaction, being scared, tearing up, all of that.

22               Is there anything else you feel like you

23          need to add to that that we haven't already

24          talked about?

25     A.   No, sir.

109

```
 1    Q.   You also are making a claim, according to this
 2         pleading, for mental anguish.
 3              Is there anything else you need to add that
 4         would be evidence of your mental anguish that we
 5         haven't already talked about?
 6    A.   No, sir.
 7    Q.   And then you are making a claim for loss of
 8         enjoyment of life.  Anything else you need to add
 9         to support that claim?
10    A.   No, sir.
11    Q.   And then you are making a claim for humiliation.
12         Anything else that you need to add for that
13         claim?
14    A.   No, sir.
15    Q.   And then embarrassment, anything you need to add
16         for that claim?
17    A.   Yeah.  It was -- yes, sir.  It was people inbox
18         and commenting about the video telling I'm just
19         -- I was just a coward.  I was weak.  It wasn't
20         that serious.  And just -- it just made me feel
21         like that people really just overlooked these
22         type of situations.
23    Q.   Okay.  So that obviously didn't make you feel
24         good about what they were saying.  But those are
25         the opinions of other people that are making you
```

110

1         feel that way, right?

2    A.   I mean, yeah.  But then knows -- like because I'm

3         known, like I'm a public figure, so everybody

4         knows me in Hopkinsville.

5              So when I'm getting messages from people

6         who -- who like my posts about basketball and

7         then here it is a situation, the police doing, is

8         like -- they acted like they all know who I am at

9         heart and then they are laughing.  It -- it just

10        -- it is humiliating.

11   Q.   Did you ever threatened to sue any of those

12        people for making you feel that way?

13   A.   No, sir.  I didn't reply to them.

14   Q.   Or embarrassing you because of what they said was

15        embarrassing to you?

16   A.   No, sir.

17   Q.   Did you ever even confront any of them?

18   A.   No, sir.

19   Q.   Do you have any appointments to see any type of

20        mental health, physical health providers for

21        injuries or emotional conditions that you believe

22        were caused by the defendants in this suit?

23   A.   I have been trying to get in contact with someone

24        who told me via Facebook I made -- I had a

25        question one day.  So I'm trying to see if there

111

1       is any way I could without being -- having

2       insurance.

3   Q.   Okay.  Do you know the person's name?

4   A.   I would have to look on the piece of paper that I

5       have at home.  I had it wrote down.

6   Q.   All right.  It is somebody in Hopkinsville.  Is

7       it on the mental health side?

8   A.   Yes, sir.

9   Q.   All right.  And if you are able to work that out,

10      you plan to go seek counselling from them?

11  A.   Yes, sir.

12  Q.   But you -- at this point, you don't know if you

13      are going to be able to do that or not?

14  A.   If they will let me without having any insurance

15      to cover it.

16  Q.   Okay.

17  A.   Because I really don't know how that works.

18  Q.   In your complaint, you make basically four

19      different claims.  And some of this is going to

20      be legal matters that you are not trained to

21      express opinions on.

22         So if I'm asking you something you don't

23      feel qualified to answer, you can just tell me

24      that, that I don't know what that means and I'm

25      not qualified and I can't answer it.  But one of

112

1          the things that you allege is that there was

2          retaliation against you by the defendants in

3          violation of your first amendment rights.

4               Do you know any other factual information

5          that would support that?

6     A.   I'm not qualified to answer that.

7     Q.   That there was an illegal search and seizure in

8          violation of the fourth amendment by Officer

9          Cortez.

10              Do you have any other information, facts,

11         that you want to share that would support that

12         allegation?

13    A.   No, sir.

14    Q.   That there was a deprivation of right to speak

15         and right to record police activity in violation

16         of the first amendment alleged against Officer

17         Cortez.  Anything else you need to add that

18         factually supports that claim?

19    A.   No, sir.

20    Q.   And then there is deliberate indifference to

21         failing to train and/or supervise Officer Lamblin

22         and Officer Cortez and that's alleged against the

23         chief at the time, Chief Sumner, and the City of

24         Hopkinsville.

25              Is there anything more you need to add in

113

1           support of that claim?

2    A.    No, sir.

3    Q.    You indicated that you had not filed any tax

4           return for '21 or 2022.  Have you since filed any

5           tax returns for those years?

6    A.    No, sir.

7    Q.    And is that because you haven't been working?

8    A.    Yes, sir.

9                MR. SIGLER:  All right.  Mr. McKnight, I

10               believe those are all the questions I have.

11               Thank you very much.

12               MR. SULLENGER:  I don't think I'm going to

13               ask any today.  I do want to, I think,

14               clarify; we produced his Facebook profile

15               and I think that's where what we were

16               talking about earlier is there were Facebook

17               comments, other posts and such interactions

18               that I -- that had to be where it came from.

19               Because I know -- they were online postings

20               and if we didn't produce them, hard copy,

21               that's why because they were part of what we

22               sent.

23               MR. SIGLER:  Okay.  We are going to go ahead

24               and mark the two-page statement of Mr.

25               McKnight that's marked in discovery as DM 1

**DAQUAVIAN MCKNIGHT**

114

1          and DM 02 as Exhibit 1.  I'm happy to put

2          into the record the video if you all want a

3          separate copy of that.  I think everybody

4          has the video and I think the descriptions

5          of what we were talking about should be easy

6          to follow.  So I was not intending to put

7          the video in the record.  That's all I have.

8          (Exhibit Number 1 marked for

9          identification.)

10         (The deposition concluded at 12:00 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

115

1                  <u>REPORTER'S CERTIFICATE</u>

2

3       I, ALLISON GAYLE DUTTON, Court Reporter and Notary
Public in and for the State of Kentucky at Large, do
4   hereby certify that the above and foregoing is, to the
best of my ability, a true, correct and complete
5   transcript of the deposition of DAQUAVIAN MCKNIGHT,
taken at the time and place and for the purpose set out
6   in the caption hereof; that said witness was duly sworn
by me; that said deposition was taken down in stenotype
7   by me and thereafter transcribed; that the appearances
were as set out in the caption hereof; and that no
8   request was made by counsel for either party or by the
witness that the deposition be submitted to the witness
9   for signature.

10      I further certify that I am neither attorney for, nor
counsel for, nor related to, nor employed by any of the
11  parties to the action in which this deposition is taken;
and further, that I am not a relative or employee of any
12  attorney or counsel employed by the parties hereto nor
financially interested in the action.

13
        My commission expires August 27, 2026.  My Commission
14  Number is KYNP56828.

15      Given under my hand and seal of office on this the
7th day of September, 2023.

16

17

18      _____
        ALLISON GAYLE DUTTON
        Notary Public
19      State of Kentucky at Large

20

21

22

23

24

25

'

**'20** [1] - 107:12
**'21** [1] - 113:4
**'22** [1] - 23:4

**0**

**01** [2] - 41:14, 84:6
**02** [2] - 40:14, 114:1

**1**

**1** [16] - 3:4, 56:11, 60:5, 60:6, 79:10, 84:3, 84:7, 86:20, 87:22, 90:13, 90:22, 113:25, 114:1, 114:8
**10** [2] - 79:10, 81:21
**100** [5] - 1:17, 2:9, 17:23, 35:1, 54:8
**11** [2] - 56:11, 100:12
**114** [1] - 3:4
**115** [1] - 2:20
**12** [3] - 76:16, 81:25, 107:15
**120** [1] - 1:24
**12:00** [1] - 114:10
**13** [4] - 73:11, 83:8, 107:13
**130** [1] - 6:12
**1313** [1] - 11:22
**13:30** [1] - 82:3
**14** [2] - 1:14, 75:16
**15** [3] - 76:16, 76:23, 105:4
**16** [1] - 74:14
**19** [2] - 48:17, 67:14
**1:05** [1] - 56:10
**1:30** [1] - 60:17
**1:37** [2] - 60:17, 60:20
**1:53** [1] - 60:20
**1:57** [1] - 60:24

**2**

**2** [3] - 13:19, 90:13, 90:22
**20** [1] - 60:6
**2000** [1] - 39:14
**2010** [2] - 107:12, 107:13
**2014** [1] - 7:10
**2018** [6] - 93:17, 94:14, 96:9, 97:22, 98:7, 98:12
**2019** [2] - 95:2, 95:20
**2020** [4] - 38:19, 38:20, 39:21, 56:16
**2021** [7] - 38:19, 38:20, 39:14, 39:21,

56:16, 95:22, 96:11
**2022** [48] - 6:15, 7:25, 8:9, 9:3, 9:4, 9:12, 10:2, 11:3, 11:11, 13:13, 13:16, 13:19, 15:22, 15:25, 16:17, 16:20, 17:7, 17:8, 17:14, 18:10, 19:1, 20:6, 20:9, 20:22, 21:19, 22:21, 22:25, 23:6, 23:10, 36:14, 37:11, 37:14, 38:6, 38:10, 38:16, 38:21, 40:10, 58:13, 85:11, 92:5, 95:22, 96:11, 98:19, 98:25, 99:6, 99:17, 107:14, 113:4
**2023** [5] - 1:14, 39:14, 60:1, 89:21, 115:15
**2026** [1] - 115:13
**210** [1] - 106:6
**22** [2] - 51:10, 74:15
**23** [1] - 83:11
**23:30** [1] - 83:21
**24** [2] - 13:14, 15:25
**24-hour** [1] - 15:21
**2508** [1] - 2:5
**27** [2] - 6:8, 115:13
**270** [1] - 21:18
**270-925-1989** [1] - 1:24
**29** [3] - 54:11, 54:20, 55:2
**2:06** [1] - 60:24
**2:20** [1] - 61:13
**2:25** [1] - 62:6
**2:27** [2] - 61:14, 61:16
**2:37** [1] - 61:16
**2:39** [1] - 61:19
**2:40** [1] - 61:19
**2:45** [1] - 62:3
**2:55** [1] - 62:3

**3**

**3** [34] - 7:25, 10:2, 11:3, 11:11, 13:13, 13:16, 15:11, 15:22, 15:25, 16:17, 17:7, 17:14, 19:1, 20:6, 20:9, 23:10, 36:14, 37:11, 37:14, 38:6, 38:10, 40:10, 42:9, 58:13, 60:1, 80:6, 85:11, 92:5, 98:19, 98:25, 99:6, 99:11, 99:17, 107:14

**30** [7] - 20:5, 31:15, 31:16, 42:11, 60:6, 104:13, 104:18
**39** [4] - 54:11, 54:20, 55:2, 55:20
**3:15** [1] - 62:6
**3:30** [2] - 18:20, 19:11

**4**

**4** [1] - 2:19
**40** [3] - 80:19, 104:13, 104:18
**400** [1] - 2:9
**402** [2] - 4:8, 14:14
**42001** [1] - 2:10
**42003** [2] - 1:24, 2:5

**5**

**5** [2] - 63:11, 80:19
**50** [1] - 75:17
**5:01** [1] - 62:24
**5:15** [2] - 63:11, 63:15
**5:22-CV-00154-BJB** [1] - 1:2
**5:45** [1] - 63:15
**5:49** [1] - 64:13
**5:50** [2] - 64:19, 69:6
**5:57** [1] - 69:10

**6**

**6** [3] - 64:6, 64:19, 80:25
**6:03** [1] - 64:23
**6:10** [1] - 65:3
**6:15** [1] - 64:6
**6:20** [3] - 65:8, 69:15, 69:24
**6:30** [2] - 65:8, 65:11
**6:41** [1] - 70:4
**6:45** [2] - 65:12, 66:8
**6:49** [1] - 67:3
**6:54** [1] - 70:12
**6:55** [1] - 81:7

**7**

**7** [3] - 67:14, 70:21, 73:11
**7:08** [1] - 71:23
**7:13** [2] - 72:22, 73:1, 73:11
**7:30** [1] - 16:12
**7th** [1] - 115:15

**8**

**8** [2] - 19:16, 81:14

**8:00** [1] - 18:20

**A**

**ability** [5] - 5:19, 5:23, 7:1, 85:7, 115:4
**able** [6] - 47:15, 47:18, 58:22, 107:9, 111:9, 111:13
**acceptable** [4] - 4:25, 5:11, 13:10, 74:21
**accomplish** [2] - 4:20, 4:21
**according** [1] - 109:1
**account** [1] - 59:24
**accurate** [2] - 5:16, 40:20
**acted** [2] - 37:5, 110:8
**action** [2] - 115:11, 115:12
**actions** [1] - 105:14
**activated** [1] - 46:20
**active** [1] - 43:15
**activity** [1] - 112:15
**add** [12] - 39:22, 68:3, 89:1, 92:2, 105:12, 108:23, 109:3, 109:8, 109:12, 109:15, 112:17, 112:25
**additional** [1] - 59:6
**address** [6] - 1:25, 4:7, 11:19, 11:21, 12:5, 14:18
**admitted** [2] - 95:5, 95:7
**advise** [2] - 29:15, 66:8
**advised** [2] - 29:12, 68:9
**advises** [1] - 83:25
**advising** [1] - 56:12
**afternoon** [1] - 14:2
**afterwards** [1] - 18:1
**Agency** [1] - 1:22
**aggravated** [1] - 106:15
**aggravation** [1] - 98:4
**aggressive** [1] - 35:20
**ago** [1] - 8:22
**agree** [12] - 31:20, 44:1, 46:19, 46:23, 47:7, 47:10, 71:22, 73:21, 74:7, 74:11, 103:9, 103:11
**agreeable** [1] - 5:5

**agreed** [1] - 73:11
**ahead** [1] - 113:23
**airplanes** [1] - 64:25
**alcohol** [1] - 15:24
**alert** [2] - 27:13, 28:2
**Alexander** [1] - 1:7
**allegation** [1] - 112:12
**allege** [1] - 112:1
**alleged** [2] - 112:16, 112:22
**ALLISON** [2] - 115:3, 115:18
**allowed** [2] - 1:18, 17:22
**alongside** [1] - 83:24
**altered** [2] - 88:18, 91:16
**Altima** [2] - 26:3, 26:9
**ambulance** [2] - 96:7, 96:9
**amendment** [9] - 35:3, 35:4, 35:7, 35:8, 35:9, 35:15, 112:3, 112:8, 112:16
**anguish** [1] - 109:2, 109:4
**answer** [7] - 13:8, 23:1, 32:19, 47:3, 111:23, 111:25, 112:6
**answered** [1] - 98:14
**answers** [4] - 4:22, 5:16, 40:15, 105:6
**anytime** [2] - 13:7, 84:24
**anyway** [1] - 103:17
**appearances** [1] - 115:7
**applicable** [1] - 1:17
**apply** [1] - 108:6
**appointments** [2] - 93:22, 110:19
**approached** [2] - 28:2, 33:2
**appropriate** [2] - 65:16, 108:13
**area** [2] - 47:12, 89:20
**arguing** [1] - 85:17
**arm** [2] - 94:22, 106:22
**arms** [4] - 86:24, 87:11, 87:16, 87:17
**arrange** [1] - 41:7
**arrest** [5] - 6:14, 6:17, 58:12, 61:23, 71:19
**arrested** [5] - 6:18, 20:12, 38:25, 71:19,

99:16
  **arrival** [1] - 42:20
  **arrive** [2] - 19:16, 81:1
  **arrived** [3] - 44:7, 51:7, 53:15
  **arrives** [2] - 34:20, 69:12
  **associate** [1] - 89:20
  **associated** [1] - 91:25
  **assume** [3] - 5:9, 16:4, 94:10
  **assumed** [1] - 37:15
  **Atlanta** [2] - 39:17, 39:22
  **attempt** [3] - 87:13, 92:8, 92:10
  **attempting** [1] - 41:2
  **attention** [1] - 77:8
  **attorney** [3] - 10:8, 115:10, 115:12
  **audio** [1] - 78:6
  **August** [43] - 1:14, 6:14, 7:25, 8:9, 10:1, 11:3, 11:11, 13:13, 13:16, 13:19, 15:11, 15:21, 15:25, 16:17, 17:7, 17:14, 18:10, 19:1, 20:6, 20:9, 23:6, 23:10, 36:13, 37:11, 37:14, 38:6, 38:10, 38:16, 38:21, 40:9, 42:9, 58:13, 60:1, 85:11, 92:5, 98:19, 98:25, 99:6, 99:11, 99:17, 100:12, 107:14, 115:13
  **authority** [1] - 88:4
  **Avenue** [1] - 11:22
  **avoid** [1] - 88:6
  **aware** [7] - 9:25, 11:15, 40:4, 42:15, 43:3, 76:2, 104:20
  **awhile** [1] - 95:15

**B**

  **background** [1] - 6:1
  **backing** [1] - 76:15
  **backyard** [2] - 101:2
  **bad** [1] - 39:3
  **Bad** [1] - 21:18
  **baited** [5] - 102:14, 103:6, 103:7, 103:11, 103:24
  **bankruptcy** [2] - 105:25, 106:2
  **Barkley** [2] - 13:25, 14:22

  **based** [1] - 29:11
  **basing** [1] - 55:6
  **basis** [1] - 68:4
  **basketball** [12] - 20:19, 21:5, 21:7, 23:4, 43:17, 43:18, 88:12, 91:21, 99:5, 99:7, 100:21, 110:6
  **Basketball** [1] - 21:9
  **bed** [1] - 16:9
  **beforehand** [1] - 87:25
  **began** [1] - 54:7
  **begin** [1] - 81:4
  **beginning** [5] - 24:1, 28:13, 34:20, 38:20, 77:19
  **behind** [8] - 23:17, 25:13, 25:17, 26:18, 26:21, 77:3, 77:21, 78:20
  **belt** [8] - 6:20, 24:8, 24:12, 24:17, 26:11, 61:7, 61:8, 80:12
  **beneficial** [1] - 52:21
  **best** [4] - 4:22, 5:4, 26:12, 115:4
  **better** [3] - 46:3, 48:2, 91:21
  **between** [25] - 17:7, 23:25, 27:7, 39:4, 39:21, 42:2, 49:17, 54:11, 60:5, 60:17, 60:20, 60:23, 61:13, 61:16, 62:3, 62:6, 63:11, 63:15, 64:5, 64:18, 65:8, 65:11, 65:12, 94:1, 94:21
  **beyond** [2] - 7:11, 17:3
  **big** [3] - 18:24, 18:25, 71:1
  **bigger** [1] - 43:23
  **bill** [3] - 97:12, 97:14
  **birthday** [1] - 100:25
  **bit** [2] - 6:1, 78:18
  **Blankenship** [1] - 2:9
  **blind** [1] - 96:1
  **blood** [1] - 39:3
  **BLUEGRASS** [1] - 1:21
  **bluegrassreporting @gmail.com** [1] - 1:25
  **body** [5] - 8:16, 39:17, 48:16, 80:5, 90:18
  **boned** [2] - 93:20, 93:25
  **born** [1] - 6:2

  **bother** [1] - 89:12
  **bottom** [2] - 84:6, 97:17
  **boy** [2] - 18:12, 18:13
  **boy's** [1] - 43:18
  **Boys** [1] - 21:18
  **break** [1] - 69:1
  **Brewing** [1] - 41:17
  **briefly** [1] - 31:4
  **broad** [1] - 20:10
  **broadcast** [1] - 51:3
  **broadcasting** [1] - 47:11
  **broke** [1] - 61:20
  **broken** [1] - 56:2
  **Brown** [3] - 36:23, 36:24, 90:17
  **brown** [19] - 37:2, 37:3, 37:6, 37:9, 37:18, 38:9, 38:22, 38:25, 39:4, 39:11, 39:13, 39:20, 39:21, 39:25, 40:5, 56:14, 56:15, 60:2
  **building** [1] - 78:2
  **bulked** [1] - 88:24
  **bully** [1] - 52:15
  **burned** [3] - 30:5, 39:18, 90:18
  **burning** [1] - 30:2
  **bus** [4] - 93:20, 93:24, 94:5, 94:6
  **but..** [1] - 78:19
  **BY** [1] - 4:4

**C**

  **calm** [1] - 59:16
  **cam** [12] - 8:16, 8:18, 48:16, 69:4, 69:24, 70:4, 70:22, 73:10, 75:15, 75:16, 79:11, 80:5
  **camera** [4] - 47:14, 50:25, 51:1, 76:3
  **camp** [1] - 16:25
  **cams** [1] - 13:3
  **cannot** [1] - 8:4
  **capacity** [1] - 57:6
  **caption** [2] - 115:6, 115:7
  **capturing** [1] - 46:8
  **car** [53] - 28:5, 29:13, 30:1, 30:5, 30:14, 30:17, 30:20, 30:23, 31:1, 31:2, 31:3, 31:4, 31:7, 31:9, 31:13, 31:23, 32:1, 32:9, 32:12, 32:23, 35:7,

36:18, 42:7, 42:9, 63:4, 68:20, 70:20, 72:17, 72:23, 75:2, 75:21, 76:21, 78:10, 78:16, 79:25, 81:15, 81:17, 83:3, 83:15, 83:19, 85:13, 85:15, 85:20, 93:16, 94:25, 95:25, 96:3, 96:11, 100:5, 101:13, 101:15, 106:9
  **car's** [1] - 95:25
  **card** [1] - 100:7
  **care** [23] - 10:24, 17:13, 17:21, 18:14, 19:15, 19:19, 19:21, 23:12, 24:9, 25:19, 26:7, 26:19, 27:8, 52:14, 78:23, 84:11, 93:5, 93:13, 94:25, 95:10, 95:19, 97:19, 98:12
  **Cary** [1] - 102:22
  **CASE** [1] - 1:2
  **catch** [1] - 27:3
  **categorize** [1] - 90:16
  **caused** [2] - 106:18, 110:22
  **causing** [1] - 86:8
  **cell** [18] - 46:6, 49:1, 49:5, 49:9, 49:24, 49:25, 50:5, 50:11, 51:8, 52:22, 53:2, 70:12, 71:17, 73:13, 73:15, 74:15, 76:6, 81:8
  **Center** [3] - 20:18, 21:2, 106:5
  **center** [3] - 26:19, 27:8, 78:24
  **centers** [2] - 93:13, 93:14
  **certain** [8] - 8:5, 65:17, 90:2, 90:9, 94:18, 94:19
  **certainly** [3] - 31:21, 45:7, 74:5
  **CERTIFICATE** [2] - 2:20, 115:1
  **certification** [1] - 7:19
  **certifications** [2] - 7:15, 7:18
  **certify** [2] - 115:4, 115:10
  **chance** [2] - 11:19, 96:22
  **change** [1] - 62:25
  **changed** [3] - 87:23,

90:23, 91:7
  **charge** [2] - 84:20, 105:23
  **check** [1] - 15:8
  **checked** [2] - 37:20, 100:13
  **chest** [3] - 87:11, 87:16, 87:17
  **chief** [8] - 102:2, 102:19, 102:24, 103:5, 103:9, 103:12, 103:25, 112:23
  **Chief** [7] - 1:8, 4:13, 67:24, 102:5, 103:23, 104:2, 112:23
  **child** [8] - 10:22, 10:24, 16:4, 17:13, 17:19, 18:8, 18:10, 91:11
  **Christian** [4] - 6:3, 6:5, 7:8, 22:12
  **circumstance** [1] - 74:7
  **circumstances** [2] - 10:1, 86:10
  **citation** [1] - 6:20, 28:15, 48:10, 63:4, 63:5, 65:14, 75:5, 76:13, 77:18, 82:15, 83:12
  **cited** [3] - 6:18, 24:20, 100:1
  **citizen** [1] - 43:2
  **City** [8] - 1:8, 4:13, 40:1, 67:25, 104:6, 104:8, 105:1, 112:23
  **city** [1] - 77:25
  **Civil** [1] - 1:18
  **claim** [11] - 96:14, 108:11, 108:16, 109:1, 109:7, 109:9, 109:11, 109:13, 109:16, 112:18, 113:1
  **claiming** [1] - 105:13
  **claims** [1] - 111:19
  **clarification** [1] - 41:12
  **clarified** [1] - 42:10
  **clarify** [6] - 18:1, 32:14, 32:17, 32:19, 40:23, 113:14
  **Clayton** [2] - 1:8, 102:3
  **clear** [2] - 5:3, 27:1
  **cleared** [1] - 50:14
  **clears** [1] - 11:25
  **client** [1] - 108:10
  **clip** [2] - 67:13, 77:20
  **clips** [1] - 12:16
  **close** [1] - 83:22

**closest** [1] - 99:25
**coach** [1] - 21:7
**coached** [1] - 88:1
**code** [1] - 80:13
**coincidence** [1] -
104:14
**College** [1] - 7:13
**college** [1] - 7:17
**collision** [1] - 94:15
**comfortable** [1] -
22:18
**comforting** [2] -
52:21, 52:25
**coming** [7] - 29:12,
30:9, 42:19, 46:25,
79:12, 85:20, 101:9
**comment** [1] - 58:7
**commented** [1] -
59:1
**commenting** [2] -
58:9, 109:18
**comments** [3] - 64:4,
65:5, 113:17
**commission** [1] -
115:13
**Commission** [1] -
115:13
**community** [3] -
7:12, 43:15, 43:25
**Community** [1] -
7:13
**company** [1] - 94:6
**Company** [1] - 41:17
**compensation** [2] -
94:11
**complaint** [3] - 40:1,
102:11, 111:18
**complaints** [4] -
101:5, 101:6, 104:10,
104:22
**complete** [2] - 17:5,
115:4
**completed** [5] - 7:4,
55:3, 55:8, 82:24,
95:16
**complied** [1] - 44:2
**composure** [1] -
87:6
**concern** [1] - 79:17
**concerned** [3] -
22:24, 33:9, 33:18
**concerning** [2] -
53:16, 77:5
**concluded** [1] -
114:10
**concluding** [2] -
24:2, 36:8
**conditions** [1] -
110:21
**conduct** [1] - 59:12

**conducting** [2] -
44:17, 63:1
**conducts** [1] - 79:8
**confident** [1] - 54:6
**confront** [1] - 110:17
**confronted** [1] - 51:7
**confused** [1] - 71:20
**connect** [1] - 11:25
**consented** [1] - 32:6
**consider** [10] -
28:11, 28:17, 45:22,
52:4, 52:7, 64:4, 65:5,
67:8, 80:6, 93:5
**considered** [3] -
34:8, 82:18, 82:24
**considering** [1] -
68:10
**constantly** [1] -
56:18
**constitutional** [1] -
36:1
**consumed** [1] -
15:24
**contact** [4] - 22:5,
97:14, 101:19, 110:23
**contacts** [1] - 6:24
**content** [2] - 52:7,
52:18
**contention** [1] -
106:12
**continue** [1] - 81:12
**continued** [1] - 41:15
**continuously** [1] -
27:4
**control** [1] - 91:13
**conversation** [6] -
69:15, 69:16, 70:6,
70:24, 71:13, 73:12
**conversations** [1] -
10:21
**convey** [1] - 54:19
**convicted** [1] -
105:20
**copy** [3] - 9:19,
113:20, 114:3
**correct** [37] - 8:5,
8:10, 9:6, 26:24, 27:8,
27:10, 27:12, 29:3,
32:12, 33:2, 33:24,
34:5, 40:23, 41:18,
42:13, 44:4, 44:20,
44:24, 51:3, 59:23,
66:10, 66:18, 68:11,
68:17, 68:18, 73:18,
74:3, 74:17, 80:1,
80:23, 81:1, 81:9,
104:5, 105:10,
105:21, 105:22, 115:4
**corrective** [1] - 6:23
**correctly** [8] - 13:10,

13:15, 15:13, 19:13,
26:16, 34:10, 55:5,
63:10
**Cortez** [86] - 1:7,
4:12, 8:17, 35:18,
36:13, 36:16, 36:19,
37:3, 37:5, 37:13,
37:17, 37:20, 38:9,
38:23, 38:25, 39:5,
39:19, 40:2, 40:6,
40:9, 42:19, 42:22,
44:6, 44:7, 45:20,
46:9, 46:11, 49:4,
49:21, 50:2, 50:8,
51:7, 51:11, 52:4,
52:18, 53:3, 53:13,
53:15, 54:7, 54:9,
54:20, 55:11, 56:12,
56:14, 56:15, 56:18,
57:5, 57:15, 58:10,
59:25, 60:3, 60:7,
63:23, 64:2, 64:5,
64:15, 65:6, 66:20,
67:24, 69:12, 69:23,
70:9, 70:23, 71:10,
72:3, 72:15, 73:12,
73:23, 74:19, 81:1,
89:13, 89:20, 90:11,
102:15, 103:2, 103:5,
103:7, 103:8, 103:24,
104:16, 104:23,
106:14, 107:22,
112:9, 112:17, 112:22
**cortez** [1] - 49:22
**Cortez's** [5] - 44:23,
45:4, 45:14, 48:16,
72:13
**counsel** [4] - 4:18,
115:8, 115:10, 115:12
**counselling** [1] -
111:10
**County** [4] - 6:3, 6:5,
7:8, 22:13
**couple** [5] - 4:19,
10:4, 41:13, 84:5,
107:18
**course** [7] - 10:14,
15:10, 20:1, 35:22,
45:1, 92:14, 104:6
**Court** [1] - 115:3
**COURT** [1] - 1:1
**court** [4] - 4:15, 10:9,
20:19, 108:10
**cousin** [2] - 100:25,
101:12
**cover** [1] - 111:15
**coward** [1] - 109:19
**create** [1] - 90:9
**creating** [2] - 59:17,
59:18

**crimes** [2] - 43:13,
43:23
**criminal** [1] - 105:23
**crossed** [1] - 86:24
**crossing** [1] - 78:7
**crowd** [1] - 101:10
**cruiser** [1] - 81:15
**crying** [3] - 84:15,
85:7, 85:25
**current** [1] - 4:7

# D

**damage** [6] - 33:23,
34:2, 86:25, 89:8,
94:23, 106:23
**danger** [1] - 91:10
**Daquavian** [3] - 1:5,
1:13, 2:18
**DAQUAVIAN** [2] -
4:1, 115:5
**daquavian** [1] - 4:6
**dash** [9] - 8:18, 69:4,
69:24, 70:4, 70:21,
73:10, 75:15, 75:16,
79:11
**date** [3] - 6:14, 7:25,
36:17
**Date** [1] - 1:14
**dates** [2] - 11:25,
106:25
**dating** [1] - 11:6
**days** [1] - 20:6
**deal** [1] - 91:24
**dealing** [1] - 54:9
**dealings** [5] - 20:5,
20:8, 22:23, 28:21,
92:1
**deceased** [1] - 36:25
**Defendants** [2] - 1:8,
2:7
**defendants** [4] -
68:5, 108:17, 110:22,
112:2
**degree** [1] - 79:16
**deliberate** [1] -
112:20
**departing** [1] - 79:12
**Department** [10] -
9:16, 13:3, 17:18,
20:1, 66:16, 98:25,
99:18, 100:10,
102:12, 105:15
**department** [3] -
15:11, 68:10, 88:13
**depict** [2] - 47:12,
48:21
**depicted** [1] - 55:1
**deployed** [1] - 64:21
**deployment** [1] -

64:25
**deponent** [1] - 1:13
**deposition** [10] -
1:17, 4:16, 8:14,
11:23, 12:2, 114:10,
115:5, 115:6, 115:8,
115:11
**deprivation** [1] -
112:14
**describe** [2] - 84:13,
108:14
**described** [1] - 61:1
**describing** [1] -
87:10
**Description** [1] - 3:2
**description** [3] -
19:24, 41:11, 57:16
**descriptions** [1] -
114:4
**detail** [3] - 41:10,
91:4, 108:13
**detained** [2] - 71:20,
90:16
**die** [2] - 39:13, 39:15
**died** [1] - 39:21
**difference** [1] - 42:2
**different** [10] - 12:9,
12:15, 27:2, 41:23,
69:4, 71:14, 84:22,
88:23, 97:7, 111:19
**Dillon** [1] - 23:2
**dip** [1] - 78:17
**diplomas** [1] - 7:15
**direct** [3] - 53:17,
100:19, 101:19
**directed** [3] - 49:10,
49:11, 49:19
**directing** [1] - 49:18
**direction** [3] - 25:4,
27:3, 45:23
**directives** [1] - 44:2
**disagree** [1] - 103:25
**disclosure** [1] -
108:7
**Disclosures** [1] -
10:7
**discovery** [2] -
40:15, 113:25
**discussed** [3] -
67:12, 71:6, 79:15
**dispatch** [4] - 42:16,
88:13, 91:18, 98:23
**disrespectful** [2] -
55:11, 55:15
**distinguishing** [1] -
49:17
**DISTRICT** [2] - 1:1,
1:1
**DIVISION** [1] - 1:2
**DJ** [1] - 101:3

**DM** [4] - 41:14, 43:6, 113:25, 114:1
**DM-0102** [1] - 84:4
**DM01** [1] - 40:14
**doctor** [1] - 93:7
**doctors'** [1] - 93:22
**documentation** [1] - 8:12
**Documents** [1] - 105:3
**doings** [1] - 72:7
**dominance** [1] - 84:19
**donated** [1] - 43:17
**done** [10] - 34:2, 48:9, 54:24, 57:24, 65:4, 68:16, 70:20, 75:24, 76:11, 83:1
**door** [3] - 94:1, 94:2, 94:21
**double** [1] - 32:18
**down** [17] - 13:10, 34:7, 43:7, 43:8, 59:17, 70:18, 71:17, 72:3, 73:14, 78:17, 84:6, 90:1, 93:23, 94:19, 101:8, 111:5, 115:6
**downtown** [1] - 25:12
**Drive** [4] - 1:24, 4:8, 14:18, 23:16
**drive** [2] - 8:4, 26:5
**driver** [2] - 93:25, 94:6
**driver's** [6] - 7:22, 8:1, 8:8, 26:11, 65:14, 96:18
**driving** [3] - 16:2, 25:22, 93:24
**drop** [2] - 17:19, 20:3
**dropped** [1] - 10:24
**drove** [2] - 14:1, 14:23
**drug** [1] - 15:21
**drugs** [3] - 28:22, 29:9, 43:10
**duly** [2] - 4:2, 115:6
**during** [5] - 14:21, 15:10, 18:16, 20:1, 72:16
**DUTTON** [2] - 115:3, 115:18

## E

**e-mail** [4] - 1:25, 40:12, 40:17, 84:4
**early** [2] - 9:4, 9:12
**easy** [1] - 114:5

**education** [2] - 7:11, 7:16
**effect** [2] - 5:8, 10:22
**effort** [1] - 22:22
**eight** [2] - 41:20, 43:16
**either** [4] - 8:16, 50:12, 74:19, 115:8
**elect** [1] - 74:23
**elected** [2] - 11:8, 45:3
**electronic** [3] - 105:3, 105:4, 105:8
**Elementary** [2] - 23:23, 26:20
**embarrassing** [2] - 110:14, 110:15
**embarrassment** [1] - 109:15
**embrace** [1] - 87:16
**emergency** [3] - 25:9, 25:20, 27:13
**emotional** [6] - 105:13, 108:11, 108:14, 108:16, 108:20, 110:21
**emotionally** [3] - 84:14, 84:17, 88:19
**emotions** [3] - 85:18, 91:13
**employed** [3] - 16:22, 115:10, 115:12
**employee** [1] - 115:11
**encompasses** [1] - 77:21
**encounter** [3] - 12:11, 71:10, 90:25
**end** [1] - 23:12
**ended** [1] - 17:11
**ending** [1] - 28:14
**engaged** [1] - 71:25
**enjoyment** [1] - 109:8
**entirety** [4] - 9:20, 25:18, 26:21, 31:8
**entries** [1] - 58:15
**escalate** [1] - 57:19
**especially** [2] - 66:4, 84:17
**Esq** [2] - 2:4, 2:8
**essence** [2] - 59:17, 71:15
**established** [4] - 79:22, 80:20, 81:7, 83:10
**estimate** [1] - 38:14
**estimated** [1] - 41:20
**estimates** [1] - 41:25
**evening** [1] - 15:3

**event** [1] - 99:8
**events** [4] - 10:1, 52:23, 76:4, 100:22
**eventually** [1] - 25:19
**evidence** [1] - 109:4
**Ex** [1] - 3:4
**exactly** [2] - 35:1, 81:20
**Examination** [1] - 2:18
**EXAMINATION** [1] - 4:3
**examined** [1] - 89:7
**excitement** [1] - 59:18
**excuse** [1] - 80:2
**exercise** [2] - 35:15, 36:1
**Exhibit** [8] - 84:3, 84:7, 86:20, 87:22, 90:13, 90:22, 114:1, 114:8
**exists** [2] - 58:20, 105:8
**exited** [2] - 28:1, 50:13
**expect** [1] - 58:20
**expected** [3] - 28:25, 29:8, 43:8
**expecting** [2] - 27:14, 102:13
**expires** [1] - 115:13
**explain** [6] - 23:24, 29:18, 34:18, 44:8, 87:24, 108:15
**explained** [1] - 66:14
**explanation** [2] - 85:23, 86:21
**express** [1] - 111:21
**extent** [1] - 65:17
**eye** [1] - 8:5
**eyed** [3] - 84:8, 85:25, 86:1
**eyes** [5] - 52:1, 84:25, 85:24, 86:5, 86:8

## F

**face** [4] - 38:7, 47:14, 85:9, 86:3
**Facebook** [24] - 46:2, 46:5, 46:7, 46:10, 46:15, 46:17, 46:20, 46:24, 47:11, 47:22, 50:12, 54:13, 56:18, 57:12, 57:25, 58:4, 58:6, 58:15, 58:22, 59:5, 104:19,

110:24, 113:14, 113:16
**fact** [5] - 29:11, 37:13, 53:24, 62:20, 97:10
**factors** [1] - 91:12
**facts** [1] - 112:10
**factual** [1] - 112:4
**factually** [1] - 112:18
**failed** [2] - 102:5, 104:8
**failing** [1] - 112:21
**failure** [1] - 34:7
**fair** [1] - 75:11
**far** [7] - 8:9, 9:22, 33:9, 33:17, 57:8, 75:1, 81:25
**fault** [2] - 96:4, 96:18, 97:18
**fear** [1] - 88:22
**federal** [2] - 4:15, 10:10
**felony** [1] - 15:21
**felt** [13] - 22:24, 39:8, 51:15, 51:16, 55:23, 60:25, 61:5, 61:7, 63:24, 84:18, 91:9, 102:14
**female** [1] - 100:9
**few** [1] - 107:17
**figure** [2] - 81:20, 110:3
**figured** [1] - 25:14
**file** [3] - 94:5, 96:11, 96:23
**filed** [14] - 4:14, 8:25, 9:3, 10:5, 10:8, 40:4, 40:5, 86:17, 102:2, 104:23, 106:2, 108:8, 113:3, 113:4
**filing** [1] - 105:25
**fill** [1] - 82:15
**filmed** [1] - 12:10
**financial** [1] - 94:11
**financially** [1] - 115:12
**fine** [1] - 100:8
**finished** [1] - 21:1
**firearm** [2] - 28:7, 28:9
**First** [1] - 105:1
**first** [17] - 4:1, 6:2, 10:6, 19:24, 23:11, 23:15, 24:1, 25:2, 28:8, 51:7, 69:11, 69:25, 77:15, 78:23, 97:24, 112:3, 112:16
**firsthand** [1] - 26:17
**fish** [1] - 43:23
**fished** [1] - 14:2

**fishing** [5] - 13:20, 13:22, 13:24, 14:8, 14:22
**five** [4] - 6:10, 24:5, 38:16, 62:24
**five-seven** [1] - 6:10
**flashers** [1] - 25:9
**folks** [4] - 10:13, 58:12, 59:14
**follow** [7] - 27:1, 41:15, 45:22, 61:10, 92:23, 95:19, 114:6
**followed** [5] - 24:22, 27:3, 41:21, 61:2, 61:5
**following** [9] - 1:17, 19:13, 24:24, 25:2, 25:6, 25:14, 26:16, 68:11, 95:5
**follows** [3] - 4:2, 24:4, 36:5
**foregoing** [1] - 115:4
**forgot** [1] - 61:24
**former** [3] - 4:13, 102:2, 102:5
**forth** [4] - 70:1, 70:10, 71:4, 88:14
**forward** [2] - 83:6, 91:23
**four** [15] - 24:5, 36:21, 37:1, 37:17, 37:22, 38:8, 38:11, 38:18, 38:22, 48:18, 49:5, 49:9, 56:16, 62:14, 111:18
**fourth** [1] - 112:8
**Fourth** [2] - 1:17, 2:9
**frame** [4] - 20:20, 38:10, 41:24, 94:2
**free** [3] - 28:16, 34:22, 83:25
**freshman** [1] - 107:12
**Friday** [2] - 100:3, 100:12
**friend** [5] - 36:23, 39:8, 39:11, 39:20, 90:17
**frisk** [1] - 28:23
**front** [7] - 65:23, 68:23, 80:22, 85:13, 85:15, 85:20, 91:14
**frustrated** [2] - 63:25, 88:20
**full** [1] - 17:2
**fundraiser** [3] - 21:5, 21:19, 23:4
**fundraising** [2] - 22:22, 99:8
**furthest** [1] - 99:24

**future** [1] - 91:23

## G

**gas** [1] - 88:8
**Gatlinburg** [1] - 43:19
**GAYLE** [2] - 115:3, 115:18
**generally** [1] - 57:14
**girl** [1] - 18:12
**girlfriend** [27] - 10:18, 10:19, 11:3, 11:4, 14:17, 15:16, 16:3, 18:21, 19:14, 26:1, 34:12, 43:1, 43:7, 43:9, 45:2, 48:22, 52:22, 53:1, 57:23, 66:21, 69:7, 72:15, 74:1, 80:21, 83:15, 87:4, 95:24
**girlfriend's** [4] - 14:24, 80:1, 89:3, 97:6
**given** [6] - 4:16, 4:18, 26:4, 28:15, 44:3, 91:4
**Given** [1] - 115:15
**Glass** [2] - 11:22, 14:18
**grab** [3] - 31:4, 102:11, 107:25
**grabbed** [7] - 55:16, 55:21, 55:25, 84:18, 87:1, 101:12, 107:25
**grabs** [1] - 107:22
**grade** [1] - 7:4
**graduate** [1] - 7:7
**gravel** [1] - 43:18
**Greenwell** [1] - 23:2
**grinned** [1] - 63:21
**ground** [1] - 4:20
**Grow** [2] - 17:22, 18:4
**guess** [5] - 35:11, 77:9, 93:23, 95:25, 103:8
**guidance** [1] - 4:18
**gun** [4] - 33:23, 68:20, 100:6
**gut** [1] - 61:11

## H

**hackled** [1] - 43:12
**hackling** [1] - 43:20
**half** [2] - 69:1, 107:9
**hall** [1] - 77:25
**hand** [28] - 49:1, 55:16, 55:17, 55:18, 55:21, 56:1, 56:2,

62:16, 71:2, 84:18, 84:21, 86:24, 87:1, 88:24, 89:19, 90:2, 90:4, 90:8, 94:22, 106:14, 106:18, 106:19, 106:24, 107:25, 108:1, 108:3, 108:5, 115:15
**handgun** [10] - 32:24, 32:25, 33:20, 65:19, 65:22, 66:3, 66:16, 68:6, 80:3, 83:19
**handles** [1] - 56:20
**hands** [1] - 51:23
**hang** [1] - 83:8
**happy** [1] - 114:1
**harassing** [2] - 39:8, 43:14
**hard** [1] - 113:20
**harm** [4] - 44:19, 45:3, 45:12, 105:13
**harmed** [3] - 102:6, 104:3, 104:8
**harmful** [2] - 66:1, 66:2
**haunts** [1] - 87:23
**head** [1] - 92:12
**healed** [1] - 107:19
**health** [6] - 92:5, 93:10, 98:11, 110:20, 111:7
**healthcare** [2] - 92:24, 98:15
**hear** [19] - 4:23, 5:7, 5:9, 5:19, 5:23, 7:2, 54:17, 64:10, 64:11, 64:18, 64:25, 66:11, 66:12, 66:20, 66:25, 67:1, 78:6, 84:8, 91:6
**heard** [7] - 11:14, 63:18, 66:8, 66:17, 77:15, 84:9, 90:17
**hearing** [1] - 59:4
**heart** [2] - 90:24, 110:9
**help** [4] - 4:20, 4:21, 21:23, 91:20
**hereby** [1] - 115:4
**hereof** [2] - 115:6, 115:7
**hereto** [1] - 115:12
**hide** [1] - 87:13
**high** [9] - 7:7, 7:11, 7:17, 7:19, 22:9, 106:20, 106:25, 107:4, 107:7
**High** [1] - 7:8
**higher** [1] - 88:3
**highest** [1] - 7:4

**Hills** [4] - 23:23, 26:19, 61:2, 61:6
**Hilltop** [1] - 4:8
**himself** [4] - 33:14, 35:22, 72:15, 74:1
**hindering** [1] - 90:24
**history** [1] - 39:3
**hit** [3] - 93:25, 96:2, 96:3
**hobby** [1] - 14:4
**hold** [1] - 87:6
**home** [6] - 14:11, 15:5, 17:19, 19:6, 19:22, 111:5
**homeless** [1] - 77:9
**homeowner** [1] - 101:13
**honestly** [1] - 70:8
**hood** [7] - 49:6, 49:10, 70:3, 70:12, 74:16, 76:7, 81:8
**hope** [2] - 46:3, 48:2
**Hopkinsville** [30] - 1:8, 4:9, 4:13, 6:3, 7:13, 9:15, 10:25, 11:17, 12:2, 13:2, 14:23, 16:3, 17:18, 18:6, 19:25, 20:18, 22:12, 24:6, 30:10, 41:17, 45:23, 47:13, 57:13, 62:1, 66:15, 67:25, 91:18, 98:24, 99:17, 100:9, 102:12, 104:6, 105:15, 110:4, 111:6, 112:24
**Hopkinsville's** [1] - 105:1
**hospital** [9] - 93:7, 93:8, 94:3, 95:5, 96:5, 97:1, 97:4, 97:11, 97:13
**hot** [5] - 85:10, 85:13, 85:15, 85:20
**hour** [1] - 69:1
**hours** [2] - 13:14, 15:25
**house** [1] - 89:3
**HPD** [17] - 20:2, 20:5, 20:8, 21:20, 22:5, 22:22, 22:24, 22:25, 23:4, 23:5, 40:1, 40:6, 42:23, 66:9, 98:22, 99:10, 101:20
**humiliating** [1] - 110:10
**humiliation** [1] - 109:11
**hump** [2] - 78:14, 78:16
**hurt** [1] - 107:6

**hurting** [2] - 62:17, 107:6
**Hutchins** [1] - 2:9

## I

**idea** [1] - 41:5
**identification** [2] - 37:21, 114:9
**identified** [3] - 10:18, 12:8, 14:12
**identify** [1] - 10:13
**illegal** [5] - 28:22, 29:9, 46:4, 48:3, 48:8, 112:7
**illuminated** [1] - 78:8
**immediately** [2] - 33:6, 46:1
**impair** [1] - 5:23
**impairment** [1] - 7:1
**important** [4] - 39:22, 67:23, 73:1, 91:5
**improper** [1] - 52:5
**inappropriate** [12] - 35:17, 36:11, 52:19, 64:7, 65:6, 65:20, 80:8, 102:25, 103:1, 103:19, 103:21, 103:22
**inbox** [1] - 109:17
**incident** [4] - 6:14, 7:25, 9:16, 11:2, 11:11, 11:14, 12:9, 12:16, 13:12, 40:13, 41:11, 97:13, 98:21, 107:14
**incidents** [2] - 37:11, 38:11
**inciting** [1] - 59:18
**included** [2] - 45:1, 101:16
**including** [1] - 101:17
**increased** [1] - 59:13
**Indian** [4] - 23:23, 26:19, 61:2, 61:5
**indicated** [1] - 113:3
**indifference** [1] - 112:20
**indirect** [1] - 100:21
**individually** [3] - 1:7, 1:7, 1:8
**infantry** [1] - 64:24
**influence** [1] - 5:19
**information** [8] - 6:1, 10:14, 59:24, 97:2, 102:4, 105:9, 112:4, 112:10
**initial** [1] - 108:7

**Initial** [1] - 10:7
**injure** [1] - 55:25
**injured** [6] - 56:7, 62:16, 96:20, 97:18, 107:24, 108:3
**injuries** [6] - 97:21, 98:1, 98:3, 106:13, 106:16, 110:21
**injury** [1] - 107:19
**inputting** [1] - 84:19
**inside** [1] - 73:3
**instantly** [1] - 24:23
**instead** [4] - 43:14, 59:16, 99:25, 104:12
**insult** [1] - 64:2
**insurance** [8] - 92:13, 92:17, 92:19, 92:22, 92:25, 111:2, 111:14
**intended** [1] - 19:1
**intending** [1] - 114:6
**intent** [2] - 46:7, 64:1
**intentions** [1] - 105:25
**interact** [1] - 88:10
**interacted** [2] - 20:13, 20:16
**interacting** [1] - 52:3
**interaction** [26] - 9:15, 15:10, 21:4, 22:21, 22:25, 23:3, 23:5, 23:25, 27:7, 28:12, 36:4, 39:20, 40:9, 49:4, 49:23, 50:4, 53:2, 54:6, 65:12, 71:6, 83:7, 98:23, 99:10, 100:19, 100:21, 101:25
**interactions** [10] - 27:20, 28:17, 34:19, 40:2, 56:13, 60:1, 79:15, 99:1, 99:12, 113:17
**interacts** [3] - 26:23, 36:7, 69:12
**interested** [1] - 115:12
**interfere** [1] - 45:12
**interfered** [1] - 85:7
**Interrogatories** [1] - 105:2
**interrupt** [1] - 66:23
**intersection** [1] - 78:7
**intimidating** [1] - 52:16
**investigation** [1] - 57:24
**involve** [2] - 39:7, 59:12

**involved** [3] - 21:20, 95:21, 106:10
**issue** [1] - 56:22
**itself** [2] - 34:4, 40:13

## J

**Jackson** [1] - 2:5
**James** [1] - 2:8
**Jaylin** [2] - 36:23, 90:17
**jaylin** [1] - 36:24
**Jennie** [6] - 93:7, 93:8, 93:11, 95:11, 106:4, 106:8
**Jim** [1] - 4:11
**job** [7] - 16:15, 17:1, 17:4, 17:11, 45:4, 72:13, 92:14
**join** [2] - 63:23, 70:5
**joined** [1] - 63:19
**July** [5] - 20:21, 21:19, 22:21, 22:25, 23:3
**jumped** [1] - 64:24
**June** [3] - 16:18, 17:7
**jury** [1] - 91:6
**just..** [3] - 52:16, 61:12, 63:25
**justify** [1] - 80:13

## K

**Kelly** [1] - 2:9
**KENTUCKY** [1] - 1:1
**Kentucky** [14] - 1:8, 1:22, 1:24, 2:5, 2:10, 4:9, 7:22, 8:1, 24:11, 24:16, 57:13, 80:13, 115:3, 115:19
**kept** [3] - 72:16, 101:4, 101:9
**Keuler** [1] - 2:9
**kid** [3] - 88:11, 91:17, 91:20
**kids** [2] - 88:1, 89:25
**killed** [2] - 39:16, 90:18
**kind** [7] - 20:10, 22:4, 22:5, 40:5, 59:19, 93:10, 98:11
**knowledge** [18] - 8:3, 26:12, 27:6, 32:11, 33:20, 34:2, 37:5, 37:7, 38:3, 39:1, 39:5, 39:25, 40:21, 42:24, 50:6, 50:9, 50:12, 50:21
**known** [1] - 110:3

**knows** [4] - 48:2, 103:2, 110:2, 110:4
**knuckle** [1] - 90:3
**KYNP56828** [1] - 115:14

## L

**lake** [7] - 13:25, 15:19, 15:20, 30:7, 30:9, 30:12, 42:12
**Lake** [1] - 14:22
**Lamblin** [87] - 1:7, 4:12, 8:17, 8:18, 23:11, 23:15, 24:1, 25:17, 26:17, 27:7, 27:13, 27:20, 28:1, 28:12, 28:18, 28:21, 29:15, 29:19, 30:23, 31:21, 33:1, 33:6, 33:12, 33:21, 34:1, 34:9, 34:12, 34:16, 34:20, 35:12, 35:18, 35:21, 36:5, 41:15, 42:15, 42:22, 44:3, 44:14, 44:17, 45:3, 45:13, 46:9, 48:8, 48:23, 49:21, 49:24, 50:5, 53:3, 55:7, 61:4, 63:1, 64:16, 64:20, 65:13, 66:8, 67:24, 68:9, 70:3, 70:5, 70:8, 70:17, 71:12, 71:24, 72:14, 72:22, 73:2, 74:1, 74:20, 75:1, 75:4, 75:18, 76:8, 76:17, 77:16, 78:20, 79:11, 79:16, 79:24, 80:21, 81:3, 81:11, 81:16, 82:6, 82:24, 83:11, 83:18, 112:21
**Lamblin's** [5] - 69:5, 70:13, 74:16, 76:7, 81:9
**lane** [5] - 25:13, 99:24, 99:25, 100:13
**Large** [2] - 115:3, 115:19
**last** [12] - 9:5, 16:17, 20:16, 30:4, 38:16, 38:18, 71:12, 93:15, 94:24, 95:18, 101:10
**lately** [1] - 40:18
**laughing** [1] - 110:9
**Law** [1] - 2:4
**law** [2] - 24:11, 24:16
**lawful** [1] - 45:23
**lawfully** [2] - 32:25, 33:9
**lawsuit** [12] - 4:14, 8:24, 9:3, 10:11,

10:14, 40:5, 67:23, 68:4, 86:17, 94:5, 96:11, 102:2
**lawyer** [8] - 11:25, 12:8, 40:13, 57:7, 58:21, 84:10, 103:14, 108:8
**lay** [1] - 94:19
**leading** [1] - 38:21
**learned** [1] - 53:24
**leave** [6] - 26:18, 28:16, 34:22, 50:15, 89:4, 101:17
**leaves** [1] - 101:15
**leaving** [2] - 19:21, 27:8
**led** [1] - 106:13
**left** [14] - 23:12, 24:9, 25:12, 25:13, 25:19, 62:16, 78:1, 78:17, 78:23, 84:23, 89:19, 90:8, 94:20, 106:13
**legal** [1] - 111:20
**length** [1] - 61:10
**lens** [1] - 6:24
**lenses** [1] - 8:6
**letting** [2] - 84:20, 101:14
**level** [1] - 59:18
**license** [5] - 7:23, 8:1, 8:4, 8:8, 65:14
**licenses** [1] - 7:15
**life** [7] - 88:18, 90:14, 91:1, 91:8, 91:9, 98:16, 109:8
**light** [1] - 78:11
**lights** [3] - 25:20, 27:13, 78:8
**likewise** [1] - 40:4
**line** [1] - 97:17
**listed** [2] - 10:15, 10:16, 11:12
**live** [14] - 14:13, 46:2, 46:15, 46:16, 46:17, 46:21, 46:24, 47:11, 47:22, 54:13, 59:5
**lived** [1] - 6:5
**lives** [1] - 12:5
**living** [3] - 11:17, 14:16, 14:25
**LLC** [1] - 1:22
**LLP** [1] - 2:9
**located** [2] - 23:20, 47:12
**locked** [1] - 28:9
**log** [1] - 50:12
**logging** [1] - 46:7
**look** [12] - 8:12, 9:8, 17:22, 51:19, 51:22,

52:2, 74:11, 75:11, 76:23, 77:4, 104:11, 111:4
**looked** [8] - 8:16, 9:5, 13:2, 40:17, 75:13, 76:6, 77:3, 88:3
**looking** [6] - 48:14, 51:18, 52:1, 53:16, 54:12, 71:23, 73:10, 75:22, 76:24, 76:25, 79:6
**looks** [2] - 9:2, 77:22
**loss** [1] - 109:7
**loud** [1] - 101:3

## M

**ma'am** [1] - 67:7
**mail** [4] - 1:25, 40:12, 40:17, 84:4
**Main** [1] - 77:22
**man** [1] - 77:9
**marijuana** [25] - 15:12, 29:12, 29:16, 29:20, 29:24, 29:25, 30:1, 30:5, 30:9, 30:19, 30:23, 30:25, 31:8, 31:14, 31:22, 31:23, 31:25, 32:8, 32:12, 32:21, 32:23, 42:6, 42:7, 42:9
**mark** [44] - 48:18, 49:5, 49:9, 51:6, 51:10, 54:11, 54:12, 55:20, 56:11, 61:14, 62:14, 63:12, 64:13, 64:19, 64:23, 65:3, 65:12, 66:9, 67:3, 69:6, 69:11, 69:15, 69:24, 70:12, 71:23, 72:22, 73:1, 74:15, 75:17, 76:16, 76:24, 79:10, 80:6, 80:20, 80:25, 81:7, 81:14, 81:21, 81:25, 82:3, 83:11, 83:21, 84:3, 113:24
**marked** [3] - 40:14, 113:25, 114:8
**Marked** [1] - 3:2
**marker** [1] - 64:6
**matter** [2] - 29:6, 88:7
**matters** [1] - 111:20
**MCKNIGHT** [2] - 4:1, 115:5
**McKnight** [13] - 1:5, 1:13, 2:18, 4:6, 4:7, 4:11, 46:23, 48:14, 57:3, 58:11, 62:15,

113:9, 113:25
**McKnight's** [1] - 104:25
**mean** [25] - 20:11, 20:12, 35:23, 37:8, 38:13, 39:11, 43:21, 46:6, 46:15, 48:1, 48:4, 49:20, 51:14, 51:25, 53:8, 54:24, 59:11, 60:12, 61:19, 75:13, 87:24, 88:7, 89:23, 104:15, 110:2
**meaning** [3] - 8:4, 62:1, 103:24
**means** [1] - 111:24
**meant** [3] - 35:25, 36:2, 46:13
**Medicaid** [1] - 93:2
**medical** [5] - 94:24, 95:19, 97:19, 98:11, 106:8
**Medical** [1] - 106:5
**medication** [1] - 5:18
**member** [2] - 43:2, 45:11
**members** [1] - 72:16
**memory** [3] - 15:8, 67:22, 68:3
**mental** [7] - 92:4, 92:24, 98:15, 109:2, 109:4, 110:20, 111:7
**mentally** [5] - 5:15, 90:23, 91:16
**mention** [1] - 43:6
**mentioned** [2] - 12:7, 15:10
**messages** [1] - 110:5
**messed** [2] - 103:3, 106:22
**might** [3] - 22:17, 74:2, 79:17
**miles** [3] - 24:5, 41:22, 41:24
**military** [3] - 63:19, 63:23, 64:16
**Millbrooke** [1] - 23:16
**mind** [5] - 45:7, 45:10, 52:19, 65:16, 90:10
**minute** [29] - 15:9, 31:15, 31:16, 41:3, 41:20, 42:11, 56:11, 60:5, 60:6, 62:14, 63:11, 63:12, 64:6, 64:19, 74:15, 75:17, 76:16, 76:24, 79:10, 80:6, 80:19, 80:25, 81:14, 81:21, 81:25,

82:21, 83:4, 83:11
**minutes** [7] - 24:5,
48:17, 62:25, 67:14,
70:21, 73:11, 76:10
**mom** [1] - 88:12
**moment** [5] - 54:14,
73:6, 73:7, 73:8, 73:9
**Monday** [4] - 13:15,
13:16, 16:13, 19:18
**money** [1] - 43:18
**month** [1] - 107:8
**months** [1] - 107:18
**morning** [11] - 10:23,
11:11, 17:14, 19:18,
20:1, 24:16, 26:5,
28:21, 43:4, 45:24,
48:24
**mother** [3] - 91:11,
91:17, 98:22
**move** [4] - 75:10,
79:21, 83:6, 91:10
**moved** [1] - 69:6
**moves** [1] - 103:8
**moving** [1] - 81:18
**MR** [12] - 4:4, 17:24,
32:14, 32:17, 47:2,
48:11, 56:25, 57:21,
68:25, 113:9, 113:12,
113:23
**multiple** [3] - 64:21,
86:3, 86:5
**municipal** [1] - 78:2
**music** [1] - 101:3
**must** [1] - 61:20
**mutually** [1] - 11:8

**N**

**name** [14] - 4:5, 4:11,
17:21, 21:8, 21:17,
22:3, 22:16, 23:2,
37:24, 38:2, 92:12,
97:7, 111:3
**named** [2] - 104:7,
108:18
**names** [3] - 56:21,
57:4, 57:10
**nature** [2] - 21:4,
57:20
**near** [1] - 87:17
**necessarily** [1] -
20:11
**necessary** [1] - 72:9
**need** [18] - 4:21,
11:23, 12:2, 12:4,
15:9, 17:25, 33:12,
41:5, 73:14, 93:10,
104:11, 108:23,
109:3, 109:8, 109:12,
109:15, 112:17,

112:25
**needed** [6] - 19:10,
22:19, 36:2, 42:16,
51:17, 61:22
**negative** [2] - 23:7,
32:18
**nerve** [3] - 86:25,
94:23, 106:23
**nervous** [4] - 85:19,
87:5, 91:12, 91:23
**never** [1] - 41:7,
51:15, 53:4, 53:9,
53:23, 66:3, 88:21,
89:17, 91:8, 97:9,
105:20
**new** [3] - 89:7, 98:1,
98:3
**next** [2] - 78:7, 88:14
**Next** [3] - 21:9,
21:11, 21:14
**NEXT** [1] - 21:13
**night** [4] - 14:8,
14:10, 15:12, 16:7
**nine** [1] - 51:6
**nissan** [1] - 26:3
**NO** [1] - 1:2
**nobody** [2] - 65:22,
77:7
**noise** [4] - 77:10,
101:5, 101:6, 101:23
**normal** [2] - 15:7,
19:18
**Notary** [2] - 115:3,
115:18
**nothing** [7] - 15:5,
88:22, 89:16, 90:6,
96:16, 106:18
**noticed** [2] - 1:17,
19:25
**notified** [1] - 42:15
**November** [2] - 9:3,
9:12
**Number** [3] - 3:2,
114:8, 115:14
**number** [2] - 1:24,
41:23
**numbers** [1] - 61:25

**O**

**o'clock** [1] - 19:16
**O1** [1] - 43:6
**oath** [1] - 105:9
**object** [1] - 47:2
**obligation** [1] - 45:22
**observation** [1] -
29:11
**observations** [1] -
57:5
**observe** [3] - 37:8,

46:10, 46:24
**observed** [2] - 11:14,
13:2
**obtain** [1] - 11:23
**obviously** [7] - 6:17,
11:10, 14:7, 26:4,
79:6, 87:5, 109:23
**occasion** [3] - 8:20,
69:11, 87:19
**occasions** [7] - 37:1,
37:22, 37:25, 38:3,
38:8, 46:24, 56:16
**occurred** [1] -
105:14
**odd** [1] - 66:2
**OF** [2] - 1:1, 2:20
**Office** [2] - 2:4, 56:15
**office** [1] - 115:15
**officer** [13] - 22:4,
36:13, 43:20, 57:6,
74:6, 88:8, 97:3,
100:10, 102:23,
104:11, 104:12,
104:14, 104:15
**Officer** [161] - 1:7,
1:7, 4:12, 8:17, 8:18,
23:11, 23:15, 23:25,
25:17, 26:17, 27:7,
27:12, 27:20, 27:25,
28:12, 28:18, 28:21,
29:15, 29:19, 30:22,
31:21, 33:1, 33:6,
33:12, 33:20, 34:1,
34:8, 34:12, 34:16,
34:19, 35:12, 35:18,
35:21, 36:5, 36:16,
36:19, 37:2, 37:5,
37:13, 37:17, 37:20,
38:9, 38:23, 38:25,
39:4, 39:19, 40:2,
40:6, 40:9, 42:15,
42:19, 42:22, 44:3,
44:6, 44:7, 44:16,
44:22, 45:3, 45:4,
45:12, 45:14, 45:20,
46:9, 46:11, 48:16,
48:23, 49:4, 49:20,
49:21, 49:23, 50:2,
50:4, 50:8, 51:6,
51:11, 52:4, 52:17,
53:3, 54:7, 54:20,
55:2, 55:7, 55:11,
56:12, 56:14, 56:18,
57:5, 57:15, 59:25,
60:3, 60:7, 61:3, 63:1,
63:23, 64:2, 64:5,
64:15, 64:20, 65:6,
65:13, 66:8, 66:20,
67:24, 68:8, 69:5,
69:11, 69:23, 70:5,

70:13, 70:23, 71:10,
71:24, 72:2, 72:13,
72:14, 72:15, 72:22,
73:2, 73:12, 73:23,
74:1, 74:16, 74:19,
74:20, 75:17, 76:7,
76:8, 76:17, 77:12,
78:20, 79:11, 79:16,
79:23, 80:20, 80:25,
81:3, 81:8, 81:11,
81:16, 82:6, 82:24,
83:11, 83:18, 89:12,
89:20, 90:11, 103:24,
104:15, 104:23,
106:14, 107:22,
112:8, 112:16,
112:21, 112:22
**officers** [7] - 21:25,
43:12, 43:16, 45:24,
47:19, 102:8, 105:16
**official** [1] - 23:7
**often** [1] - 89:23
**oftentimes** [1] -
59:13
**old** [3] - 6:7, 6:8,
18:10
**older** [1] - 93:21
**once** [3] - 15:5,
82:17, 99:21
**one** [26] - 5:2, 8:20,
9:14, 10:9, 12:19,
12:20, 12:21, 12:24,
12:25, 22:1, 22:2,
42:11, 51:16, 85:20,
91:10, 93:12, 93:17,
95:23, 101:6, 103:13,
104:14, 106:13,
106:15, 108:8,
110:25, 111:25
**ones** [2] - 58:24,
58:25
**ongoing** [3] - 72:4,
73:20, 74:25
**online** [1] - 113:19
**operating** [2] -
24:13, 24:16
**opinions** [2] -
109:25, 111:21
**opportunity** [2] -
75:11, 92:21
**or..** [1] - 35:11
**order** [1] - 87:11
**Osborne** [9] - 10:17,
11:13, 26:4, 34:13,
50:4, 53:1, 53:17,
63:13, 69:8
**osborne** [2] - 62:9,
67:6
**Osborne's** [2] - 9:8,
9:25

**otherwise** [4] - 12:4,
13:9, 104:2, 105:17
**outline** [1] - 4:19
**outlook** [1] - 87:24
**outpatient** [1] -
93:13
**outside** [4] - 6:5,
26:23, 82:7, 85:15
**overlooked** [1] -
109:21
**overnight** [1] - 95:8
**own** [2] - 25:22, 72:6
**owned** [3] - 25:25,
33:7, 46:7

**P**

**p.m** [1] - 114:10
**PADUCAH** [1] - 1:2
**Paducah** [4] - 1:24,
2:5, 2:10, 4:15
**page** [8] - 41:14,
84:6, 86:20, 87:22,
90:13, 90:22, 105:4,
113:24
**pages** [1] - 106:6
**pain** [8] - 56:3, 56:5,
89:15, 90:3, 90:10,
108:11, 108:14,
108:16
**paper** [5] - 97:4,
97:6, 102:11, 111:4
**parents** [1] - 91:19
**parking** [4] - 23:23,
26:20, 26:22, 79:8
**part** [8] - 9:4, 20:24,
63:8, 64:25, 66:14,
72:13, 88:16, 113:21
**particular** [8] - 11:5,
17:10, 73:6, 73:7,
73:8, 73:9, 76:25,
93:9
**parties** [3] - 10:11,
115:11, 115:12
**party** [5] - 101:1,
101:2, 101:18, 104:7,
115:8
**past** [2] - 59:1,
100:12
**pat** [3] - 34:7, 43:7,
43:8
**Pax** [1] - 93:20
**pending** [1] - 4:14
**people** [28] - 36:18,
46:24, 47:24, 56:17,
56:19, 56:21, 57:4,
57:6, 57:12, 57:17,
57:19, 58:8, 59:1,
59:3, 59:6, 59:9, 88:2,
88:10, 93:21, 97:14,

104:13, 104:18, 104:19, 109:17, 109:21, 109:25, 110:5, 110:12
**people's** [1] - 97:2
**perceived** [1] - 57:15
**percent** [3] - 17:23, 35:1, 54:8
**period** [4] - 15:21, 71:2, 91:24, 107:18
**permanently** [1] - 90:25
**permission** [1] - 26:5
**person** [5] - 28:23, 28:24, 29:8, 93:9, 93:24
**person's** [1] - 111:3
**personnel** [4] - 9:16, 20:9, 21:20, 22:22
**perspective** [1] - 26:17
**petition** [1] - 106:2
**petty** [1] - 60:11
**phone** [54] - 1:24, 43:12, 45:18, 46:6, 46:11, 46:17, 48:8, 49:1, 49:6, 49:10, 49:11, 49:24, 49:25, 50:5, 50:11, 50:25, 51:2, 51:8, 52:12, 52:15, 52:22, 53:2, 54:12, 55:17, 55:22, 56:4, 56:6, 70:1, 70:2, 70:12, 70:18, 70:20, 71:2, 71:17, 71:21, 72:3, 72:6, 73:13, 73:15, 74:16, 75:3, 75:8, 76:6, 81:8, 84:12, 86:23, 88:24, 89:13, 89:21, 90:11, 106:15, 107:23
**physical** [5] - 40:25, 94:13, 95:14, 110:20
**physically** [2] - 5:14, 98:8
**physician** [1] - 93:6
**pick** [1] - 76:6
**picked** [1] - 75:3
**picking** [2] - 27:25, 89:14
**piece** [2] - 97:3, 111:4
**place** [7] - 66:9, 66:16, 70:12, 77:2, 79:6, 81:8, 115:5
**Place** [2] - 17:22, 18:3
**placed** [3] - 49:5, 49:9, 68:7
**places** [1] - 83:19

**Plaintiff** [2] - 1:5, 2:3
**Plaintiff's** [1] - 10:7
**plan** [2] - 17:18, 11:10
**plans** [1] - 19:8
**play** [1] - 43:19
**played** [1] - 88:11
**player** [1] - 98:21
**playing** [45] - 21:22, 21:24, 51:5, 51:10, 54:10, 55:10, 55:19, 56:10, 60:5, 60:17, 60:20, 60:23, 61:13, 61:16, 62:3, 62:13, 62:23, 63:11, 63:15, 63:22, 64:4, 64:11, 64:18, 64:23, 65:3, 65:8, 65:11, 66:12, 66:20, 67:1, 67:11, 69:10, 69:14, 70:11, 74:14, 76:23, 77:11, 78:5, 79:5, 79:21, 80:5, 80:19, 81:6, 81:14, 81:24
**pleading** [10] - 10:6, 12:7, 12:14, 40:15, 104:25, 105:7, 105:19, 108:7, 109:2
**pleadings** [1] - 8:13
**plenty** [1] - 65:21
**PLLC** [1] - 2:4
**point** [52] - 20:9, 22:4, 23:17, 24:1, 24:2, 24:9, 25:5, 25:15, 26:22, 27:20, 27:25, 28:13, 28:15, 34:20, 34:21, 36:5, 36:6, 36:9, 49:2, 50:11, 51:20, 52:3, 54:2, 54:18, 54:22, 55:10, 62:10, 62:15, 62:18, 63:3, 63:7, 67:13, 69:16, 69:22, 70:4, 70:7, 70:21, 70:25, 72:4, 72:23, 73:16, 73:21, 74:23, 76:8, 78:5, 78:9, 80:6, 83:14, 83:18, 89:6, 103:10, 111:12
**pointed** [1] - 67:22
**pointing** [1] - 51:24
**points** [1] - 41:13
**Police** [11] - 9:15, 13:3, 17:18, 19:25, 62:1, 66:15, 98:24, 99:18, 100:10, 102:12, 105:15
**police** [28] - 9:24, 10:22, 11:2, 12:11, 15:11, 43:16, 45:23,

47:19, 49:6, 57:6, 68:10, 70:13, 74:16, 80:22, 81:9, 88:7, 88:8, 88:13, 91:18, 91:24, 99:14, 101:1, 101:4, 102:3, 102:23, 104:14, 110:7, 112:15
**posed** [1] - 74:2
**position** [1] - 44:18
**positive** [2] - 22:25, 23:6
**possessed** [2] - 32:25, 33:10
**possession** [3] - 33:13, 33:21, 49:25
**post** [2] - 46:25, 59:5
**posted** [6] - 48:15, 58:8, 58:11, 58:12, 58:14, 58:25
**postings** [2] - 57:25, 113:19
**posts** [5] - 58:6, 58:22, 59:6, 110:6, 113:17
**potential** [1] - 29:9, 101:23
**potentially** [2] - 44:19, 47:1
**practice** [4] - 43:17, 89:25, 107:9, 107:10
**preexisting** [1] - 106:24
**prepare** [1] - 8:13
**prepared** [1] - 10:8
**prescribed** [1] - 5:18
**present** [3] - 11:12, 37:16, 102:18
**presented** [1] - 67:13
**presenting** [1] - 65:13
**presents** [1] - 83:12
**pressure** [2] - 90:5, 108:6
**pretty** [2] - 18:3, 56:23
**prevent** [2] - 45:4, 45:14
**previous** [4] - 15:12, 69:17, 71:7, 98:4
**primary** [1] - 93:5
**printed** [2] - 40:12, 40:17
**problem** [3] - 79:5, 106:25, 107:3
**problems** [7] - 94:3, 94:13, 94:18, 95:11, 97:23, 100:16, 108:5
**Procedure** [1] - 1:18
**proceeded** [1] - 96:1
**produce** [1] - 113:20

**produced** [6] - 9:19, 56:25, 57:1, 57:22, 113:14
**producing** [1] - 106:4
**Production** [1] - 105:2
**professional** [4] - 28:18, 28:20, 65:15, 67:8
**professionalism** [1] - 34:14
**profile** [1] - 113:14
**profiled** [1] - 60:25
**profiling** [3] - 57:18, 59:12, 80:8
**prompted** [1] - 103:7
**properly** [1] - 33:22
**protect** [5] - 33:13, 73:25, 88:2
**protecting** [1] - 43:13
**protocol** [4] - 66:9, 66:15, 68:9, 68:13
**provide** [1] - 97:1
**provided** [4] - 56:24, 57:7, 57:8, 105:9
**provider** [1] - 93:6
**providers** [1] - 110:20
**providing** [1] - 1:22
**PT** [1] - 95:19
**public** [8] - 33:14, 43:2, 45:11, 51:3, 72:16, 74:2, 88:10, 110:3
**Public** [2] - 115:3, 115:18
**pull** [10] - 26:22, 27:14, 27:16, 39:9, 61:6, 61:8, 61:10, 61:22, 79:7, 99:15
**pulled** [35] - 6:17, 17:17, 19:22, 20:11, 24:19, 25:23, 27:21, 28:3, 28:8, 36:8, 36:19, 37:3, 37:17, 38:9, 38:22, 41:16, 43:3, 48:23, 51:16, 60:3, 61:9, 65:21, 68:19, 78:12, 78:19, 80:7, 80:14, 80:15, 99:13, 99:16, 100:2, 100:4, 100:12, 101:12
**pulling** [1] - 78:15
**pulls** [4] - 24:3, 24:6, 26:19, 56:19
**purely** [1] - 84:14
**purpose** [2] - 47:21, 115:5

**purposes** [1] - 1:18
**pursuant** [1] - 1:17
**pursuing** [1] - 96:23
**pushups** [2] - 90:1, 90:4
**put** [21] - 43:11, 49:11, 65:19, 65:22, 65:23, 66:3, 68:22, 70:2, 70:18, 70:20, 71:16, 72:3, 72:6, 73:14, 84:11, 87:10, 87:16, 91:8, 101:13, 114:1, 114:6
**putting** [2] - 45:18, 65:25, 90:5

**Q**

**qualified** [3] - 111:23, 111:25, 112:6
**questioned** [2] - 31:17, 72:8
**questioning** [1] - 71:16
**questions** [4] - 5:2, 5:16, 84:5, 113:10
**quickly** [1] - 27:16
**quiet** [1] - 35:11
**quote** [5] - 43:11, 45:17, 46:1, 48:2, 84:7

**R**

**racial** [3] - 59:12, 80:8, 80:16
**racially** [1] - 57:18, 60:25
**raised** [1] - 6:2
**rallying** [1] - 101:10
**ran** [2] - 100:6, 100:7
**react** [2] - 46:25, 88:19
**reacted** [2] - 84:22, 88:23
**reaction** [1] - 108:21
**reactions** [1] - 59:1
**ready** [1] - 19:15
**realize** [1] - 25:11
**realized** [1] - 25:5
**really** [10] - 28:10, 70:9, 78:18, 84:21, 89:17, 92:11, 104:11, 107:10, 109:21, 111:17
**reason** [8] - 11:5, 17:10, 30:25, 72:2, 79:24, 80:9, 86:1, 92:23
**reasonable** [10] - 31:21, 32:2, 33:17,

38:13, 45:7, 45:10, 65:15, 67:9, 74:6, 74:12

**reasons** [3] - 55:14, 80:16, 80:17

**reassuring** [1] - 52:25

**Rec** [1] - 21:2

**received** [2] - 6:19, 59:5

**recognize** [1] - 22:15

**recollection** [3] - 12:24, 58:13, 76:4

**record** [13] - 4:19, 48:12, 48:13, 50:24, 51:17, 51:21, 53:17, 58:1, 69:2, 69:3, 112:15, 114:2, 114:7

**recording** [16] - 13:1, 46:2, 46:5, 46:14, 46:20, 47:22, 50:22, 51:13, 52:23, 53:2, 53:4, 53:6, 53:9, 53:10, 53:12, 53:23

**recordings** [3] - 12:9, 12:15, 12:18

**records** [3] - 59:2, 106:5, 106:8

**recreation** [1] - 14:4

**Recreational** [1] - 20:18

**reference** [2] - 10:21, 106:4

**referred** [3] - 12:8, 58:15, 95:13

**referring** [5] - 41:14, 45:20, 60:24, 61:3, 67:5

**reflect** [1] - 62:19

**reframing** [1] - 87:3

**refresh** [1] - 68:2

**refreshes** [1] - 67:21

**registered** [1] - 28:7

**regular** [1] - 16:9

**regularly** [2] - 14:5, 26:9

**relate** [1] - 106:9

**related** [5] - 7:16, 9:16, 59:25, 107:19, 115:10

**relating** [1] - 57:25

**relationship** [2] - 11:6, 11:24

**relative** [1] - 115:11

**released** [1] - 36:9

**relevant** [1] - 10:13

**rely** [1] - 82:12

**relying** [1] - 37:9

**remember** [10] - 28:10, 35:1, 35:3,

54:3, 55:7, 63:9, 70:8, 70:24, 82:9, 85:10

**removed** [1] - 68:20

**removing** [3] - 79:24, 80:2, 80:3

**repeat** [3] - 4:24, 12:13, 27:24

**rephrase** [1] - 5:3

**reply** [1] - 110:13

**reporter** [1] - 13:9

**Reporter** [1] - 115:3

**REPORTER** [1] - 2:20

**REPORTER'S** [1] - 115:1

**REPORTING** [1] - 1:21

**represent** [2] - 4:12, 48:15

**represented** [1] - 108:9

**Request** [1] - 105:2

**request** [2] - 34:23, 115:8

**requests** [1] - 34:16

**require** [1] - 10:10

**required** [1] - 24:11

**residence** [4] - 14:12, 14:24, 15:16, 16:6

**resolved** [1] - 94:8

**respect** [2] - 32:24, 34:13

**respond** [1] - 63:20

**response** [3] - 40:14, 59:6, 59:14

**responses** [2] - 5:11, 5:24

**Responses** [1] - 104:25

**rest** [2] - 28:9, 91:1

**restrictions** [1] - 8:3

**result** [4] - 34:4, 92:5, 94:14, 105:14

**retaliation** [1] - 112:2

**retrieve** [1] - 66:5

**return** [1] - 113:4

**returned** [1] - 33:23

**returns** [1] - 113:5

**reveal** [1] - 32:11

**review** [1] - 76:5

**reviewed** [4] - 8:20, 86:16, 107:23

**rights** [6] - 36:1, 48:6, 48:7, 52:13, 84:10, 112:3

**role** [5] - 21:6, 44:13, 44:23, 45:14, 73:24

**roughly** [4] - 9:12, 65:4, 67:14, 85:10

17:4, 17:11

**seat** [9] - 6:20, 24:8, 24:12, 24:17, 26:11, 61:7, 61:8, 80:12, 94:2

**second** [25] - 41:10, 42:11, 48:12, 48:18, 49:5, 49:9, 51:6, 51:10, 54:11, 54:12, 54:20, 55:20, 56:11, 64:5, 69:21, 74:15, 75:9, 75:17, 76:16, 79:10, 80:20, 97:17, 97:24, 98:1, 98:18

**seconds** [9] - 31:15, 31:16, 48:17, 55:2, 60:6, 67:15, 73:11

**section** [1] - 58:7

**secured** [1] - 33:22

**see** [34] - 7:2, 20:2, 23:11, 23:15, 24:2, 39:14, 48:18, 57:21, 58:1, 58:23, 65:11, 70:2, 70:11, 70:22, 76:19, 77:20, 79:11, 80:25, 81:3, 83:7, 83:22, 84:25, 85:7, 85:9, 85:23, 86:1, 87:15, 88:7, 89:7, 93:9, 93:24, 103:9, 110:19, 110:25

**seeing** [2] - 62:19, 77:4

**seek** [3] - 41:1, 92:4, 111:10

**seeked** [1] - 40:25

**segment** [4] - 49:8, 51:12, 54:11, 60:5

**seizure** [2] - 48:8, 112:7

**semester** [1] - 7:12

**sending** [1] - 51:24

**sent** [4] - 40:12, 58:5, 58:8, 113:22

**separate** [3] - 71:8, 71:9, 114:3

**September** [1] - 115:15

**serious** [2] - 55:24, 109:20

**serve** [1] - 88:2

**served** [3] - 10:9, 64:16, 64:20

**serves** [2] - 15:8, 68:4

**services** [1] - 1:22

**set** [2] - 115:5, 115:7

**Set** [1] - 105:1

**settle** [1] - 96:14

**settled** [2] - 94:10,

**Rules** [1] - 1:17

**rules** [2] - 4:20, 10:10

**run** [2] - 58:10, 88:6

**run-ins** [2] - 58:10, 88:6

## S

**safe** [1] - 72:16

**safely** [1] - 27:16

**safety** [4] - 51:13, 79:25, 80:1

**sake** [1] - 87:7

**save** [1] - 81:19

**saved** [1] - 58:22

**saw** [1] - 10:21

**scared** [5] - 62:20, 84:7, 85:19, 91:13, 108:21

**scarred** [2] - 91:1, 91:7

**scene** [27] - 12:11, 12:18, 34:22, 36:7, 37:21, 42:17, 42:20, 42:23, 43:3, 44:7, 45:12, 45:24, 46:8, 46:21, 46:25, 47:19, 48:14, 48:22, 51:3, 52:4, 52:23, 53:5, 53:22, 56:8, 73:25, 87:20

**schedule** [1] - 12:1

**scheduled** [3] - 16:13, 17:15, 19:3

**school** [13] - 7:5, 7:7, 7:11, 7:17, 7:19, 22:6, 22:8, 22:9, 22:11, 106:20, 107:1, 107:4, 107:7

**School** [3] - 7:8, 23:23, 26:20

**screen** [2] - 58:5, 59:2

**seal** [1] - 115:15

**search** [28] - 28:23, 29:8, 32:2, 32:11, 34:4, 44:15, 44:18, 47:23, 55:3, 55:8, 63:2, 63:8, 70:3, 70:18, 71:13, 71:25, 72:4, 73:3, 73:20, 74:25, 75:24, 79:8, 81:4, 81:12, 82:12, 82:19, 82:25, 112:7

**searched** [2] - 33:22, 34:1

**searching** [5] - 33:14, 35:7, 45:13, 72:17, 82:1

**seasonal** [3] - 17:1,

97:16

**settlement** [1] - 96:16

**seven** [4] - 6:10, 24:5, 48:17, 101:4

**seventh** [1] - 101:11

**several** [2] - 85:9, 104:10

**shaking** [9] - 84:7, 86:18, 86:21, 86:23, 87:3, 87:13, 87:20, 94:22, 94:23

**Sharber** [1] - 102:22

**share** [1] - 112:11

**shared** [1] - 60:13

**sharp** [2] - 56:3, 89:15

**shortly** [1] - 26:18

**shots** [2] - 58:5, 59:2

**shoulder** [2] - 94:1, 94:21

**show** [3] - 69:3, 86:17, 87:4

**showed** [1] - 45:11

**showing** [3] - 21:22, 40:16, 69:7

**shown** [2] - 49:8, 86:22

**shows** [1] - 82:13

**shut** [2] - 35:24, 36:2

**shutting** [1] - 101:8

**sic** [1] - 60:1

**side** [6] - 24:6, 26:11, 41:16, 96:2, 96:3, 111:7

**Sigler** [4] - 2:8, 2:9, 2:19, 4:11

**SIGLER** [5] - 4:4, 48:11, 68:25, 113:9, 113:23

**sign** [1] - 23:13

**signals** [1] - 51:24

**signature** [2] - 105:3, 105:4, 105:8, 115:9

**sit** [1] - 57:10

**sitting** [3] - 23:18, 23:19, 65:24

**situation** [14] - 50:22, 59:3, 59:17, 85:17, 87:23, 87:25, 88:5, 88:21, 90:23, 91:9, 91:22, 96:25, 106:19, 110:7

**situations** [4] - 56:20, 57:19, 58:9, 109:22

**six** [2] - 24:4, 43:16

**sixth** [1] - 101:11

**skip** [1] - 81:18

**skipped** [1] - 74:25

**sleep** [1] - 94:18
**sleeping** [1] - 94:18
**slightly** [1] - 41:23
**smell** [2] - 29:25,
30:23
**smelled** [4] - 29:12,
31:1, 31:18, 31:22
**smoke** [2] - 30:9,
30:12
**smoked** [4] - 15:12,
30:19, 42:6, 42:9
**smoking** [6] - 30:18,
31:3, 31:7, 31:9,
31:14, 42:12
**snatched** [1] - 46:17
**so..** [1] - 67:7
**solely** [2] - 51:2,
85:14
**solving** [2] - 43:13,
43:22
**someone** [2] - 43:14,
110:23
**sometime** [2] - 9:4,
38:20
**sometimes** [2] -
88:20, 94:20
**somewhat** [3] -
28:19, 52:9, 52:21
**somewhere** [5] -
10:24, 16:18, 23:18,
83:7, 99:13
**son** [6] - 18:14,
19:11, 19:15, 19:19,
20:3, 26:6
**soon** [1] - 26:17
**sorry** [5] - 56:14,
64:6, 67:20, 79:4,
85:3
**sort** [1] - 87:11
**sought** [3] - 94:24,
98:11, 98:15
**sounded** [1] - 77:12
**sounds** [2] - 11:4,
67:7
**South** [2] - 1:17, 2:9
**sparingly** [1] - 26:10
**speaking** [3] - 54:13,
56:17, 57:14
**speaks** [1] - 36:6
**specific** [3] - 57:10,
85:22, 102:4
**speculation** [1] -
47:3
**spell** [1] - 21:12
**spoken** [1] - 56:22
**sports** [2] - 43:15,
107:19
**spot** [2] - 85:12, 96:1
**Spring** [1] - 1:24
**squeezed** [7] -

55:16, 55:17, 56:6,
84:18, 84:21, 87:1,
88:24
**stand** [2] - 44:14,
80:22
**standing** [2] - 85:12,
85:13
**staring** [1] - 52:2
**start** [3] - 13:14,
79:6, 99:15
**started** [1] - 86:23
**state** [9] - 4:5, 41:14,
42:5, 43:11, 46:1,
66:11, 87:22, 90:13,
90:22
**State** [2] - 115:3,
115:19
**statement** [10] - 3:4,
34:24, 34:25, 35:6,
41:18, 61:19, 84:2,
102:7, 102:9, 113:24
**STATES** [1] - 1:1
**stating** [1] - 43:12
**station** [1] - 88:8
**stay** [2] - 52:14,
88:15
**stayed** [2] - 25:17,
26:20
**stems** [1] - 90:10
**stenotype** [1] - 115:6
**steps** [1] - 92:20
**still** [27] - 10:19,
11:17, 18:8, 21:14,
31:18, 40:20, 41:17,
56:8, 62:15, 62:17,
63:1, 71:14, 71:25,
72:4, 72:22, 72:23,
73:20, 74:25, 76:9,
76:17, 80:10, 81:22,
82:1, 82:4, 94:13,
96:23, 108:5
**stomach** [1] - 84:17
**stop** [5] - 23:13,
69:14, 88:9, 88:25,
107:6
**stopped** [5] - 11:6,
48:18, 48:21, 71:24
**stopping** [2] - 62:13,
62:23
**Street** [5] - 1:17, 2:5,
2:9, 25:16, 77:23
**street** [5] - 23:13,
23:14, 25:15, 78:13,
93:23
**strictly** [1] - 55:6
**strong** [1] - 91:14
**Stuart** [6] - 93:7,
93:8, 93:11, 95:12,
106:5, 106:8
**stuck** [2] - 94:1,

94:21
**stuff** [2] - 43:25, 58:5
**styled** [1] - 104:25
**submitted** [1] - 115:8
**subpoena** [1] - 12:4
**substance** [2] - 5:22,
15:24
**sue** [1] - 110:11
**sued** [1] - 105:16
**suffer** [1] - 94:14
**suffered** [1] - 89:7,
97:21
**suffering** [3] -
108:11, 108:14,
108:17
**suggesting** [2] -
63:22, 87:12
**suggestion** [1] -
35:14
**suit** [3] - 104:7,
108:18, 110:22
**Suite** [1] - 2:9
**SULLENGER** [7] -
17:24, 32:14, 32:17,
47:2, 56:25, 57:21,
113:12
**Sullenger** [2] - 2:4,
2:4
**summer** [3] - 16:25,
17:2, 17:3
**Sumner** [9] - 1:8,
4:13, 67:25, 102:3,
102:5, 102:14,
103:23, 104:2, 112:23
**Sunday** [4] - 13:18,
14:8, 14:10, 14:21
**super** [1] - 60:11
**supervise** [1] -
112:21
**supervisor** [2] -
16:25, 42:16
**supplied** [1] - 58:21
**support** [5] - 67:23,
109:9, 112:5, 112:11,
113:1
**supports** [1] -
112:18
**surgery** [1] - 95:3
**surprise** [1] - 30:22,
30:24
**surprising** [1] - 43:6
**suspected** [1] -
31:25
**suspecting** [1] -
43:10
**suspicion** [1] - 28:22
**sustain** [1] - 98:1
**sweat** [2] - 85:13,
85:21, 86:13
**sweating** [9] - 84:15,

85:2, 85:5, 85:6,
85:14, 85:16, 85:24,
86:2, 86:8
**swerving** [1] - 78:15
**sworn** [2] - 4:2,
115:6
**symptoms** [3] -
89:19, 89:24, 94:25

**T**

**T-boned** [2] - 93:20,
93:25
**tags** [1] - 100:7
**tall** [1] - 6:9
**tax** [2] - 113:3, 113:5
**team** [8] - 21:7, 21:8,
21:17, 43:18, 88:12,
88:16, 98:22
**tear** [1] - 86:9
**teared** [1] - 86:9
**tearing** [3] - 84:16,
85:8, 108:21
**tears** [4] - 84:25,
85:23, 86:4, 86:12
**teary** [1] - 84:8,
85:25, 86:1
**ten** [1] - 41:20
**terms** [1] - 40:8
**testified** [2] - 4:2,
41:23
**testify** [1] - 17:24
**thanking** [1] - 66:21
**THE** [4] - 18:2, 32:16,
32:22, 58:4
**therapy** [6] - 40:25,
41:6, 92:5, 92:24,
95:14, 95:15
**thereafter** [1] - 115:7
**thinking** [4] - 80:15,
88:21, 88:25, 91:16
**third** [1] - 101:7
**threat** [1] - 74:2
**threatened** [1] -
110:11
**three** [13] - 16:6,
36:21, 37:1, 37:17,
37:21, 38:8, 38:11,
38:18, 38:22, 41:22,
56:15, 68:21, 105:16
**throughout** [1] - 1:22
**today** [14] - 4:19,
4:21, 5:14, 6:7, 7:22,
8:14, 10:16, 10:19,
22:16, 42:3, 55:7,
57:11, 86:16, 113:13
**together** [1] - 10:23
**tone** [1] - 52:5
**took** [10] - 33:21,
46:11, 52:12, 59:11,

59:21, 75:6, 86:23,
88:24, 89:13, 106:14
**tools** [1] - 50:23
**top** [1] - 92:12
**totally** [1] - 8:8
**tournament** [1] -
43:19
**toward** [3] - 9:4,
37:6, 84:6
**town** [1] - 41:16
**traffic** [2] - 80:13,
80:16
**train** [1] - 112:21
**trained** [1] - 111:20
**transcribed** [1] -
115:7
**transcript** [1] - 115:5
**transportation** [1] -
93:21
**travel** [1] - 21:7
**treat** [1] - 34:12
**treated** [4] - 57:17,
59:7, 59:8, 100:16
**treatment** [1] - 98:15
**treats** [1] - 57:6
**tried** [1] - 45:12
**trigger** [1] - 57:18
**triggering** [1] - 59:13
**trip** [1] - 26:21
**true** [2] - 42:8, 115:4
**trunk** [9] - 65:19,
65:22, 65:25, 66:4,
66:10, 66:16, 68:7,
83:19, 83:22
**truthful** [3] - 5:10,
5:15, 5:24
**try** [8] - 45:3, 58:3,
61:23, 88:6, 89:10,
90:1, 91:20, 93:9
**trying** [17] - 32:17,
32:19, 41:6, 54:19,
59:16, 75:10, 81:18,
81:19, 81:20, 87:2,
87:6, 88:15, 91:13,
97:12, 97:15, 110:23,
110:25
**turn** [2] - 24:4, 91:19
**turned** [8] - 25:8,
27:13, 77:3, 77:10,
77:13, 77:14, 77:15,
99:24
**turning** [1] - 90:2
**turns** [1] - 25:19
**twelfth** [1] - 7:6
**two** [18] - 12:8,
12:14, 12:15, 12:17,
12:19, 12:24, 18:11,
19:5, 26:6, 29:10,
71:8, 71:9, 82:21,
83:4, 101:6, 105:15,

106:12, 113:24
**two-page** [1] -
113:24
**type** [15] - 5:22, 6:23,
11:24, 13:1, 26:2,
39:3, 40:1, 59:13,
88:6, 90:10, 92:4,
94:25, 98:12, 109:22,
110:19
**typed** [1] - 84:4
**typically** [1] - 93:12

## U

**ultimately** [1] - 79:7
**uncle** [1] - 102:22
**uncomfortable** [2] -
51:18, 51:20
**under** [7] - 28:22,
71:19, 74:6, 78:11,
105:9, 105:23, 115:15
**understandable** [1] -
5:4
**understood** [17] -
5:10, 24:11, 24:15,
24:19, 32:1, 33:12,
44:16, 44:22, 57:4,
72:2, 72:18, 73:23,
73:24, 79:23, 101:22,
103:5, 105:6
**UNITED** [1] - 1:1
**unnecessary** [1] -
34:17
**unofficial** [1] - 23:7
**unprofessional** [5] -
34:9, 35:16, 52:8,
52:10, 64:7
**unprofessionally** [1]
- 37:6
**unquote** [5] - 42:7,
45:18, 46:4, 48:3,
84:12
**unreasonable** [3] -
34:17, 34:23, 35:16
**unrestricted** [1] - 8:8
**unsure** [2] - 62:20,
76:17
**Up** [2] - 21:9, 21:11
**up** [45] - 16:11,
17:22, 19:14, 19:15,
21:14, 21:22, 27:3,
27:25, 28:5, 34:21,
35:24, 36:2, 38:21,
39:18, 45:11, 55:19,
61:25, 62:9, 64:9,
67:12, 69:6, 70:17,
75:1, 75:3, 75:25,
76:6, 76:15, 77:25,
78:10, 79:12, 83:24,
84:16, 85:8, 86:9,
88:24, 89:14, 92:23,

95:19, 101:10,
101:12, 103:3,
106:22, 107:19,
108:21
**UP** [1] - 21:13
**upper** [1] - 87:11
**upset** [6] - 62:20,
84:7, 84:13, 84:17,
87:5, 87:9
**urgent** [1] - 93:13
**usable** [1] - 26:14

## V

**valid** [2] - 7:22, 8:1
**Valley** [1] - 1:24
**vehicle** [69] - 23:20,
23:21, 23:22, 24:13,
24:16, 25:18, 25:22,
26:2, 26:5, 27:22,
28:1, 28:2, 28:13,
28:14, 29:17, 29:21,
32:2, 33:1, 33:2,
33:13, 33:15, 33:22,
34:1, 34:3, 34:21,
36:6, 44:17, 45:13,
49:6, 49:10, 49:11,
50:14, 55:3, 60:2,
63:2, 66:17, 68:23,
69:5, 70:13, 71:25,
73:3, 74:17, 75:18,
76:7, 76:8, 76:10,
76:18, 79:12, 79:25,
80:3, 80:22, 81:4,
81:9, 81:12, 81:22,
82:1, 82:4, 82:7,
82:10, 82:15, 82:18,
82:20, 82:25, 83:24,
94:14
**vehicles** [1] - 26:23
**verification** [1] -
105:8
**verified** [1] - 108:9
**via** [1] - 110:24
**video** [114] - 8:13,
8:17, 9:5, 9:8, 9:14,
9:20, 9:24, 9:25, 10:1,
12:10, 12:16, 12:25,
13:3, 15:8, 48:15,
48:16, 48:19, 48:21,
51:1, 51:5, 51:10,
54:10, 54:21, 55:2,
55:10, 55:19, 56:10,
56:11, 58:7, 58:25,
60:5, 60:17, 60:20,
60:23, 61:13, 61:16,
62:13, 62:19, 62:23,
62:24, 63:3, 63:11,
63:12, 63:15, 63:22,
64:4, 64:7, 64:11,
64:18, 64:23, 65:3,

65:8, 65:11, 66:12,
66:20, 67:1, 67:11,
67:12, 67:21, 68:2,
69:4, 69:5, 69:6,
69:10, 69:14, 69:15,
69:17, 69:24, 70:4,
70:11, 70:22, 71:7,
71:12, 71:24, 73:10,
74:14, 75:12, 75:13,
76:5, 76:14, 76:16,
76:19, 76:21, 76:23,
77:11, 77:20, 78:5,
78:6, 79:5, 79:21,
80:5, 80:19, 81:6,
81:14, 81:19, 81:24,
82:7, 82:13, 84:24,
85:1, 85:8, 86:15,
86:16, 86:22, 87:15,
102:14, 107:23,
109:18, 114:2, 114:4,
114:7
**Video** [1] - 62:3
**videos** [4] - 12:24,
71:8, 71:9, 85:4
**view** [2] - 59:16,
62:25
**violate** [1] - 48:7
**violated** [3] - 48:5,
52:13, 84:10
**violation** [8] - 24:15,
80:12, 80:16, 100:13,
101:23, 112:3, 112:8,
112:15
**violence** [1] - 59:19
**Virginia** [3] - 25:16,
77:22, 78:8
**visible** [1] - 33:4
**voice** [1] - 52:5

## W

**walked** [3] - 28:5,
76:20, 82:6
**walking** [1] - 77:8
**wants** [1] - 91:21
**watch** [2] - 44:14,
75:9
**watched** [5] - 62:24,
67:13, 69:16, 71:12,
84:24
**watching** [2] - 76:14,
76:15
**weak** [1] - 109:19
**wear** [3] - 6:23, 8:5,
24:12
**wearing** [3] - 6:20,
24:8, 24:17
**week** [1] - 18:16
**weeks** [1] - 107:18
**weigh** [1] - 6:11
**weight** [2] - 6:13,

6:21
**welding** [1] - 7:19
**Wes** [1] - 2:4
**WESTERN** [1] - 1:1
**western** [1] - 1:22
**whatsoever** [1] -
98:24
**whichever** [1] -
12:25
**whole** [2] - 50:22,
78:21
**window** [3] - 41:21,
42:11, 54:20
**wiped** [4] - 86:3,
86:4, 86:12
**wiping** [1] - 85:9
**wise** [1] - 93:7
**WITNESS** [4] - 18:2,
32:16, 32:22, 58:4
**witness** [4] - 4:1,
115:6, 115:8
**woman** [1] - 92:16
**wondering** [1] - 83:4
**words** [6] - 23:24,
29:10, 34:19, 35:14,
53:14, 72:8
**works** [2] - 98:22,
111:17
**worried** [1] - 87:9
**worse** [3] - 90:16,
90:20, 97:22
**worst** [1] - 90:14
**wreck** [18] - 86:25,
93:16, 93:19, 95:1,
95:6, 95:10, 95:21,
96:9, 96:12, 97:18,
97:24, 97:25, 98:2,
98:5, 98:7, 98:18,
106:18, 106:22
**wrecks** [2] - 106:9,
106:12
**wrenching** [1] -
61:12
**wrist** [8] - 89:7,
89:12, 89:20, 106:14,
106:25, 107:22,
107:24, 107:25
**writing** [1] - 48:10
**written** [1] - 40:15
**wrote** [1] - 111:5

## Y

**year** [5] - 7:9, 38:16,
88:14, 101:1, 107:11
**years** [6] - 6:8, 38:17,
38:18, 107:14,
107:15, 113:5
**yelled** [2] - 77:2, 77:6
**yelling** [2] - 77:7,

77:15
**YMCA** [3] - 16:23,
17:11, 20:24
**yourself** [4] - 10:15,
14:1, 14:22, 37:8
**youth** [2] - 43:15,
43:17

## Z

**Zachary** [1] - 1:7
**Zakia** [1] - 10:16
**ZAKIA** [1] - 10:16

**Wes Sullenger**



EXHIBIT
PENGAD 800-631-6989
McKNight

| | |
|---|---|
| **From:** | Wes Sullenger |
| **Sent:** | Tuesday, April 11, 2023 10:32 PM |
| **To:** | Wes Sullenger |
| **Subject:** | It was august 3 , 2022 8:20 AM a normal morning of me being a father getting m |

It was august 3 , 2022 8:20 AM a normal morning of me being a father getting my son dressed and ready to be dropped off at daycare with my girlfriend. We head over to his daycare which is on millbrooke drive. After dropping him off and getting to the end of the street about to turn on Pyle Lane when I observed a police officer sitting across the street at Indian Hills elementary proceeded to turn right but he also turned out behind me in my direction. He continued to follow me to the other side of town where I was pulled over at the Hopkinsville brewing company which is 8-10 minutes or 3 + miles away from where we seen each other at. After being pulled over he stated that I was pulled over for my seatbelt. While talking to me he observed my firearm in the middle console and his eyes quickly lit up and got wide like he seen a ghost. What was a simple sealbelt traffic stop quickly turned into him saying he smells weed all of a sudden and needs to remove my firearm from my vehicle even after I told him my firearm was registered and it was in plain sight & easily visible so I didn't understand why he wanted to remove my legal firearm. He proceeded to go on saying he smellled marijuana asking me if I had any on me or in my vehicle I stated I did not have any marijuana and that I hadn't even smoked marijuana in the car. I told him that the day before was the last time I smoked marijuana which was none of his business because it had nothing to do with the traffic stop. He asks me to step out of the vehicle and then my girlfriend & we stepped to the back of the car in front of his police cruiser. While sitting at the front of the police cruiser another officer pulls up to the scene. Upon arrival, the other police officer asked me to put my phone away and I asked him was it a law that I had to put my phone away since I'm not under arrest and I'm not being detained. He told me I was being detained. Even though I was never searched once or even patted down I knew I wasn't detained. To be pulled over and accused of having marijuana but not once did they search my person or even pat me or my girlfriend down was confusing to me because we could've got right back in the car with whatever he claimed to have smelled. I didn't want nothing to go further than it already had over a seatbelt. I put my phone away and I hackle the officers stating they could be solving crimes or protecting somebody instead they are harassing some one who is active in the community and a youth sports coach who had just had 6-8 police officers come to his youth basketball practice and practiced against & donated money to my boys basketball team to travel to Gatlinburg and play in a tournament. After the search looked to be done because the police officer who pulled me over went back to his vehicle I asked him was everything done and what was going on he stated that he was doing my traffic ticket and letting me go. After hearing that I turned around and grabbed my phone which was behind me on the front of his cruiser. Officer Cortez which is the officer who came on the scene AFTER I got pulled over told me again to put my phone away even though they didn't find anything illegal in the vehicle no marijuana or anything. I told him no everything was over and I'm not putting my phone away. He goes to to told me get off my phone and that he didn't have to say anything to my girlfriend about her phone which was in her hand the whole time on record. After refusing to put the phone away he approached me and took one of his hands and grabbed my hand squeezing it showing his dominance and making me feel fearful then took his other hand and snatched my phone away. I Immediately told him I was recording it on Facebook live and that he better hope he know what he just did was illegal and wrong. Upset, Shaking, Scared, & Teary eyed I told him he would hear about this and I would make sure he heard from my lawyer because he just violated my rights he told me he didn't care and he told me put my phone away. A simple traffic stop for a seatbelt turned drastic. I've never been so scared to be in police presence until after that day. That situation haunts me it had changed my outlook on the ones who I looked to protect and serve. Someone I looked at as the authority figure now has me steering clear of any encounters scared of what may happen next. Once in the car my girlfriend tried to calm me down but I was so shook and upset I couldn't stop shaking. After calming down nearly 4-5 hours later I asked her was she scared and she said yes she didn't know how nothing was going to go since everything was getting heated and out of hand. I explained to her that I didn't do anything wrong and I would never put her in any situation that would put her in harms way. We both agreed that we feared for each others safety but luckily my son wasn't in the car to be apart of this nightmare. Moving forward I wouldn't want to be around any more police officers or nobody that I look at as an authority figure off of this traffic stop. This traffic stop altered my

1

life it changed the way I interact with people it of authority. I try my best to avoid police and anybody with authority period. For the first 2-3 nights after the incident I was eating or sleeping as much. Getting worried my girlfriend would stay up with me until I fell asleep or until she seen me eat something which ever came first. Til this day I still think about that stop. Wondering if I had a bad temper and tried to wrestle my phone back would he have shot me. Would he have wrestled me to the ground and put his knee in my neck in front of my childs mother. I tried therapy to help me with my mental stress and I had no insurance to help pay for my therapy that is very much still needed to this day. Parents of my basketball team seen the video on Facebook and quickly realized that it was taking a toll on me. I was coming to practice not speaking as much or being as active with my players like I normally would. I've never feared for my life or felt like I had to until august 3 2022. Worst day of my life. Scariest day of my life. Police are hear to protect and serve! Not over power you and make you feel like your life is on the line. I hope officers & citizens around the world & in my city of Hopkinsville can one day see my video and learn from it. Officers learning to keep they cool and to stay the authority figure and not to make citizens feel like they life is in danger. I hope citizens can watch this video as well and see that keeping a cool head is very important in police interactions because they are human just like us but sometimes they forget that they are human. They will abuse their power and authority in anyway they can. Being trained you would think they know how to handle situations especially ones that are none threatening to them. I didn't have my firearm or anything so him taking my phone after already taking my legal firearm mad me nervous and ask what's next. As for the officers they can't say I was ever a threat. Never said anything threatening towards them once. This situation has changed me mentally and it's hindering me from being who I am at heart. This encounter has permanently scarred me for the rest of my life.

daquavian mcknight

--

D. Wes Sullenger, esq.
Sullenger Law Office, PLLC
2508 Jackson Street
Paducah, KY 42003
(270) 443-9401

This message has been sent from a law firm and may contain information that is confidential or privileged. If you are not the intended recipient, please advise the sender immediately by reply e-mail and delete this message and any attachments without retaining a copy. Please advise immediately if you or your employer do not want us to use Internet e-mail for future messages of this kind. Thank you.

DM000002